# 12-4671(L),

**12-4708(CON), 12-4765(CON), 13-4719(CON), 13-4750(CON), 13-4751(CON), 13-4752(CON), 14-0032(CON), 14-0117(CON), 14-0119(CON), 14-0133(CON), 14-0157(CON), 14-0159(CON), 14-0192(CON), 14-0197(CON), 14-0219(CON), 14-0225(CON), 14-0241(CON), 14-0250(CON), 14-0266(CON), 14-0303(CON), 14-0331(CON), 14-0349(CON), 14-0379(CON), 14-0443(CON), 14-0404(CON), 14-0422(CON), 14-0480(CON), 14-0497(CON), 14-0530(CON), 14-0567(CON), 14-0584(CON), 14-0606(CON), 14-0663(CON), 14-0837(CON)**

## United States Court of Appeals

### for the

### Second Circuit

⬩◗◖⬩

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR APPELLANT
## RETAILERS AND MERCHANTS OBJECTORS

PARKER WAICHMAN, LLP
6 Harbor Park Drive
Port Washington, New York 11050
(516) 723-4620

THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, Arkansas 72201
(501) 374-1058

DUNCAN FIRM, P.A.
900 S. Shackleford, Suite 725
Little Rock, Arkansas 72211
(501) 228-7600

*Attorneys for Appellant Retailers and Merchants Objectors*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................... 2

STATEMENT OF THE CASE .................................................................. 3

SUMMARY OF THE ARGUMENT ......................................................... 10

ARGUMENT ..................................................................................... 12

I.      Standard Of Review .................................................................. 12

II.     The Notice Of The Settlement Received By Class Members Was
        Constitutionally Infirm ............................................................. 13

        A.      Because the structure of the Settlement makes it impossible for Class
                Members to understand how the decision to opt-out will affect their
                claims for future damages, Class Members deserve new notice and
                another opportunity to opt-out, in order to allow them to make an
                informed, intelligent decision of whether to participate in the
                Settlement .......................................................................... 13

        B.      Where the plain terms of the Notice and the Settlement documents
                describing the release of future claims contradict with the Named
                Parties' representations made at the Fairness Hearing regarding the
                breadth of the Settlement's Releases, Class Members are entitled to
                new notice clarifying and accurately describing the Releases and
                Settlement.. ........................................................................ 18

        C.      The Notice inaccurately described the benefits of the Settlement to the
                Class, thereby depriving Class Members of the ability to make
                informed, intelligent decisions of whether to participate in or opt-out
                of the 23(b)(3) Class, in violation of their constitutional due process
                rights ................................................................................ 20

                1.      The Notice contained numerous false claims ......................... 20

                2.      The false claims in the Notice prevented Class Members from
                        making informed decisions whether to opt-out of the 23(b)(3)
                        Class and therefore violated their due process rights ............. 23

III.    The Substantive Terms Of The Settlement Are Not "Fair, Reasonable, And Adequate," Where Essential "Benefits" It Supposes To Confer Upon The Class Are Worthless To Many, If Not Most, Class Members ..................... 26

    A.    Background ....................................................................... 26

    B.    The district court committed error by certifying a mandatory settlement class that received injunctive relief that many within the class cannot use ............................................................... 28

        1.    105 Degrees should not have been forced to relinquish valuable rights in exchange for surcharging relief it is precluded from using ..................................................................... 30

        2.    Whole Hog should not have been forced to relinquish valuable rights in exchange for surcharging relief it is precluded from using ..................................................................... 38

CONCLUSION .................................................................... 43

CERTIFICATE OF COMPLIANCE .................................... 45

# TABLE OF AUTHORITIES

## Cases

*Albertson's, Inc. v. Amalgamated Sugar Co.*,
503 F.2d 459 (10th Cir. 1974) .......................................................... 34

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591, 117 S. Ct. 2231 (1997).................................... 13, 23, 25

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) .................................... 29

*Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992) ................................. 14

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*,
624 F.3d 185 (5th Cir. 2010) .......................................................... 34

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S. Ct. 1925 (1980) ......... 39

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 154, 94 S. Ct. 2140 (1974) .................... 14

*Eubank v. Pella Corp.*, Nos. 13-2091, -2133, -2136, -2162, -2202,
2014 WL 2444388 (7th Cir. June 2, 2014) ................................................ 17, 23

*Gerber v. MTC Elec. Tech. Co.*, 329 F.3d 297 (2d Cir. 2003) ............................ 13

*In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740 (E.D.N.Y. 1984).......... 23

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) .................... 17, 18

*In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010)..................... 24

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)............................................................ 25

*In re Managerial, Prof'l & Technical Emps.*,
No. MDL 1471, 02-CV-2924, 2006 WL 38937 (D.N.J. Jan. 5, 2006)............. 34

*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*,
957 F.2d 1020, 1026 (2d. Cir. 1992) .................................................... 12,13

## Cases (cont.)

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977)............ 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720, 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)............. *passim*

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011)........... 34

*Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000) ............ 28

*Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*,
    No. 96-CV-3839, 1997 WL 166497 (S.D.N.Y. Apr. 9, 1997) .................... 9, 16

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295 ....................... 12, 23, 29

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ......................................... 14

*Robinson v. Metro-N Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) ............. 28

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150, 60 S. Ct. 811 (1940)................................................................. 39

*Vasalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013) ................... 23, 24

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2341 (2011) ............................... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ............... 25

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ........................................... 13

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) ................................... 13

## Rules

Federal Rule of Civil Procedure 23(b)(2) ....................................................... *passim*

Federal Rule of Civil Procedure 23(b)(3) ....................................................... *passim*

Federal Rule of Civil Procedure 23(e)(2) ..................................................... 3, 8, 27

## <u>Other Authorities</u>

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure* § 1787 (3d ed. 2005).................................... 19

7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure* § 1797.6 (3d ed. 2005)........................... 23 n.8

5 James Wm. Moore et al., *Moore's Federal Practice*
§ 23.162[3] (3d ed. 2013) ......................................................................... 24 n.8

3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*
§§ 8:32, 8:39 (4th ed. 2002)...................................................................... 24 n.8

## <u>JURISDICTIONAL STATEMENT</u>

The R&M Objectors objected to this class action settlement (the "Settlement") in the district court (JA _____, _____ (DE 2281, 2421)), and they timely appealed from the Settlement's approval (JA _____, _____ (DE 6175, 6263)).

The R&M Objectors otherwise adopt the Jurisdictional Statement from the Joint Merchant Appellants' Brief (the "JMA Brief").

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

I.   The Notice Of The Settlement Received By Class Members Was Constitutionally Infirm.

    A.   Because the structure of the Settlement makes it impossible for Class Members to understand how the decision to opt-out will affect their claims for future damages, Class Members deserve new notice and another opportunity to opt-out, in order to allow them to make an informed, intelligent decision of whether to participate in the Settlement.

    B.   Where the plain terms of the Notice and the Settlement documents describing the release of future claims contradict the Named Parties' representations made at the Fairness Hearing regarding the breadth of the Settlement's Releases, Class Members are entitled to new notice clarifying and accurately describing the Releases and Settlement.

    C.   The Notice inaccurately described the benefits of the Settlement to the Class, thereby depriving Class Members of the ability to make informed, intelligent decisions of whether to participate in or opt-out of the 23(b)(3) Class, in violation of their constitutional due process rights

II.  The Substantive Terms Of The Settlement Are Not "Fair, Reasonable, And Adequate," Where Essential "Benefits" It Supposes To Confer Upon The Class Are Worthless To Many, If Not Most, Class Members.

2

## STATEMENT OF THE CASE

The R&M Objectors are a broad-based, diverse group of 65 separate business entities operating more than 150 retail outlets in 13 states across the country. All of the R&M Objectors pay interchange, or "swipe," fees when they accept payment by credit card for goods sold to consumers. They all ask this Court to invalidate the oppressive and onerous class action Settlement to which they objected before its approval by Judge John Gleeson of the United States District Court for the Eastern District of New York. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013).

As convincingly set forth in the JMA Brief and the industry brief on the fairness of the Settlement filed by the Retail Industry Leaders Association ("RILA") and the National Retail Federation ("NRF"), the substantive terms of this Settlement fall short not only of constitutional requirements, but also of the baseline procedural command that any compromise of claims binding absentee class members be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The R&M Objectors wholeheartedly join in the JMA Brief, along with the brief filed by RILA and the NRF.

The R&M Objectors write separately, however, to emphasize the inadequacy of the Notice they received of the Settlement and to highlight the due process

3

shortcomings of a Settlement featuring benefits that were falsely represented in the Notice to Class Members and are of ***no value*** to many of them.

## I.     <u>The Deficient Notice</u>

Established law teaches that the Settlement is invalid given the failure of its Notice to (i) provide absent Class Members with their constitutional right to opt-out of classes involving monetary damages, (ii) adequately describe the breadth of applicable releases, and (iii) accurately inform Class Members of what the Settlement achieves.

### A.     <u>The Notice Did Not Provide Class Members With Their Constitutional Right To Opt-Out Of Classes Affecting Claims For Monetary Damages</u>

Even though the U.S. Constitution demands that absentee class members receive an opportunity to make an informed decision of whether to exclude themselves from a settlement that bargains away their claims for monetary damages, the Notice in this litigation did not – as a practical matter – afford them that right.  This Brief demonstrates that a Class Member attempting to decrypt the deficient Notice here could not have made a rational, informed decision on whether to exercise "opt-out" rights, considering that the underlying Settlement made any opt-out election pointless when it purported to release all future damages claims on behalf of both of the substantially overlapping classes certified under, respectively,

Rule 23(b)(2) and 23(b)(3) of the Federal Rule of Civil Procedure. (JA _____ (Notice ¶¶ 25-26, at 18-27).)

The release of future claims is by far the most significant feature of this deal to the R&M Objectors,[1] and each of them would have elected ***not*** to participate in this Settlement if that could have preserved the ability to bring a future claim for damages. Significantly, though, the Notice informed them that their right to opt-out and avoid the release of future claims only extended to the Rule 23(b)(3) class, with the release of future claims contained in the Rule 23(b)(2) class presented as "mandatory" with no right to opt-out. (JA __ (Notice ¶¶ 12-13, at 11-12).)

Given this scenario, which renders meaningless any decision to opt-out, it is easy to see why some R&M objectors decided to remain a part of the 23(b)(3) class, on the theory that they may as well collect some compensation – however nominal – for their sacrifice of substantial rights. Others elected to withdraw from the (b)(3) class, in the hope that the courts would eventually recognize the constitutional infirmities in the purported release of future damages claims under Rule 23(b)(2), and not wanting to have consented to the release of future claims by not opting out of the (b)(3) class should that judicial relief occur. Basically, the Notice, as drafted, placed the R&M Objectors, and all Class Members, in an impossible position, unable in the circumstances to make any rational

---

[1] In light of the amount and content of objections to this Settlement, it appears that the same is true for a significant portion, if not a majority, of Class Members.

determination as to how to best protect their rights.  (*See, e.g.,* JA ____ (DE   2422, Notice of Opt-Outs, at 1).)

B.    The Notice Did Not Adequately Describe The Breadth Of Its Releases

The express wording of the Releases, as reproduced in the Notice (JA _____ (Notice ¶¶ 25-26, at 18-27)), claims to bar all future claims regarding "*any Rule* of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's entry of the Class Settlement Preliminary Approval Order" or "any . . . substantially similar . . . Rule."  (SPA 135-36, 171 (Settlement Agreement ¶¶ 33(g), (h); 68(g), (h) (emphasis added)).)  The R&M Objectors, as with any reasonable Class Member, took this language to mean what it says: Based on the terms of the Settlement, merchants would be forever prohibited from challenging any of Defendants' voluminous rules then in effect and any similar rules adopted in the future.

At the Final Approval Hearing, though, counsel advocating the Settlement vigorously denied that the Releases are so sweeping.  (*See, e.g.*, JA ___ (Tr.    Final Approval Hr'g 33-36).)  As one attorney for Defendants put it, the notion that the Releases "cover every rule . . . in the Master Card rule book" is just "wrong."  (JA _ (Tr. Final Approval Hr'g 36 ll.10-11).)  Taking him at his word, and assuming that the Releases are not as vast as their own language suggests, Class Members are entitled to new notice explaining the correct terms of the Settlement, and allowing

6

Class Members to make an informed decision on whether to opt-out or stay in the classes.

      C.     <u>The Notice Improperly Assumed Credit For Independent Occurrences</u>

The first page of the Notice summarizes the terms of the injunctive relief for the (b)(2) class:

- **The settlement will also require Visa and MasterCard to change some rules for merchants who accept their cards, including to allow merchants to do the following:**
  - **Charge customers an extra fee if they pay with Visa or MasterCard credit cards,**
  - **Offer discounts to customers who pay with payment forms less expensive than Visa or MasterCard credit or debit cards,**
  - **Accept Visa or MasterCard cards at fewer than all of the merchant's trade names or banners, and**
  - **Form "buying groups" that meet certain criteria to negotiate with Visa and MasterCard.**

(JA ___ (DE 1656-1, Notice, Sett. F-1).)

The publication notice contained the same summary:

7

**OTHER BENEFITS FOR MERCHANTS**

Merchants will benefit from changes to certain MasterCard and Visa rules, which will allow merchants to, among other things:

* Charge customers an extra fee if they pay with Visa or MasterCard credit cards,

* Offer discounts to customers who do not pay with Visa or MasterCard credit or debit cards, and

* Form buying groups that meet certain criteria to negotiate with Visa and MasterCard.

Merchants that operate multiple businesses under different trade names or banners will also be able to accept Visa or MasterCard at fewer than all of the merchant's trade names and banners.

(JA__ (DE 1656-1, F1-2).)

With one exception, each of these claims was false.

## II.     Because Critical Provisions Of The Settlement Are Unavailable, And Therefore Worthless, To Many Class Members, The Settlement Is Not "Fair, Reasonable, and Adequate"

Aside from the crippling flaws in the Notice, the terms of the Settlement reveal that it is anything but "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The many reasons advanced in the JMA Brief make it plain that the Settlement fails this basic standard mandated by Rule 23, but the unfairness, unreasonableness, and inadequacy of the Settlement is especially apparent when its provisions are applied to Class Members such as the Oklahoma enterprise known

8

as 105 Degrees, LLC ("105 Degrees") and the northwest Arkansas restaurants doing business as Whole Hog Barbecue ("Whole Hog").[2]

As shown by the succeeding portions of this Brief, neither of these businesses is in a position to benefit from key components of the Settlement, yet each is required to relinquish valuable rights in return for others that do not apply to them and many other Class Members. The district court recognized that scores of Class Members are in this same predicament (SPA 38-41 (Opinion, 2013 WL 6510737, at *18-20)), but the court nonetheless ratified a Settlement lacking in consideration to many Class Members. The R&M Objectors respectfully submit that the ability of select Class Members to fully enjoy all aspects of the Settlement, while many of their peers have no opportunity to share in the same relief, destroys the cohesion necessary for the certification of a settlement class under Rule 23(b)(2).

In the final analysis, the JMA Brief establishes that the ostensible release of damages claims by the Rule 23(b)(2) settlement class cannot stand, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2559 (2011) ("[I]ndividualized monetary claims belong in Rule 23(b)(3)."), and the release of future antitrust causes of action by its Rule 23(b)(3) counterpart is equally as tenuous, *see Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, No. 96-CV-3839 (MBM), 1997 WL 166497, at *3

---

[2] The Grady Corporation and The Grady Corporation II operate, respectively, as Whole Hog Barbecue in the cities of Bentonville and Fayetteville, Arkansas.

(S.D.N.Y. Apr. 9, 1997) ("[A] prospective waiver of an antitrust claim violates public policy."). Should this Court undo one, or both, of these releases, it would totally reshape Class Members' analysis of whether or not to exclude themselves from the 23(b)(3) class. Moreover, because the Settlement extends its benefits to only certain Class Members, while leaving others out in the cold, it does not provide the "uniform remedy" essential to the approval of a settlement under Rule 23(b)(2).

For these and other reasons addressed in this Brief, the R&M Objectors respectfully request that this Court reverse the district court's approval of this Settlement, remanding for further proceedings to include, at minimum, the issuance of a new notice clearly and accurately explaining the settlement and the scope of any releases.

## SUMMARY OF THE ARGUMENT

The Settlement and its Notice approved by the district court violated due process rights granted by the U.S. Constitution by releasing Class Members' ongoing and future damages claims without giving them an opportunity to opt-out of the Rule 23(b)(2) class.

Although the Notice did inform Class Members that they had an ability to opt-out of the class certified under Rule 23(b)(3), the Notice at the same time

advised that the Rule 23(b)(2) class – which also relinquished ongoing and future damages claims – offered no opt-out rights and was "mandatory." The structure of the Settlement therefore conflicts with the Supreme Court's instruction that "individualized monetary claims belong in Rule 23(b)(3)," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2341, 2558 (2011), and the Notice made it impossible for Class Members to make an informed and intelligent decision about whether to opt-out.

If it is the case that the Settlement's proponents accurately described the scope of the Releases at oral argument on final approval, the Notice did not accurately convey to Class Members the scope of the Releases being granted on their behalf. Moreover, the Notice incorrectly led Class Members to believe that approval of the Settlement would produce certain benefits when in fact those benefits already existed. This false and inaccurate description of the Settlement deprived Class Members of an opportunity to make an intelligent and informed decision to opt-out or stay in the class. Furthermore, the classes underlying the Settlement lacked the cohesion necessary for certification, in that key benefits generated by the Settlement could not be used by – and were therefore worthless to – many Class Members.

For all these reasons, along with others described in the JMA Brief, and in the RILA/NRF brief, the R&M Objectors respectfully request that this Court reverse the district court's certification of settlement classes under Rule 23(b)(2)

11

and (b)(3), and/or order the issuance of new Notice providing Class Members an effective opportunity to opt-out of classes involving claims for and/or releases of monetary damages, and which understandably and accurately describes the terms of the Settlement and the breadth of the Releases.

## ARGUMENT

## I. Standard Of Review

The review of a mandatory, settlement-only class – like the classes at issue here – should be searching. The Supreme Court has required this by instructing that a district court must act as a fiduciary for the class when applying *heightened scrutiny* to evaluate the threshold class certification question for a class action resolved by settlement. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999). "A court can endorse a settlement only if 'the compromise is fair, reasonable, and adequate.'" *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d. Cir. 1992) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (Friendly, J.)). This Court has further observed that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id.*

While a district court generally has discretion in deciding whether to approve a settlement, this Court reviews the district court's decision de novo where

an appellant's challenge to the authority of the district court to approve the settlement raises novel issues of law.  *In re Masters*, 957 F.2d at 1026; *Gerber v. MTC Elec. Tech. Co.*, 329 F.3d 297, 302 (2d Cir. 2003) (Sotomayor, C.J.); *Weinberger*, 698 F.2d at 73.  Moreover, "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions."  *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

In the end, a district court must separate the class certification inquiry from its consideration of the overall fairness of the settlement to avoid any "gestalt judgment or overarching impression of the settlement's fairness."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997).

## II.   The Notice Of The Settlement Received By Class Members Was Constitutionally Infirm

### A.   Because the structure of the Settlement makes it impossible for Class Members to understand how the decision to opt-out will affect their claims for future damages, Class Members deserve new notice and another opportunity to opt-out, in order to allow them to make an informed, intelligent decision of whether to participate in the Settlement

The United States Supreme Court has construed Rule 23(b)(3) to guarantee that "each class member shall be advised that he has the right to exclude himself

13

from the action on request." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 154, 173 (1974).  The Court has further held that the Constitution extends this fundamental right to "opt-out" to any class action affecting claims for money damages.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2341, 2558-59 (2011) (regarding the ability to opt-out as mandatory "in the context of a class action predominately for money damages," and acknowledging a "serious possibility" that the opt-out right is required even "where the monetary claims do not predominate"); *cf. Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992) (requiring "minimal due process . . . [i]n order to bind an absent plaintiff concerning a claim for money damages"), *cert. dismissed*, 511 U.S. 117 (1994).  As such, when it comes to a class action settlement touching upon class members' individual claims for monetary relief, "due process requires *at a minimum* that an absent plaintiff be provided with an opportunity to remove himself from the class."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (emphasis added).

The R&M Objectors, like all Class Members, were deprived of this most basic due process protection by the settlement, for they received no opportunity to opt-out of releases purporting to relinquish their right to bring future claims for money damages.  *Cf. Dukes*, 131 S. Ct. at 2558-2559; *Shutts*, 472 U.S. at 812.  The wholesale elimination of ongoing and future monetary claims by the (b)(3) and (b)(2) classes was the most important, and offensive, attribute of this settlement to

the R&M Objectors, but they were given no right to opt-out of the Settlement containing the release of future monetary claims.

Even if Class Members opted out of the class certified under Rule 23(b)(3), they would still be stuck with the objectionable release by virtue of the settlement engineered on behalf of the "mandatory" 23(b)(2) class.  With no way to avoid the only part of the Settlement that mattered to them, many Class Members who otherwise would have opted out undoubtedly did not do so because the effort would have been pointless.  The exercise of their constitutional right to opt-out would have offered Class Members no relief from the oppressive release, so why bother?  After all, if there is no way to prevent the release of future monetary claims, there is little reason to reject whatever meager reparations were available to individual Class Members under the 23(b)(3) settlement.

On the other hand, some of the millions of Class Members were assuredly aware of the Supreme Court's recent admonition that "individualized monetary claims belong in Rule 23(b)(3)," *Dukes*, 131 S. Ct. at 2558, and those Class Members may have opted out of the (b)(3) class on the expectation that a court would not allow a (b)(2) class to release ongoing and future monetary damages.  If that occurs, these Class Members did not want to have voluntarily consented to be in a (b)(3) class containing a release of future monetary damages.

15

What is more, the entire analysis changes if the release of future monetary damages in the (b)(2) class is disallowed.   The Joint Merchant Appellants' Brief has quite persuasively shown that the release of ongoing and future monetary damages claims for the 23(b)(2) class violated the Constitution, *see Dukes*, 131 S. Ct. at 2558 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)."), and this Court's adherence to that principle will totally reshape Class Members' evaluation of whether they should opt out of the Settlement.   In such a scenario, which would allow a Class Member to truly preserve future damages claims by opting out of the 23(b)(3) class – *without* being forced to accept the same outcome by way of 23(b)(2) – Class Members may very well decide to opt out even though they did not do so before.

The decisional process changes yet again should this Court invalidate the future damages releases under *both* 23(b)(2) and 23(b)(3), which is very possible. *See Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, No. 96-CV-3839 (MBM), 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("[A] prospective waiver of an antitrust claim violates public policy.").   In that instance, once the prospect of losing the right to bring future anti-trust claims against the Defendants has been removed from the equation, the same Class Member might determine that it makes sense to remain a part of the 23(b)(3) class and receive the settlement payment for

16

damages arising out of Defendants' past conduct.[3]  (*See, e.g.,* JA _____ (ECF   No. 2473 ¶ 10, at 3 (Objection of The Wendy's Company (stating that the "calculation concerning the value of opting out may have been different had we been permitted to challenge the ongoing imposition of interchange on Wendy's, as the going forward implications of this continuing damage is more important to our company than past damages")))).)

In the final analysis, the critical point is not how any particular Class Member may have assessed the situation, but that the Notice of settlement, as fashioned, made it impossible for anyone to make an "informed decision[] on whether . . . to . . . opt out of the class."  *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013).  In similar circumstances, Judge Posner was recently unimpressed that notice of a class action "provoked few objections" given that the named parties had crafted it so that "it was not intended to; *it was incomplete and misleading*."  *Eubank v. Pella Corp.*, Nos. 13-2091, -2133, -2136, 2162, 2202, 2014 WL 2444388, at *11 (7th Cir. June 2, 2014) (emphasis added).  The same is true here:  The Notice sent to Class Members "was not neutral and it did not provide a truthful basis for deciding whether to opt out."  *Id.*

---

[3] It is for these very reasons, with the import of their opt-outs fluctuating depending upon the courts' treatment of the releases of future damages claims, that the R&M Objectors submitted "conditional" opt-outs reserving the right to reconsider the decision as appropriate upon the outcome of the Courts' decision on the applicability of the release of future damages claims.  (*See* JA _____ (DE 2422)).

17

The R&M Objectors are confident that this Court will vindicate their due process rights in this appeal – much as the Seventh Circuit did for the class before it in *Eubank* – redefining the scope of the settlement of future claims to remove the release of future damages claims from either, or both, settlement classes. After this Court issues its opinion bringing clarity to this unresolved issue, the Class Members are entitled to new notice of the settlement advising them of the resolution of the issues surrounding the release of future damage claims and the extent of their right to opt-out of the Settlement. *See In re Baby Prods Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013); *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977) (insisting that notice "contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class").

### B.   <u>Where the plain terms of the Notice and the Settlement documents describing the release of future claims contradict with the Named Parties' representations made at the Fairness Hearing regarding the breadth of the Settlement's Releases, Class Members are entitled to new notice clarifying and accurately describing the Releases and Settlement</u>

The Notice sent to Class Members contained copies of the Releases included as part of the settlement, and those paragraphs purported to protect the Defendants from any future causes of action related to "the continued imposition of or adherence to [or conduct regarding] *any Rule* of any Visa Defendant or MasterCard Defendant in effect in the United States as of the date of the Court's

18

entry of the Class Settlement Preliminary Approval Order" or "any . . . substantially similar . . . Rule." (SPA 135-36, 171 (Settlement Agreement ¶¶ 33(g), (h); 68(g), (h) (emphasis added)).) A plain reading of this language informs Class Members that the proposed settlement bars a future challenge to "any" of the thousands of "Rule[s]" currently imposed by Defendants and any substantially similar ruled enacted in the future.[4] This reasonable interpretation, however, directly contradicts the repeated assurances of Class Counsel at the Fairness Hearing that the releases do not, in fact, extend to "any Rule" or substantially similar future rule under which Class Members operate. (*See, e.g.,* JA _____ (Tr. Final Approval Hr'g 33-36).).)

It is critical that any class notice be in an "understandable format," 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1787, at 511-12 (3d ed. 2005), and the affirmations of Class Counsel show that the Notice here violates that cardinal principle. If the releases cover something less than "any Rule" now in place, the Class Members must receive new notice explaining how this is so, and Class Members must have a right to reconsider their decisions to opt-out of what was, on its face, an overly broad

---

[4] The Releases not only covered *all* of Defendants current Rules, but also any future rules that are "substantially similar" to any existing Rules. (*E.g.*, Settlement Agreement ¶ 33(h).) Because Class Members cannot possibly know what rules Defendants may enact in the future, they are at a loss to determine the full extent of the Releases, and the future claims they propose to prohibit.

release.  This clarification is particularly essential given the reality that, in any future proceeding, Defendants are certain to argue for the broadest possible construction of the term, "any Rule" or "substantially similar" rule.

      **C.**    **<u>The Notice inaccurately described the benefits of the Settlement to the Class, thereby depriving Class Members of the ability to make informed, intelligent decisions of whether to participate in or opt-out of the 23(b)(3) Class, in violation of their constitutional due process rights</u>**

      1.    <u>The Notice Contained Numerous False Claims</u>

With the following representation appearing on its first page, the Notice falsely summarized the benefits of the Settlement:

> **The settlement will also require Visa and MasterCard to change some rules for merchants who accept their cards, including to allow merchants to do the following:**
>
> - **Charge customers an extra fee if they pay with Visa or MasterCard credit cards,**
>
> - **Offer discounts to customers who pay with payment forms less expensive than Visa or MasterCard credit or debit cards,**
>
> - **Accept Visa or MasterCard cards at fewer than all of the merchant's trade names or banners, and**
>
> - **Form "buying groups" that meet certain criteria to negotiate with Visa and MasterCard.**

(JA __ (Notice at 1).)  That the Settlement is responsible for these "change[s]" to various "rules" is repeated in the body of the Notice, in answer to the question,

"What do the members of the Rule Changes Settlement Class Get?"  (JA _____ (Notice at F-9).)[5]  In actuality, although the Notice states that the Settlement "will require" Visa and MasterCard to "change some rules . . . to allow merchants" to engage in these practices, merchants were already allowed to engage in all of them, except for surcharging, before the Settlement.

Most significantly, in 2010, "Visa and MasterCard . . . agreed to modify [their] 'no discount' and 'no discrimination' rules as part of the settlement of a lawsuit brought by the Department of Justice and certain state attorneys general" – not because of ***this*** Settlement.  (JA __ (DE 1551 at 18); SPA 139-40, 153 (Sett. ¶¶ 40, 53); JA _____ (DE 1656-1 at J-5).)

The false claim that the Settlement empowered merchants to discount for cheaper brands when, in fact, the DOJ provided that relief years earlier is far from the only misstatement in the Notice.  As another example, the Settlement purports to "require Visa and MasterCard to change some rules . . . to allow merchants to . . . [a]ccept Visa or MasterCard cards at fewer than all of the merchant's trade names

---

[5] The Notice states that, "[i]f the Court approves the settlement, Visa and MasterCard will make changes to their rules and practices . . ." and these "changes will benefit the Rule Changes Settlement Class."  (JA ___ (Notice at F-9).)   In addition to the "changes" outlined on the first page of the Notice, this section includes a reference to the "$10 Minimum Rule" – a rule which allows merchants to set up to a $10 minimum purchase for Visa and MasterCard credit cards that was mandated by the Durbin Amendment, not the Settlement.  *See* 15 U.S.C. § 1693o-2(b)(3) (prohibiting limitations on credit card minimums up to $10, provided the minimums do not differentiate between card network or issuing bank).

or banners" after preliminary approval, but that is another misstatement because Visa and MasterCard did not need to make **any** such rule changes inasmuch as the practice was not prohibited by their rules.[6]

The same was true for "buying groups." After obtaining preliminary approval of the proposed settlement – and sending out the Notice touting group buying benefits as a beneficial rules "change" the Settlement "will require" – Class Counsel admitted in final approval papers that "Visa and MasterCard rules did not previously prohibit merchants from engaging in joint negotiations." (JA ____ (DE 2111-1 at 39).) As with the "all outlets" rule, in the end, Visa and MasterCard did not find it necessary to change any rules to permit group buying.[7]

---

[6] *See* JA ____ (Shinder Decl. Ex. 76 (containing no modifications to any "all outlets" rule)); JA ___ (Shinder Decl. Ex. 77 (setting forth surcharging rule changes but including "all outlets" provision under "Additional MasterCard Rules and Policies Impacted by Settlement")); JA ____ (Shinder Decl. Ex. 78 (same, including trade name or banner provision under "Additional Practices and Policies")).

[7] *See* JA _____ (Shinder Decl. Ex. 76 (containing no new rules on buying groups)); JA _____ (Shinder Decl. Ex. 77 (setting forth surcharging rules changes but including group buying under "Additional MasterCard Rules and Policies Impacted by the Settlement"); JA ____ (Shinder Decl. Ex. 78 (same, including group buying under "Additional Practices and Policies").

2.    The False Claims In The Notice Violated Due Process

The Supreme Court has made it clear that notice of an impending class action settlement performs a critical due process function.  *See Amchem*, 521 U.S. at 628 (explaining that notice must be "sufficient under the Constitution and Rule 23"); *Ortiz*, 527 U.S. at 847-48 ("[D]ue process require[s] that the [absent class] member 'receive notice plus an opportunity to be heard and participate in the litigation,' and . . . that 'at a minimum . . . an absent plaintiff [must] be provided with an opportunity to remove himself from the class.'" (quoting *Shutts*, 472 U.S. at 812)).

To accord with due process, the information and notice must be objective, neutral and accurate to ensure that absent class members make informed decisions based on reliable information.  *See Eubank*, 2014 WL 2444388, at *11 (excoriating notice that "was not neutral and . . . did not provide a truthful basis for deciding whether to opt out"); *Vasalle v. Midland Funding LLC*, 708 F.3d 747, 759 n.2 (6th Cir. 2013) (right to opt out "illusory . . . when the class notice form failed to inform [unnamed class members] of their most significant ground of objection"); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 759 (E.D.N.Y. 1984) ("Notice must be 'scrupulously neutral' . . . .").[8]  A misleading or inaccurate notice calls

---

[8] *See also* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.6, at 213 (3d ed. 2005) ("[P]roposed notice that is incomplete or erroneous or that fails to apprise the absent class members of their

into question the integrity of the entire settlement, mandating disapproval. *Vasalle*, 708 F.3d at 759 (reversing approval of settlement where notice failed to satisfy due process); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198-99 (5th Cir. 2010) (rejecting misleading notice).

The Notice in this case failed to meet these standards. The Notice falsely attributed certain rules changes – including, most importantly, the no-discounting rule – to the Settlement, when those changes predated the Settlement. Such false claims cannot be considered "scrupulously neutral" or "accurate."

The problems created by the Notice are aggravated dramatically by the fact that the false claim about discounting was designed to obscure one of the central reasons why a mandatory class should never have been certified – that the surcharging relief at the heart of the Settlement was unavailable to a substantial portion of the class. Unlike surcharging, which is banned by at least 10 states, its close cousin, discounting, is permitted nationwide.[9] That being so, the false claim

---

rights . . . [is] ineffective to ensure due process."); 3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 8:39, at 282 (requiring clarity and objectivity); *id.* § 8:32, at 261 (requiring "accuracy and completeness"); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.162[3] (3d. ed. 2013) ("The right to object is meaningless if the class members lack information about the terms of the proposed settlement . . . .").

[9] While some economists have called out the close similarity between offering discounts for cheaper forms of payment and surcharging the more expensive tender types, the practices, and their impact on consumer behavior, are different. The Antitrust Division, for example, chose to challenge Visa's and MasterCard's rules against discounting and not their prohibitions against surcharging. *See United*

about discounting could have suppressed objections to the Settlement, thereby rendering the certification of a (b)(2) class all the more egregious.[10]  *Cf. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005) (describing the "favorable reaction of the overwhelming majority of class members" as "perhaps the most significant factor in our *Grinnell* inquiry").  Thus, the district court's failure to specifically consider the misstatements in the Notice is another instance of its failure to apply the required "heightened attention" to both the certification of the (b)(2) settlement class and the fairness of the settlement.  *See Amchem*, 521 U.S. at 620; *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

The district court's treatment of this issue is particularly troubling because the court implicitly, and erroneously, held that there is no due process right to truthful statements about the achievements of a settlement in the notice.  After noting that certain objectors complained about "false statements" concerning the achievements of the Settlement, the court held that there was no due process violation because the Notice accurately summarized *other* matters, including the litigation and the Settlement's terms.  (SPA 50-51 (Opinion, 2013 WL 6510737, at

---

*States v. Am. Express Co.*, 10-cv-04496 (NGG)(RER), DOJ Letter to Judge Garaufis, ECF No. 273, at 2 (E.D.N.Y. June 21, 2013).

[10] The false claims in the Notice may well have also suppressed the number of opt-outs and thus is relevant to the fairness and certification of the (b)(3) settlement class.  Nonetheless, the primary focus here is on the (b)(2) class, where the district court's obligation to closely review the settlement process is at its height.

*25-26).)   By approving the dissemination of such a blatantly, and materially, inaccurate Notice and by failing even to consider the effect of indisputably false statements about the achievements of the Settlement in the Notice provided to a class of merchants who had no right to opt out of the Settlement, the district court committed error as a matter of law.

### III.   The Substantive Terms Of The Settlement Are Not "Fair, Reasonable, And Adequate," Where Essential "Benefits" It Supposes To Confer Upon The Class Are Worthless To Many, If Not Most, Class Members

#### A.   Background

The district court recognized that the "heart" of the Settlement's rules changes are those lifting, subject to certain limits, the Visa and MasterCard prohibitions against surcharging, which would involve merchants passing along to consumers some portion of the higher cost attributable to credit card transactions. (SPA 15 (Opinion, 2013 WL 6510737, at *6).)  Because many R&M Objectors, like many Class Members, for various reasons are unable to derive any benefit from the "heart" of the Settlement, the agreement is nothing approaching "fair, reasonable, and adequate," as required by Rule 23.  Fed. R. Civ. P. 23(e)(2).

To be more specific, 105 Degrees is an R&M Objector operating in Oklahoma.   Along with nine other states, the State of Oklahoma prohibits surcharging, making the main injunctive relief of the Settlement unavailable to 105 Degrees and others like it.

The situation is similar for Whole Hog, one of the many R&M Objectors from Arkansas. Whole Hog must accept American Express to remain competitive, and that competing credit card effectively forbids surcharging, meaning that Whole Hog is subject to the Settlement's "'level-playing-field' provision, [which] conditions a merchant's ability to surcharge a Visa or MasterCard credit card on a requirement that it also surcharge other payments" such as American Express. (SPA 41 (Opinion, 2013 WL 6510737, at *20).)

Consequently, Whole Hog and 105 Degrees are similar to many merchants that, as the district court found, "will, as a practical matter, be precluded from surcharging Visa and MasterCard products." (*Id.*)

In exchange for a right to surcharge that they cannot use, the Class Representatives traded away rights that are meaningful to 105 Degrees and Whole Hog, such as their capacity to bring claims against Visa and MasterCard. Whole Hog and 105 Degrees objected to the Settlement because the predominant relief in the Settlement was of no value to them and because they consider the release of any claims they might have against Visa's and MasterCard's rules and practices, as of November 27, 2012, and all substantially similar rules and practices going forward, forever, as far too broad. Whole Hog and 105 Degrees opted out of the Rule 23(b)(3) class and would have opted out of the Rule 23(b)(2) class had they been permitted to do so.

27

2       Notwithstanding the objections of 105 Degrees and Whole Hog to the Settlement, the district court certified a Rule 23(b)(2) settlement class that included them.  It did so, concluding that the surcharging rules changes "affect all (b)(2) class members equally."   (SPA 52 n.20 (Opinion, 2013 WL 6510737, at *26 n.20).)  In reaching that conclusion, the district court disregarded their objections, and those of other merchants, which were based on the incontrovertible fact that valuable rights were being swapped for relief that is unavailable and useless to them.

## B.    The District Court Committed Error By Certifying A Mandatory Settlement Class That Received Injunctive Relief That Many Within The Class Cannot Use

Because a Rule 23(b)(2) class does not provide class members notice or opt-out rights, the law requires a higher degree of cohesion for such classes than it does for classes certified under Rule 23(b)(3), where notice and opt-out rights are provided.  *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 165 (2d Cir. 2001) (remarking that a Rule 23(b)(2) class is based on "a presumption of cohesion and unity between absent class members and the class representative such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process"); *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and

28

homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members."); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998) ("Indeed, a (b)(2) class may require more cohesiveness than a (b)(3) class.").

Moreover, the Supreme Court has made clear that a mandatory Rule 23(b)(2) class cannot be certified unless there is a "single injunction or declaratory judgment [that] would provide relief to each member of the class." *Dukes*, 131 S. Ct. at 2557; Fed. R. Civ. P. 23(b)(2) ("A class action may be maintained if[, among other things,] final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."). These requirements mean that persons should not be forced into a mandatory class when their interests diverge such that they would be interested in different claims and different relief from that negotiated by class representatives. As the Supreme Court has acknowledged, persons with different interests in the requested relief should not be forced into the same mandatory class when a settlement is negotiated "with results almost certainly different from the results that those with" different interests "would have chosen." *Ortiz*, 527 U.S. at 857.

Here, there can be no doubt that the many merchants that are precluded from surcharging would have chosen a different remedy from a limited right to surcharge that they cannot use. Indeed, that is exactly what objecting merchants

29

that cannot surcharge – such as 105 Degrees and Whole Hog – told the district court.  The district court committed error when it ignored these complaints to certify a mandatory Rule 23(b)(2) class.

1.  105 Degrees Should Not Have Been Forced To Relinquish Valuable Rights In Exchange For Surcharging Relief It Is Precluded From Using

105 Degrees cannot take advantage of the principal surcharging relief because it operates in Oklahoma, which prohibits surcharging.  This fact is undisputed and it, standing alone, should have ended any discussion of certifying a mandatory class that precludes 105 Degrees from pursuing its own individualized legal claims.  That the district court, nonetheless, certified a mandatory class – including numerous merchants who cannot surcharge even if they wanted to do so – cannot be squared with its obligation to apply "heightened scrutiny" and certify a Rule 23(b)(2) class only if "a single injunction or declaratory judgment would provide relief to each member of the class."  *Dukes*, 131 S. Ct. at 2557.

Given Oklahoma's ban on surcharging, Visa's and MasterCard's revisions to their surcharging rules are of no value to 105 Degrees.  Because of this legal ban on surcharging, Visa's and MasterCard's previous rules prohibiting surcharging were superfluous to 105 Degrees and its new rules permitting limited surcharging are irrelevant.  105 Degrees would have had absolutely no interest in asserting any claims that sought injunctive relief achieving such modifications to Visa's and

30

MasterCard's prohibitions on surcharging. Yet, 105 Degrees was given no opportunity to opt out of the mandatory Rule 23(b)(2) class that traded its ability to vindicate its rights in the future for useless surcharging relief. (*See, e.g.*, JA ____ (Settlement ¶¶ 1(nn), 2(b) (containing no exclusions for Rule 23(b)(2) class members)).)

The district court's rationale for concluding that the surcharging relief might eventually prove beneficial to 105 Degrees, and similarly situated merchants, is fatally flawed and inconsistent with the precedents cited above requiring a high degree of cohesion among members of a mandatory settlement class. *See, e.g., Dukes*, 131 S. Ct. at 2557 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").

Far from finding the injunctive relief indivisible, the district court found that the majority of the class would be "precluded" from using the limited right to surcharge either because of legal prohibitions or because of Visa's and MasterCard's agreement to align their surcharging restrictions with those of American Express. (SPA 38-41 (Opinion, 2013 WL 6510737, at \*18-20).) Similarly, the court found that the limited right to surcharge would provide an immediate benefit only to the minority of the class possessing an ability to surcharge, by "allow[ing] them to steer customers to less costly cards or to other

31

payment mechanisms, decreasing their card-acceptance costs."  (SPA 38 (Opinion, 2013 WL 6510737, at *18).)

By contrast, the district court found the limited right to surcharge only had the "potential" to benefit the majority of the class precluded from surcharging. The court found that surcharging by a minority of merchants would cause "market forces" to "exert downward pressure" on interchange fees, and that as a result, "surcharging (or the threat of surcharging) by merchants in the states where it is permitted *may well* inure to the benefit of merchants in those ten states" that do not allow surcharges, and has "the *potential* to ameliorate the precise anticompetitive effect—supracompetitive interchange fees—that these lawsuits were brought to challenge."   (SPA 42 (Opinion, 2013 WL 6510737, at *18, *20 (emphasis added)).)

The district court's conclusions that the Settlement's injunctive relief would provide an actual direct benefit to merchants that can surcharge, but only a potential indirect benefit to merchants – like 105 Degrees – that cannot, conclusively establishes that the (b)(2) class lacks the cohesion required by Rule 23.  This is vividly demonstrated by two other R&M Objectors:  PetroPlus, LLC and Diamond State Oil, LLC.   Petro Plus operates a convenience store in Texarkana, Arkansas, literally across the street from the Texas state line.  While merchants in Texas cannot surcharge, those in Arkansas theoretically can do so,

although businesses like PetroPlus cannot realistically surcharge and remain competitive with its competition one block away, but in a different state. Likewise, Diamond State Oil operates in Fort Smith, Arkansas, less than a mile from Oklahoma, where surcharging is illegal.

This conflict between those who may "directly" benefit and those – across or perhaps down the street – who may only "indirectly" benefit is made even worse in light of the concession by the proponents of the Settlement that it might take "*years*" for surcharging to take hold.  (JA___ (Indiv. Pls. Opp. to Objecting Pls. Mot. to Stay Class Sett. Prelim. Approval Order, Dkt. 1751, at 3, 4).)  Even if surcharging by a minority of merchants has the potential to eventually benefit non-surcharging merchants, such a belated and indirect benefit fails the requirements for a (b)(2) class that the relief sought must be a "single injunction [that] would provide relief to each member of the class," and would benefit "all its members *at once*."  *Dukes*, 131 S. Ct. at 2557, 2558 (emphasis added).

The district court's acceptance of this disparity between actual and potential benefits establishes that it failed to apply the required "heightened" scrutiny of the mandatory (b)(2) class.  During the years that it would take for the supposed benefits of surcharging to trickle down to non-surcharging merchants, surcharging merchants in states that permit surcharging would benefit, while merchants such as 105 Degrees would not.  If that happens, some merchants will benefit at the

expense of their competitors. A settlement that, at best, benefits some class members at the expense of their competitors should not have been certified under Rule 23(b)(2). *See, e.g., Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 893 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of all plaintiffs, class certification is typically not appropriate."); *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n,* 624 F.3d 185, 200 (5th Cir. 2010) (finding "forty percent of the class benefiting from an injunction is not sufficient to certify under (b)(2)"); *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463-64 (10th Cir. 1974) (affirming denial of class certification because of "diversity of interest" that arose from class plaintiffs' requesting relief that would change defendants' pricing system, which would substantially change the competitive positions of class members); *In re Managerial, Prof'l & Technical Emps.*, No. MDL 1471, 02-CV-2924 (GEB), 2006 WL 38937, at *9 (D.N.J. Jan. 5, 2006) (deeming certification under (b)(2) inappropriate when requested relief would not be "generally applicable to the class because it would have potentially conflicting effects on different members").

The district court's failure to give heightened scrutiny to the mandatory settlement class is also demonstrated by its failure to make any findings concerning the "potential" that merchants that could not surcharge due to state law would nonetheless eventually benefit, or how long it would take for any such benefit to

34

materialize.   Tellingly, the court's own appointed independent expert, Professor Alan O. Sykes, undermined the notion that surcharging would have class-wide benefits, when he characterized surcharging's potential as "highly uncertain and [possibly] small." (JA __ (Memorandum of Prof. Sykes at 43, Aug. 28, 2013, ECF No. 5965.)  That conclusion was bolstered by Professor Sykes' acknowledgment that virtually the entire Rule 23(b)(2) class probably will not surcharge under the Settlement.  According to his analysis, 90% of the volume in the class accepts American Express, and therefore cannot surcharge, and the remaining 10% are mainly smaller merchants that likely will not surcharge for fear of losing sales to their larger competitors that cannot (and therefore) will not surcharge.  *Id.* at 42 (noting how the 90-plus % of merchants by volume that cannot surcharge will incentivize the remaining 10% not to surcharge "because [the 10%] know that competitors who take American Express will not match any surcharges" and therefore the 10% would lose sales to the 90-plus %).

The district court's conclusions were further contradicted by the objections of numerous national merchants that operate in states that prohibit surcharging. Those merchants testified that in addition to not surcharging in states that ban the practice, they would not implement different surcharging practices in states that permit surcharging as opposed to those that do not because of the high costs and

administrative burden of doing so.[11]  That large national merchants likely will not surcharge further supports Professor Sykes' ultimate conclusions about the speculative and likely small benefits of surcharging.[12]  The district court ignored all of this undisputed evidence to arrive at its conclusions.

The district court also justified its conclusion that the Settlement might benefit merchants such as 105 Degrees by suggesting that the state laws do not really mean what they say, or might, in any event, be repealed.  (SPA 38-41 (Opinion, 2013 WL 6510737, at *18-19).)  This, too, was error.  The district court, for example, suggested that "there is *reason to believe* that *at least* some state laws are enforced in a manner that prohibits surcharging only when the merchant fails to sufficiently disclose the increased prices for credit card use."  (SPA 38 (Opinion, 2013 WL 6510737 at *18 (emphasis added)).)  The district court neither explained

---

[11] *See, e.g.*, BJ's Wholesale Obj. ¶¶ 17-20, ECF No. 2433; David's Bridal Obj. ¶¶ 16-21, ECF No. 2434; Best Buy Obj. ¶¶ 22-25, ECF No. 2445; Carter's Obj. ¶¶ 12-16, ECF No. 2446; Michaels Stores Obj. ¶¶ 14-17, ECF No. 2460; Wet Seal Obj. ¶¶ 13-17, ECF No. 2471; Wendy's ¶¶ 17-21, ECF No. 2473; Crate & Barrel Obj. ¶¶ 15-20, ECF No. 2534; Gap Obj. ¶¶ 15-19, ECF No. 2536; Aldo Obj. ¶¶ 17-19, ECF No. 2432; Family Dollar Obj. ¶¶ 16-18, ECF No. 2441; Panera Obj. ¶¶ 17-19, ECF No. 2466; Sears Obj. ¶¶ 22-24, ECF No. 2470.

[12] Moreover, the independent expert dismantled the expert report of Dr. Alan S. Frankel, which was submitted by the proponents to show that surcharging might drive down interchange rates over time.  (*See* JA __ (Mem. of Prof. Sykes at 38, 43 (concluding that the calculation of class-wide benefits proffered by Dr. Frankel "is of no value," because it is premised on "shaky" and "questionable" conclusions drawn from Australia and "imagin[ed]" assumptions about the extent to which merchants in the United States would surcharge Visa/MasterCard transactions)).)  It speaks volumes that the district court did not rely on that independent expert report for its conclusions.

its basis for this belief, nor detailed which states interpret their state restrictions – which unambiguously prohibit the practice – in this fashion.[13]  As such, the district court's speculation comes nowhere near the degree of scrutiny that is required to certify a settlement class, let alone a mandatory class that binds even class members that object.

Given the express terms of the applicable Oklahoma statue, there is no question that 105 Degrees would be exposing itself to legal liability if it ever attempted to surcharge.  Indeed, Visa suggests on its website[14] that consumers that are subjected to surcharging in "Oklahoma" and the other nine states that currently prohibit surcharging may want to "report the retailer to their state attorney general's office."

Similarly, the Court should not give any deference to the district court's suggestion that simply because "things change," the fact that New York's prohibition against surcharging was struck down under New York's constitution means the statutes in the other 10 states might suffer the same fate.  Again, the district court offered no support for this conclusion.  It made no attempt to analogize New York's provision with those on the books in the other 10 states.  The district court also did not analyze whether Judge Rakoff's analysis

---

[13] *See* SPA 215-32 (reproducing relevant statutes from the no-surcharging states).

[14] *See* JA ___ (ECF No. 2670, Shinder Decl. Ex. 73 ("States Where No Surcharge Laws Protect Consumers," http://usa.visa.com/personal/get-help/checkout-fees.jsp (accessed May 16, 2014))).

might be followed in other Circuits.  In fact, the district court conceded that those laws were not before it (SPA 40 (Opinion, 2013 WL 6510737 at *20)), and thus, its *ipse dixit* regarding the viability of these statutes should be disregarded.[15]

2.    Whole Hog Should Not Have Been Forced To Relinquish Valuable Rights In Exchange For Surcharging Relief It Is Precluded From Using

Whole Hog cannot take advantage of the Settlement's primary relief because it must accept American Express and therefore is prohibited by the "level-the-playing-field requirement" from surcharging under the Settlement.  (SPA 141-44, 154-57 (Settlement ¶¶ 42(a), 55(a)).)  The district court found that because of this provision "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products."  (SPA 41 (Opinion, 2013 WL 6510737 at *20).)  This finding that the Settlement's centerpiece relief is available to some merchants and not to others should have ended the inquiry into the viability of the (b)(2) settlement class.

---

[15] Even if the district court is correct in its speculation that the 10 state prohibitions might be rescinded over time, that conclusion does not support the certification of a mandatory class.  The district court acknowledged that the state prohibitions will reduce the effectiveness of the settlement in the near term.  (*See* SPA 40 (Opinion, 2013 WL 6510737, at *35 ("Will those laws diminish, at least in the near term, the efficacy of the proposed relief here?  Of course.").)  Thus, even under the most optimistic scenario there will be an interim period where some class members can surcharge and others cannot.  That result is inconsistent with the indivisibility that is required to certify a mandatory class.  *See Dukes*, 131 S. Ct. at 2557.

Whole Hog would have had absolutely no interest in asserting any claims that sought injunctive relief achieving a right to surcharge Visa and MasterCard products that it is precluded from exercising. Although Whole Hog cannot take advantage of the main injunctive relief offered by the Settlement, neither can it opt out of the mandatory Rule 23(b)(2) class. Instead, Whole Hog is forced to accept the Class Representatives' trading of its ability to pursue future claims, for surcharging relief that it is precluded from using.

What is more, the level-the-playing-field restriction is facially anticompetitive, and the district court's decision to approve this *per* se unreasonable restraint of trade was error. As the Supreme Court has made clear, agreements among horizontal competitors "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). The level-the-playing-field restriction has the purpose and effect of both fixing and stabilizing prices.[16]

---

[16] This case law establishes that if Visa and MasterCard had met by themselves and agreed that they would both implement the level-the-playing-field restriction, that agreement would amount to a per se violation of the Sherman Act. The only thing that even arguably saves this unreasonable restraint of trade from being considered per se *illegal* is the fact that it is part of a court-approved settlement.

39

The level-the-playing-field restriction restrains competition by opening the door to the elimination of merchants' ability to use differential surcharging to stimulate competition between the networks.   Under this provision, if a "Competitive Credit Card Brand" that is as or more expensive limits surcharging "in any manner," the merchant can surcharge Visa or MasterCard credit card transactions "only on either the same conditions on which the merchant would be allowed to surcharge transactions of that Competitive Credit Card Brand … or on the terms on which the merchant actually does surcharge transactions of that Competitive Credit Card Brand…."  (SPA 141, 144-45, 154-55, 158 (Settlement ¶¶ 42(a)(iv), (b)(iv), 55(a)(iv), (b)(iv)).)  If Visa and MasterCard maintain price parity the Settlement will classify them as Competitive Credit Card Brands of each other.  And American Express is classified as a Competitive Credit Card Brand of both Visa and MasterCard.

As such, this provision exposes the industry to the entirely predictable, and anticompetitive, possibility that the three leading networks could eliminate differential surcharging by maintaining price parity.   Given that Visa and MasterCard post their average cost of acceptance for purposes of the Settlement's surcharge caps, it would not be difficult for them to align their pricing to achieve this result.   That being so, a Settlement intended to introduce much needed

competition could, in reality, *eliminate* merchants' ability to play any of the three dominant networks off against each other to drive down rates.[17]

This result – which Visa and MasterCard collusively engineered by implementing identical rules changes via a jointly negotiated Settlement – is, in effect, a *per se* unreasonable restraint of trade under the above-cited Supreme Court opinions construing Section 1 of the Sherman Act. The agreement facilitates price fixing because it depends upon Visa and MasterCard maintaining price parity.

Moreover, while such a collusive adoption of competitive terms is *per se* unreasonable – making analysis of the effects unnecessary – it is clear that such an agreement would raise prices to merchants and eliminate interbrand competition. It would raise prices because this restraint on differential surcharging will motivate the networks to implement lock-step price increases to avoid the threat of surcharging. (*See* JA _ (Declaration of Alan S. Frankel, Ph.D. (Apr. 10, 2014), 11-md-2221 (E.D.N.Y.), ECF No. 370, ¶ 22 ("Differential pricing or promotion at retail is a principal mechanism by which competition between

---

[17] In this way the level-the-playing-field requirement is tantamount to an agreement, and an invitation, not to compete. American Express recently took Visa and MasterCard up on their offer when it settled a separate class action against it by agreeing to permit surcharging of its credit and charge cards, provided that the same surcharge be applied to all other credit card brands as well. If that settlement is approved, and American Express's rules are amended consistent with it, differential surcharging between the dominant networks will be permanently eliminated.

merchants' *suppliers* occurs")).)  But when differential surcharging is effectively limited by the settlement that restraint on price increases does not exist.  And this restriction eliminates interbrand competition for price or surcharging among the dominant networks.  As long as they maintain their current relative pricing parity, each of them is immune from network competition via merchant threats to surcharge.

The district court failed to even address this issue, let alone consider how the level-the-playing-field restriction contradicts its optimism about the benefits of the surcharging relief.  The district court held that the surcharging relief "has the potential to alter the very core of the problem this lawsuit was brought to challenge" (SPA 36 (Opinion, 2013 WL 6510737 at*17)), a problem the district court repeatedly characterized as rules that insulated Visa and MasterCard from network competition.  (SPA 37, 41-42 (Opinion, 2013 WL 6510737 at *18, 20).)  But the level-the-playing-field requirement does the opposite; it perpetuates, rather than alters, the very core of the problem.  The district court never grappled with this anticompetitive deficiency at the heart of this settlement.   As this horizontal agreement is clearly a *per se* unreasonable restraint of trade, it should not have been approved by the district court.

42

## **CONCLUSION**

The R&M Objectors respectfully request that this Court reverse the district court's certification of classes under Rule 23(b)(2) and (b)(3), which release Class Members' ongoing and future damages claims without providing them an opportunity to opt-out, and/or order that upon remand, a new notice be issued which provides Class Members an effective opportunity to opt-out of classes involving claims for and/or releases of monetary damages, and which understandably and accurately describes the terms of the Settlement and the breadth of the Releases.

Respectfully Submitted,

By:    s/

Jerrold S. Parker
Jay L.T. Breakstone
**Parker Waichman, LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Telephone: (516)-723-4620

Thomas P. Thrash, ABN 80147
Marcus N. Bozeman, ABN 95287
**Thrash Law Firm, P.A.**
1101 Garland Street
Little Rock, Arkansas 72201
Telephone: 501-374-1058

43

Phillip Duncan
Richard Quintus
**Duncan Firm, P.A.**
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE <u>REQUIREMENTS</u>**

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) and this Court's order dated May 27, 2014 (ECF No. 936), because this brief contains 9,997 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 Point Times New Roman type.

Dated:        June 16, 2014