PAGE PROOF

# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON), 13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON), 14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON), 14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON), 14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON), 14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON) 14-422-cv(CON), 14-443-cv(CON),14-480-cv(CON), 14-497-cv(CON), 14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON), 14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

―――――――――

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF FOR OBJECTORS-APPELLANTS NATIONAL RETAIL FEDERATION AND RETAIL INDUSTRY LEADERS ASSOCIATION (THE MERCHANT TRADE GROUPS' BRIEF)

Andrew G. Celli, Jr.
Debra L. Greenberger
EMERY CELLI BRINCKERHOFF
  & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
212-763-5000

*Attorneys for Objectors-Appellants
  National Retail Federation
  and Retail Industry Leaders Association*

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ............................................................................ii-vii

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................7

ISSUE PRESENTED FOR REVIEW ...............................................................7

STATEMENT OF THE CASE...........................................................................8

    I.       BACKGROUND ON THE PAYMENT-CARD INDUSTRY............8

          A.    Payment Cards, the Networks That Operate Them,
              and How They Function.......................................................8

          B.    Visa's and MasterCard's Anti-Competitive Rules ....................9

          C.    The Adverse Effects of Interchange Fees .................................11

          D.    New Technologies Pose a Threat to Visa and MasterCard ......13

    II.      VISA AND MASTERCARD VIOLATED THE SHERMAN ACT,
         AND REORGANIZED IN A TRANSPARENT EFFORT
         TO AVOID LIABILITY ....................................................................14

          A.    Visa's and MasterCard's Conduct Was Held Unlawful...........14

          B.    The Reorganizations ...............................................................15

          C.    This Lawsuit.............................................................................17

    III.    THE SETTLEMENT .........................................................................17

          A.    The "Relief" ............................................................................18

          B.    The Release ..............................................................................22

    IV.    THE DISTRICT COURT APPROVED THE SETTLEMENT
         OVER UNPRECEDENTED MERCHANT OBJECTIONS ..............24

          A.    Unprecedented Merchant Objections.......................................24

B.    RILA's and NRF's Objections ................................................. 26

C.    The District Court's Decision ................................................. 27

STANDARD OF REVIEW ................................................................. 28

SUMMARY OF ARGUMENT ........................................................... 29

ARGUMENT .................................................................................... 31

I.    THE LEGAL STANDARD FOR ANALYZING
A MANDATORY (B)(2) CLASS SETTLEMENT ........................... 31

A.    The District Court Erred in Justifying the (b)(2) Settlement
With the Value of the (b)(3) Relief .......................................... 34

B.    Trapping Class Members into an Objectionable Settlement
Raises Serious Fairness Concerns ............................................ 36

II.    THE DISTRICT COURT'S CONCLUSION THAT THE
MERCHANTS' ANTITRUST CLAIMS WERE WEAK IS
ERRONEOUS, AS IT MISAPPLIED GOVERNING LAW. ............. 37

A.    Visa and MasterCard Have Market Power,
and Have Imposed Ever-Increasing Interchange Fees
on Merchants—Key Facts the District Court Ignored ............. 39

B.    The District Court's Analysis of HAC and Default
Interchange's Purported Pro-competitive Justifications
Was Flawed and the Court Did Not Analyze
the Necessity of These Restraints ............................................ 41

1.    The District Court Erred in Evaluating the
Pro-competitive Effects of the Challenged Rules .......... 41

2.    The District Court Never Considered Whether HAC
and Default Interchange Remain Necessary Today,
or Whether a Reasonable Alternative
to Them Exists. ............................................................... 45

C.    The District Court Erred by Relying on DOJ Inaction and the
Corporate Reorganizations to Bolster Its Conclusions ............ 46

1.    DOJ's Inaction Is Not Evidence of Government
      Approval ........................................................46

2.    Visa's and MasterCard's Corporate Reorganizations
      Did Not "Strengthen[]the Defendants' Argument"
      That Their Anti-competitive Rules Were
      Not Horizontal Restraints of Trade ................................47

III.   THE (B)(2) SETTLEMENT IS NOT REASONABLE IN
       LIGHT OF ITS COST AND AS COMPARED TO
       THE BEST POSSIBLE RECOVERY ................................50

       A.    The Best Possible Recovery Is a Clean Rescission of the
             Challenged Rules ........................................50

       B.    The (b)(2) Settlement Unjustifiably Releases Merchants'
             Claims for Future Damages and Injunctive Relief and Makes
             Things Worse by Immunizing Future Anti-competitive
             Behavior—All for Little or No Relief ......................51

       C.    The (b)(2) Settlement Provides Illusory Relief
             to Merchants ...........................................54

             1.    The Primary Relief—Surcharging—Is Illusory ............54

             2.    The Buying Group Provision Is Valueless ...................59

IV.    THE OBJECTIONS OF THOUSANDS OF MERCHANTS
       THAT WERE POWERLESS TO ESCAPE THE SETTLEMENT
       IS NOT A REACTION THAT "FAVORS" SETTLEMENT
       APPROVAL ....................................................60

CONCLUSION ........................................................63

<u>TABLE OF AUTHORITIES</u>

<u>PAGE NO.</u>

**Federal Cases**

*Alden-Rochelle, Inc. v. ASCAP*,
  80 F. Supp. 888 (S.D.N.Y. 1948) .................................................................44

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)......................................................................................49

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................. 32, 37

*Authors Guild v. Google Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ...........................................................62

*Buffalo Broadcasting Co., Inc. v. ASCAP*,
  744 F.2d 917 (2d Cir. 1984) ..........................................................................44

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ..........................................................................43

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................. *passim*

*City of Livonia Emps.' Ret. Sys. v. Hanson*,
  238 F.R.D. 476 (D.S.D. 2006).......................................................................31

*Cobell v. Salazar*,
  679 F.3d 909 (D.C. Cir. 2012)........................................................................36

*Compare NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984)..........................................................................................43

*Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)*,
  957 F.2d 1020 (2d Cir. 1992) ........................................................................28

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) ............................................................................32

*Emp'rs. Ins. of Wausau Cty. v. Fox Entm't Group*,
  522 F.3d 271 (2d Cir. 2008) ..........................................................................29

*Eubank v. Pella Corp.*,
  13-cv-2091, 2014 WL 2444388 (7th Cir. June 2, 2014) ...............................57

*Expressions Hair Design v. Schneiderman*,
  975 F. Supp. 2d 430 (S.D.N.Y. 2013) ...........................................................19

*Greenberg v. Proctor & Gamble Co.*,
  724 F.3d 713 (6th Cir. 2013) .........................................................................59

*Hawksbill Sea Turtle v. FEMA*,
  126 F.3d 461 (3d Cir. 1997) ..........................................................................53

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)........................................................................................35

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) .........................................................................12

*In re Carbon Black Antitrust Litig.*,
  No. 03 Civ. 10191-D, MLD 1543, 2005 WL 2323184
  (D. Mass. Sept. 8, 2005) ................................................................................47

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) .........................................................................47

*In re Packaged Ice Antitrust Litig.*,
  779 F. Supp. 2d 642 (E.D. Mich. 2011) ........................................................47

*In re Visa Check/MasterMoney Antitrust Litigation*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom.*
  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)........15

*Interoceanica Corp. v. Sound Pilots, Inc.*,
  107 F.3d 86 (2d Cir. 1997) .............................................................................52

*Jermyn v. Best Buy Stores, L.P.*,
  No. 08 Civ. 214 CM, 2012 WL 2505644 (S.D.N.Y. June 27, 2012)............33

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000) ...........................................................................33

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) .......................................................................45

*Laumann v. NHL*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..........................................................35

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
  354 F.3d 661 (7th Cir. 2004) ......................................................................39

*Milanese v. Rust-Oleum Corp.*,
  244 F.3d 104 (2d Cir. 2001) ........................................................................29

*National Bancard Corp. v. Visa U.S.A., Inc.*,
  779 F.2d 592 (11th Cir. 1986) ............................................................. 44, 45

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)......................................................................................36

*Palmer v. BRG of Georgia, Inc.*,
  498 U.S. 46 (1990)........................................................................................44

*Pls.' Class v. Bd. of Comm'rs (In re Katrina Canal Breaches Litig.)*,
  628 F.3d 185 (5th Cir. 2010) .......................................................................57

*Plummer v. Chem. Bank*,
  668 F.2d 654 (2d Cir. 1982) ................................................................. 35, 50

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) .......................................................................31

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ........................................................................47

*United States v. Am. Express Co.*,
  10-cv-04496-NGG-RER, 2014 WL 1817427 (E.D.N.Y. May 7, 2014) .......56

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)......................................................................................42

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ............................................................. *passim*

*W. Va. v. Chas. Pfizer & Co.*,
  440 F.2d 1079 (2d Cir. 1971) ......................................................................33

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ......................................................... 15, 37, 51, 61

**Other Authorities**

Fed. R. Civ. P. 23(h) Advisory Committee's Note to 2003 Amendment ................57

Federal Practice and Procedure: Jurisprudence § 4417 (2d ed. 2002).....................53

Manual for Complex Litigation (Fourth) § 21.62 (2004) ........................................36

Newberg on Class Actions § 11:42 (4th ed. 2002) ........................................... 32, 57

Objectors-Appellants the National Retail Federation ("NRF") and the Retail Industry Leaders Association ("RILA") submit this brief in support of their appeal of the approval of the Rule 23(b)(2) settlement (the "(b)(2) Settlement" or the "Settlement").

## INTRODUCTION

A class action settlement must benefit the class. In this case, a broad cross-section of the American retail industry—numbering thousands of businesses, from iconic national department-store and general-merchandise chains, to apparel outlets, specialty shops, restaurants, and one-location Main Street stores—thoughtfully analyzed the (b)(2) Settlement and concluded that it offers them no benefit.

The district court's approval would be troubling on that basis alone. But this settlement—binding the largest class in U.S. history—permits no opt-outs. By its terms, it will deprive thousands of objecting merchants of valuable, forward-looking relief—specifically, all injunctive relief and future damages, including on claims that the Plaintiffs never asserted, involving each and every one of Visa's and MasterCard's hundreds of rules—against their will. Approval of a *mandatory* settlement of such breathtaking scope in the face of widespread and substantive opposition is unprecedented and warrants reversal.

The (b)(2) Settlement is manifestly unfair. It is unfair because it compels merchants to release valuable claims in return for worthless "relief." And, it is unfair because it entrenches Defendants' anti-competitive practices, rather than rectifying them. NRF and RILA—trade associations whose members account for more than 100,000 store locations nationwide—join together in this appeal to highlight the egregious harm the Settlement inflicts and perpetuates, and the breadth and depth of retail industry opposition.

For decades, Visa and MasterCard have dominated the domestic credit-card market, and their conduct as agents of the banks that issue cards suppresses competition. While banks compete vigorously for credit-card *consumers*—offering teaser low rates and special rewards—these same banks, operating through the Visa and MasterCard networks, do not compete at all for *merchants*. Instead, banks use the networks' rules to force merchants to accept all banks' cards no matter the price the banks charge, and then to fix those prices, collusively, at exorbitant levels. These prices are called "interchange fees," and they are levied every time a merchant processes a credit-card transaction.

In a normal competitive environment, each bank would establish its own prices, and banks would compete with one another by offering merchants lower fees to persuade them to accept their cards. But the market for merchant acceptance is not a competitive one. Instead, Visa and MasterCard, acting for the

2

banks, *require* any merchant who accepts a Visa or MasterCard issued by one bank to accept every Visa or MasterCard issued by *any* bank—thereby ensuring that no bank will have any incentive to compete on price. These rules are known as "Honor-all-Cards." Worse yet, the banks use Visa and MasterCard to fix interchange rates—so-called "default interchange."

Relieved by the Honor-all-Cards rules from the pressure to compete on price, the banks have used Visa and MasterCard to consistently *raise* interchange fees, even as the cost of processing a credit-card transaction has *declined*. It is a stunning show of economic force resulting in U.S. merchants and their customers paying supra-competitive prices—the highest interchange fees in the industrial world.

Honor-all-Cards and "default interchange" violate the antitrust laws—that is what the claims in this case are about. But the Settlement offers no relief whatsoever from either restraint of trade. Far from enjoining the restrictive rules at issue, as this Court's decision in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003) ("*U.S. v. Visa*") and settlements in other antitrust cases against Visa and MasterCard have done, this Settlement expressly ratifies both rules for all time. The Settlement provides that Visa and MasterCard can continue to require merchants to honor all cards, and can collectively fix interchange rates, in perpetuity.

3

What, then, does the (b)(2) class get out of the Settlement?  A narrow and all-but-unusable tweak in the networks' "no-surcharge" rules.  Historically, and again by express rule, Visa and MasterCard barred merchants from passing along high interchange fees to cardholders.  These were known as the "no-surcharge" rules.  The Settlement purports to relax these rules but such "relief" is, upon inspection, no relief at all.  So crippled by state law, and so burdened with conditions, is the Settlement's "relaxed" rule that—as the district court found—most merchants will not be allowed to surcharge.  Currently, some 10 states outlaw credit-card surcharging; for merchants operating in any one of those states, the surcharging "relief" is an empty promise.  Moreover, the Settlement effectively bars the 90% of merchants (based on card volume) who accept American Express from surcharging Visa and MasterCard.  (The Settlement "permits" surcharging only under conditions that merchants who accept American Express cannot meet.)  Finally, for that small percentage of merchants who manage to meet the Settlement's conditions and do not operate in a no-surcharge state, surcharging, were it to be implemented, would harm their businesses, as customers would object to paying for credit-card use when nearly every other merchant provides that service for "free."

In the end, the conclusion is inescapable:  This Settlement will lead to little if any actual surcharging, and will have *no* meaningful impact on the status

quo.  Certainly there is no evidence that relaxing the "no-surcharge" rule will create competitive pressures on interchange rates; as the district court's appointed expert concluded, "the value of surcharging to plaintiffs is highly uncertain and may be small."  JA__{DE5965 at 43}.

On the other side of the equation, however, the (b)(2) Settlement foists upon merchants a broad Release that precludes claims *going forward for all time*.  The Release expressly immunizes Visa and MasterCard from future merchant claims at precisely the moment when new payment technologies— generally linked to smartphones instead of traditional plastic cards—create the possibility of true competition in the payments market.  Consistent with Defendants' confessed goal to wield the Release against all manner of evolving technology, this Settlement will likely stifle innovation and competition, as merchants in the future may have no choice but to adopt whatever technological approach Visa and MasterCard impose.

The most prevalent complaint RILA and NRF members have voiced is that the Settlement's broad Release strips merchants of their ability to obtain redress for future injuries.  Merchants cannot understand how the American system of justice can permit class counsel to craft a mandatory "settlement" that offers no benefit, releases their claims, and requires them to bear enormous costs forevermore, all without offering them the opportunity to opt out.

5

The Release is unprecedented and contrary to law, although one can certainly understand why Visa and MasterCard would want it:  It gives them *carte blanche* to continue to mandate acceptance and fix interchange rates without fear of future suits from the direct victims of their conduct, merchants.  The value of such immunity is, to quote a MasterCard slogan, "priceless."

While a settlement this skewed was bound to be unpopular, the extent of dissatisfaction within the retail industry has been extraordinary.  A majority of the named Plaintiffs and thousands of merchants have objected and/or opted out of the (b)(3) Settlement.  More than 25% of merchants, by transaction volume, opted-out of the (b)(3) Settlement and at least 19% objected.  Not a single merchant—except those who were promised special deals or incentive payments—advocated for the (b)(2) Settlement.

What the class counsel have agreed to is not just a settlement; it is surrender.  The proposed Rule 23(b)(2) Settlement is not fair, reasonable, or adequate.  This Court, as a fiduciary of the absent class members, should reject it.

## JURISDICTIONAL STATEMENT

This is an appeal from a final Opinion and Order dated December 13, 2013, JA__{DE6124}, and Judgment entered January 14, 2014, JA__{DE6199}, approving the proposed class-action settlement. Subject-matter jurisdiction in the district court was based on 28 U.S.C. §§ 1331, 1332, 1337, 2201, and 2202. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. NRF timely filed its notice of appeal on January 2, 2014. JA__{DE6148}. RILA timely filed its notice of appeal on February 13, 2014. JA__{DE6251}.

## ISSUE PRESENTED FOR REVIEW

Did the district court err in approving as fair, reasonable, and adequate a Rule 23(b)(2) settlement that forces class members to release a wide range of existing and future antitrust claims, without opt-out rights, in return for illusory relief, over large numbers of objections from sophisticated merchants? *Yes.*

\*\*\*

NRF and RILA support the arguments in the Merchants' Joint Brief and incorporate them by reference.

## STATEMENT OF THE CASE

### I.    BACKGROUND ON THE PAYMENT-CARD INDUSTRY

#### A.    Payment Cards, the Networks That Operate Them, and How They Function

Credit cards are issued by banks, and, historically, those banks joined together to form "networks" to process card payments. Visa and MasterCard are the two dominant networks. The major U.S. banks are all members of both, and virtually every merchant that accepts Visa also accepts MasterCard. *U.S. v. Visa*, 344 F.3d at 235, 236 n.3; JA__ ¶ 17{DE1536}. When a consumer uses a card to make a purchase, the networks route the payment from the bank that issued the credit card to the merchant's bank. *See id.* (explaining how the networks function); SPA 7-8.

The bank that issues the card charges the merchant for the "privilege" of "swiping" that card. That charge is called the interchange fee. JA__ ¶ 11{DE2538-2}. The amount of the interchange fee charged by a bank on a particular card- or transaction-type is set by standard rate tables published by Visa and MasterCard. JA __-__, __ ¶¶ 47, 58{DE1543}. This is known as "default interchange." The interchange fee for a given transaction is the same regardless of which bank issued the credit card. While the per-transaction interchange fee *averages* 2%, the amount that a merchant pays on any particular transaction varies depending on several factors, including the type of transaction, type of merchant,

8

and whether the card provides rewards to consumers.  *See* JA __ ¶ 11{DE2538-2}. (Rewards cards cost merchants more than basic cards.  SPA8.)  Visa- and MasterCard-branded payment cards are ubiquitous, as the district court recognized. SPA47.  Customers expect merchants to accept them and, as a practical matter, merchants cannot refuse.

Visa and MasterCard are so widely accepted, and have become such staples, that, more than a decade ago, this Court affirmed that both networks have "market power" in the credit-card market, an important component of an antitrust violation.  *See U.S. v. Visa*, 344 F.3d at 239.  That power remains undisturbed. JA__-__ ¶ 10{DE2670-5}.[1]

## B.    Visa's and MasterCard's Anti-Competitive Rules

While banks issuing Visa and MasterCard credit cards compete for consumers on the basis of rewards, interest, fees, and penalties, those same banks do not compete for merchants to accept their cards.[2]  Instead, having firmly established their position as a must-accept payment method, Visa, MasterCard and the banks *collectively* dictate the terms of merchant acceptance.

---

[1] *See also* Competitive Impact Statement at 6-7, *United States v. Am. Express Co.*, No. 10-cv-4496-NGG-RER (E.D.N.Y. Oct. 4, 2010), ECF No. 5.

[2] JA__-__ ¶ 45{DE2670-5}; *cf.* JA __ ¶ 78(d){DE1543} (statement of bank representative disclaiming knowledge of bank competition for merchant business).

Under Visa's and MasterCard's rules, a merchant cannot "pick and choose" which banks' credit cards to accept based on normal business considerations, such as price (i.e., interchange).  If a merchant agrees to accept a credit (or debit) card issued by one bank (e.g., a Citi Visa card), it must accept all cards issued by all banks over the same network (Chase's Visa, Wells Fargo's Visa, etc.).  SPA8.  These inviolate rules, known as Honor-all-Cards ("HAC"), require merchants to accept *every* card regardless of its interchange price.  JA __ ¶¶ 48-49{DE2670-5}; JA __-__ ¶¶ 50-65{DE1543}.  As a result, banks do not compete, on price or otherwise, to win acceptance of their cards by merchants.

Visa and MasterCard also enforced "anti-steering" rules, which prohibited merchants from "steering" or "incentivizing customers to use lower-cost cards or other forms of payment."  SPA9.  One such rule—the "no-surcharge" rule—prohibited merchants from imposing an extra charge on consumers who use more expensive rewards cards.  Another barred merchants from offering discounts to customers to encourage them to use lower-fee cards (the "no-discount" rule).[3]

---

[3]  JA __ ¶ 53{DE2670-5} (Hausman Report); JA__-__ ¶¶ 42-49{DE1536}; JA__-__ ¶ 106{DE1543}.  In a settlement with the DOJ announced in 2011, Visa and MasterCard agreed to change their rules to allow discounting based on card brand (Visa or MasterCard) or product type (basic or premium).  JA__-__{DE1656-1 at 369-70}.

10

Absent Honor-all-Cards and, to a lesser extent, the anti-steering rules, merchants could refuse higher-cost cards or encourage consumers to use lower-cost cards, pressuring banks to reduce rates. But, with these rules as a cudgel, banks need not bend to competitive pressures—because there are none.

### C.    The Adverse Effects of Interchange Fees

Visa's and MasterCard's rules require merchants to pay the interchange rates set by Visa's and MasterCard's "default interchange" tables, unless a merchant and a bank come to a separate agreement to bypass the default rates. In practice, no such separate agreements exist. Because of Honor-all-Cards, banks have no "incentive to accept interchange fees lower than the default interchange fees." SPA8-9; *see also* JA__ ¶ 52{DE2670-5}; JA__-__ ¶ 69{DE1543} (identifying several banks' policies not to negotiate interchange). "Default interchange" constitutes *the* price.

Because of their market power, Visa and MasterCard can, and do, set default interchange rates at levels significantly higher than would prevail in a competitive market. JA__-__ ¶ 10{DE2670-5}. Visa and MasterCard have consistently raised interchange fees, even as costs of processing payments have fallen. JA__-__ ¶ 45 & n.224{DE1543}.[4] This stark disconnect between costs

---

[4] JA__{U.S. Gov't Accountability Office, Pub. No. GAO-10-45, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, But Options for*

11

and price is classic evidence of monopolistic pricing.[5]  Notably, interchange fees

continued to climb even *after* Visa's and MasterCard's reorganizations, *see infra*

Section II.B.  *See* JA__-__ ¶ 22{DE2670-5}.

        The impact of rising, non-negotiable interchange fees on merchants is

acute.  Merchants now pay over $40 billion a year in interchange fees.  JA__-__ ¶

12{DE2538-2}.  For U.S. retailers, interchange fees often represent the second or

third largest expense after payroll.  JA__ ¶ 11{DE2538-2}.

        These ever-rising fees also harm consumers by increasing prices for

goods and services across the board.  The result is that "[c]onsumers who do not

have credit cards, disproportionately poorer consumers, are injured the most since

they pay higher prices yet do not receive 'rewards' offered by banks who issue

credit cards."  JA__-__, __ ¶¶ 10, 110{DE2670-5}.  Supra-competitive interchange

fees are tantamount to a tax imposed by banks on consumers and the retail

economy.

        Despite all of this—despite the massive costs, and despite the ever-

rising rates of interchange—"virtually no merchants have ceased accepting Visa or

---

*Reducing Fees Pose Challenges* 16 (2009)} (GAO report showing that Visa and
MasterCard interchange rate rose, for different card types, from 22% to 82%
during the period 1991 to 2009).

[5] *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 603 (7th
Cir. 1997) (monopoly power is "the power to raise price above cost without losing
so many sales as to make the price rise unsustainable").

MasterCard."  JA__ ¶¶ 31-32{DE2670-5}; *see also* JA__-__ ¶¶ 93-96{DE1543}.

"[T]he networks' conduct and their Rules create a Hobson's choice for retailers: accept Visa's and MasterCard's swipe fees as published, for all locations, or be shut out of the overwhelming majority of the payment card market."  JA__ ¶ 16{DE2538-2}.

### D.    New Technologies Pose a Threat to Visa and MasterCard

For decades, when a consumer initiated a credit transaction, s/he reached into his or her wallet and pulled out a plastic card.  Today, plastic cards are just one way to pay.  Smartphones and other technology—so-called "digital wallets"—increasingly offer new and more efficient ways to pay.

The "digital wallet"—which uses everything from bar codes to near field communication—has also opened the door to new means of competition in the payments market.  For the first time in decades, new companies like PayPal, Google Wallet, Isis, and MCX have introduced new, inventive approaches to facilitating payments.[6]  Such innovation, history teaches, threatens established monopolies; cell phones' and cable phone service's effect on local telephone companies' "natural monopoly" is a recent example.  JA__-__ ¶ 10{DE2670-5}.

---

[6] *See, e.g.,* Google Wallet, http://www.google.com/wallet/ (payment "app" created by Google);  Isis, https://www.paywithisis.com/ (payment "app" created by cell phone providers); PayPal, https://www.paypal.com/home (money transfers through smartphones or the internet); MCX, http://www.mcx.com/ (merchant consortium to develop smartphone-based payment "app").

13

Here, the Settlement comes just as Visa's and MasterCard's dominance is in peril, threatened by new payment technologies that might upend Visa's and MasterCard's business model, including by routing payments directly from the customer's bank to the merchants.  JA__-__ ¶ 106{DE2670-5}.  Yet the Settlement threatens to inhibit technological advances by, among other things, broadly defining "credit card" to include all known mobile payment technologies, as discussed below.  SPA109.

## II.    VISA AND MASTERCARD VIOLATED THE SHERMAN ACT, AND REORGANIZED IN A TRANSPARENT EFFORT TO AVOID LIABILITY

### A.    Visa's and MasterCard's Conduct Was Held Unlawful

Visa's and MasterCard's decades-long dominance of the payment-card market is a direct result of their anti-competitive rules and practices (like Honor-all-Cards) and their inflated interchange rates.  Not surprisingly, the networks have been subject to numerous court challenges and enforcement efforts, of which this case is one.

Most significant is *U.S. v. Visa*, in which this Court affirmed that Visa and MasterCard were "consortiums of competitors" that had enacted restrictive rules that prohibited member banks from issuing AmEx or Discover cards.  *U.S. v. Visa*, 344 F.3d at 242.  These rules were illegal agreements not to compete, and this Court affirmed the rules' injunction.  *Id.* at 234, 242.

14

Also relevant are: (1) the 2003 class settlement in *In re Visa Check/MasterMoney Antitrust Litigation*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ("*Visa Check*"), in which Visa and MasterCard agreed to rescind an Honor-all-Cards rule tying debit to credit cards; and (2) the 2011 consent decree between Visa and MasterCard and the DOJ, which required them to "remove their rules prohibiting merchants from [brand- and] product-level discounting of credit and debit cards."  SPA10.

### B.    The Reorganizations

In an attempt to avoid the application of this Court's ruling in *U.S. v. Visa* to the conduct at issue in this case,[7] MasterCard and Visa underwent corporate "reorganizations" in 2006 and 2008, respectively.  They converted from not-for-profit associations owned by their member banks to for-profit companies, which are partially owned by those banks, and partially publicly-owned.  SPA10.  The member banks expressly conditioned the "reorganizations" on the new companies' continued enforcement of the rules at issue in this case—including HAC and anti-steering rules.  JA__-__ ¶¶ 33-40{DE1543}.  Visa announced:  "[T]he changes we're making will not disrupt Visa's ongoing operations or change the nature of

---

[7] *See* JA__-__ ¶ 156.21-22{DE1545}.

[Visa's] relationship" with member banks.[8]  Indeed, the banks' shares in the reorganized company gave them a veto right over any effort to change Visa's core business or practices.  JA__-__ ¶¶ 113-21{DE1154}.  Since the reorganizations, Visa and MasterCard have maintained the same rules as existed previously, and the banks have continued to agree to enforce those rules against merchants.  JA__-__, __¶¶ 21, 25{DE1543}.

Defendants' assurances that the reorganizations would change nothing have proved true:  Since the reorganizations, Visa's and MasterCard's market power has not diminished, the interchange fees paid by merchants to the member banks have continued to climb, and banks continue not to compete.  *See* JA__-__ ¶¶ 31-32{DE1543}; JA__-__ ¶ 22{DE2670-5}.  It is thus not surprising that the European Commission—the only judicial body to rule on the effect of the reorganizations based on a factual record—rejected the claim that the reorganizations ended the anti-competitive conduct.[9]

---

[8] JA__-__ ¶ 40{DE1543}; *see also* JA__-__, __-__ ¶¶ 23, 39{DE1543} (citing banks' expectation that they would continue communicating with Visa and MasterCard after the IPOs and that the networks would continue to pursue the banks' best interests).

[9] *See* JA__-__{DE1573-3 at 3-10}; JA__ ¶ 259{Case T-111/08, *MasterCard, Inc. and Others v. Eur. Comm'n* (May 24, 2012)}.

### C.    This Lawsuit

This class action was filed in 2005, two years after the decision in *U.S. v. Visa*.  It challenged the rules and conduct that most directly impact merchants: the Honor-all-Cards, default-interchange, and anti-steering (no-surcharge and no-discount) rules.  Specifically, the complaint alleged that Honor-all-Cards, like the exclusivity rules enjoined in *U.S. v. Visa*, is an agreement among banks not to compete in violation of Section 1 of the Sherman Act.  This case also challenged the legality of the default-interchange rules as a conspiracy among the member banks to fix the prices merchants must pay.

## III.   THE SETTLEMENT

The July 13, 2012, Settlement Agreement established two settlement classes: a Rule 23(b)(3) class for past damages (the "(b)(3) Settlement"), from which absent class members could opt-out; and a Rule 23(b)(2) class, which purported to provide injunctive relief and from which no opt-out is permitted.  SPA98-202 (Settlement Agreement).  The (b)(2) and (b)(3) settlements include nearly identical—and identically broad—releases (the "Release").

The focus of this brief is the (b)(2) Settlement; RILA and NRF have opted out of the Rule 23(b)(3) class.  SPA139-50, 153-64 (Settlement ¶¶ 40-44, 53-57).

17

## A. The "Relief"

The (b)(2) Settlement does *not* offer any relief that would facilitate competition among the banks or curb Visa's and MasterCard's market power. JA__-__ ¶ 10{DE2670-5}.  Unlike the *U.S. v. Visa* judgment or past Visa and MasterCard settlements, this Settlement does not revoke *any* anti-competitive rules.  There is no relief from HAC or default interchange; the Settlement ratifies both restraints.  SPA134-35, 169-70 (Settlement ¶¶ 33(a), (c); 68 (a), (c)).  Under the Settlement, Visa and MasterCard can continue their practices indefinitely.[10]

The principal relief afforded to the (b)(2) Settlement class is a limited modification of the "no-surcharge" rules.  Under the Settlement, merchants will theoretically be allowed to charge consumers a fee—a "surcharge"—for certain credit-card transactions under limited circumstances.  But the Settlement does not eliminate the no-surcharge rule.  SPA141-49, 153-63 (Settlement ¶¶ 42, 55).  It expressly leaves in place the rule that merchants cannot surcharge based on the "issu[ing]" bank.[11]  Thus, while the modified rule created by the Settlement allows merchants to surcharge all cards of a particular *brand* (e.g., all Visa or all MasterCard cards), a merchant cannot surcharge a Citi-issued Visa credit card,

---

[10] SPA152, 166 (Settlement ¶¶ 51, 64) (settlement does not "limit the ability of [Visa or MasterCard] to set interchange rates").

[11]  SPA148-49, 162 (Settlement ¶¶ 42(d), 55(d)).

while not surcharging a Chase-issued Visa credit card.  Competition *among* banks remains suppressed.

Moreover, most merchants will be unable to surcharge under the modified rule, for a variety of legal and practical reasons.  First, the 40% of merchants operating in any one of the 10 states that currently prohibit surcharging by law obviously cannot surcharge.[12]  JA__ ¶ 13{DE2469}; JA__-__ ¶¶ 20-21{DE2538-2}.  In huge states like California, Florida, and Texas, surcharging cannot occur.

Second, under the Settlement's so-called "level-playing-field" provision, the many merchants who also accept American Express cannot surcharge Visa or MasterCard products.  That provision requires merchants to surcharge *all* credit-card brands whose interchange rate equals or exceeds Visa's or MasterCard's on "the same conditions."  SPA41 n.9.[13]  But this is not possible.  American Express only allows a merchant to surcharge its credit cards if that merchant also surcharges other payment cards, including debit cards.  Visa and

---

[12] *See* SPA215-32 (state statutes in California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, Minnesota, New York, Oklahoma, Texas, and Utah).  A federal court recently struck New York's surcharging ban, *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013), which has been appealed.

[13] SPA141, 144-45, 154-55, 158 (Settlement ¶¶ 42(a)(iv), 42(b)(iv), 55(a)(iv), 55(b)(iv)); JA__-__ 41-42{DE5965} (Sykes Report); JA__-__, __ ¶¶ 54, 56{DE2670-5}.

MasterCard, on the other hand, prohibit surcharging debit cards entirely. The two schemes are at loggerheads, and the "same conditions" requirement can never be satisfied. Hence, merchants can never surcharge all three brands "on the same conditions." The Settlement thus ensures that merchants that accept American Express cannot surcharge at all. Nearly 70% of merchants accept American Express, and those merchants comprise over 90% of credit-card transaction volume nationwide. JA__{DE2111-1 at 48-49}; JA__ ¶ 65{DE2670-5}. The American Express "exception" all but swallows the new rule. As the parties were well aware and as the district court acknowledged, as a consequence, "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products." SPA41.

Even among the few merchants who *could* surcharge, it is undisputed that many will "be hesitant to impose surcharges because of the fear of losing sales to merchants who do not." JA__{DE5965 at 36} (Sykes Report).

Despite its finding that most merchants would be precluded from surcharging, the district court theorized that surcharging has the "potential" to affect interchange rates through merchants "disfavor[ing] one network at the point of sale by surcharging . . . [which] will incentivize both networks to moderate or lower their interchange fees to avoid being disfavored." SPA37. That theory lacked evidentiary support, as found by Professor Sykes, the economist the district

court appointed to value the (b)(2) Settlement.  SPA10.  Professor Sykes concluded "that the value of surcharging to plaintiffs is highly uncertain and may be small," and that "[o]ne cannot predict with confidence to what degree surcharging will actually occur."  JA__{DE5965 at 43} (Sykes Report); *see also* JA__ ¶ 41{DE2533-2} (Weisbach Decl.) (challenging the economic value of surcharging); JA__¶¶ 2, 8{DE5982} (Hausman Resp.).

The other (b)(2) relief provided by the Settlement is peripheral.  The provision permitting merchants to form "bona fide buying groups" for the purpose of making proposals to Visa and MasterCard adds nothing to the current landscape, which already permits such buying groups.  SPA43; SPA149-50, 163-64 ¶¶ 43, 56.  And there is no evidence this provision will benefit merchants, because they will have no more negotiating leverage post-settlement than they did pre-settlement.  SPA149-50, 163-64 ¶¶ 43, 56.

Almost universally, merchants who have spoken have agreed that the Settlement's "reforms" are worth little, and its relief is illusory.[14]  The evidence supports that conclusion.  As the district court's expert concluded, there is "no

---

[14]  *See, e.g.*, JA__-__ at ¶¶ 11-23{DE2444} (Amtrak); JA__-__ at ¶¶ 15-32{DE2445} (Best Buy); JA__-__ at ¶¶ 10-22{DE2587} (Foot Locker); JA__-__ at ¶¶ 10-35{DE2458 } (IKEA US); JA__-__ at ¶¶ 9-26{DE2491} (Petco); JA__-__ at ¶¶ 9-24{DE2467} (PetSmart); JA__-__{DE2644 at ¶¶ 10-42} (WalMart).

convincing basis in the expert reports for any reliable quantitative estimate" of the potential benefit from the Settlement's rule changes.[15]

## B.    The Release

On the other side of the scales, the Settlement foists an unprecedented and inescapable Release on merchants, extinguishing all claims for ongoing and future damages and injunctive relief that relate "in any way" to the Complaint's allegations.  SPA169 (Settlement ¶ 68).  The Release covers more than claims based on HAC, default interchange, and the other rules challenged in the Amended Complaint.  It also covers claims related to "any other [Visa or MasterCard] Rule" —defined expansively to mean "any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card."  SPA113; *see also* SPA134-35, 170 (Settlement ¶¶ 33(a),(c); 68(a),(c)).  This means that *all* of Visa's and MasterCard's rules, written and unwritten, spanning thousands of pages of rulebooks covering topics that have nothing to do with this case, are immunized. *See* JA__-__{public rulebooks}.  Even rules promulgated *after* merits discovery closed in 2009 are covered.

---

[15]  JA__, __{DE5965 at 31, 44}; *see also* JA__-__ ¶ 101{DE2670-5} (Hausman Report) (opining that buying groups will not have an economic effect on interchange).

The Release even extinguishes claims concerning *new*, "substantially similar" rules and conduct, and the "future effects" of such rules. SPA171 ¶ 68(g)(h). Thus, the Release immunizes both existing and new rules and conduct, and their future effects. For example, the Release purports to bar a merchant from challenging HAC forever, even if HAC causes new and additional harm when applied to new payment technologies. Under HAC, Visa and MasterCard can even insist that merchants "honor" their mobile-payment products, restricting merchants' rights to "freely choose" the best and cheapest mobile technologies. JA__-__ ¶ 24{DE2464}. MasterCard's attorney expressly confirmed that the broad Release bars claims based on all technology in the market, such as "mobile phone transaction[s]." JA__{Corrected 9/12/13 Tr. at 39}. He also asserted that the Release applied to *future* technologies, such as a "wrist watch or . . . your Google Glass[]," which are derived from current technology. *Id.*

In short, even though mobile technologies were never an issue in the case, the Release purports to bar future claims concerning such technologies, even those not yet invented. As a result—and as the district court's expert cautioned— the Settlement threatens to thwart emerging payment technologies' ability to break Visa's and MasterCard's market dominance. JA__-__{DE5965 at 50-51} (Sykes Report) ("settlement raises a danger of adverse, unintended consequences in a

23

technologically dynamic industry"). Numerous objections and a significant

portion of the fairness hearing echoed such concerns.[16]

Finally, unlike the relief (rules changes) that expires in 2021, the

Release continues forever. The Settlement thus releases Visa and MasterCard

from an unbounded range of rules and conduct that might have anti-competitive

effect, in perpetuity.

## IV. THE DISTRICT COURT APPROVED THE SETTLEMENT OVER UNPRECEDENTED MERCHANT OBJECTIONS

### A. Unprecedented Merchant Objections

Citing the issues above, over 3,500 merchants objected to the (b)(2)

Settlement and over 6,000 opted out of the (b)(3) class. *See* JA__{DE6154-2};

SPA23. Even a majority of the named Plaintiffs opted out.[17] Especially given the

mandatory nature of the class, this level of objection is telling, and disturbing.

The Settlement allowed Visa and MasterCard to walk away if

merchants representing more than 25% of the transaction volume opted out of the

(b)(3) Settlement. JA__ ¶ 97{DE1588-1}. By this metric, more than 25% of the

---

[16] *See* Fairness Hr'g Tr., JA__{Corrected 9/12/13 Tr. at 98}; NRA Obj., JA__-__
¶24{DE2464}; IKEA Obj., JA__-__, __ ¶¶ 14, 39{DE2458}; PETCO Obj., JA__-
__ ¶ 29{DE2491}.

[17] *See* Coborn's Inc. Obj., JA__{DE2447}; D'Agostino Supermarkets, Inc. Obj.,
JA__{DE2449}; Jetro Holding, LLC Obj., JA__ {DE2459}; Affiliated Foods
Midwest, JA__{DE2563}; NACS Obj., JA__{DE2561}; NCPA Obj., JA
__{DE2619}; NCGA Obj., JA__{DE2546}; NGA Obj., JA__{DE2475}; NRA
Obj., JA__{DE2464}; NATSO Inc. Obj., JA__{DE2461}.

merchant class opted out of the (b)(3) Settlement, and 19% also made the effort to object to the (b)(2) Settlement, figures far above what is typical in settlements of this sort. JA__{Corrected 9/12/13 Tr. at 65}.

The Objectors are a "Who's Who" of American merchants, representing a wide range of industries: Amazon, Amtrak, Best Buy, Foot Locker, Gap, Home Depot, IKEA, J.C. Penney, Lowe's, Macy's, Office Depot, PETCO, PetSmart, Staples, Starbucks, Target, Wal-Mart, and Whole Foods, to name just a few.[18]  More than just large merchants objected:  Thousands of small merchants from every region of the country also rejected the Settlement.[19]  Dozens of trade associations—including NRF and RILA—collectively representing the interests of tens of thousands of merchants opposed the Settlement.  JA __{DE2538}; JA__{DE2469}; *see also* JA__{DE6234} (National Federation of Independent Business).  Consumer groups opposed the Settlement.  JA__{DE2598} (Consumers Union of United States); JA__{DE2361} (U.S. Public Interest

---

[18] *See* JA__{DE2605}; JA__{DE2444}; JA__{DE2445}; JA__{DE2587}; JA__{DE2563}; JA__{DE2591}; JA__{DE2458}; JA__{DE2509}; JA__{DE2437}; JA__{DE2517}; JA__{DE2519}; JA__{DE2491}; JA__{DE2467}; JA__{DE2525}; JA__{DE2606}; JA__{DE2495}; JA__{DE2644}; JA__{DE2559}.

[19] *See, e.g.*, Retail Trust LLC d/b/a/ Dave's Soda and Pet City, JA __{DE2538-20}; Lipert International Inc., d/b/a Keith Lipert Gallery, JA __{DE2538-21}; Heinen's Fine Foods, JA __{DE3755}; Life Time Fitness, Inc., JA __{DE5385}; B & H Foto & Electronics Corp., d/b/a B&H Photo, JA __{DE2408}.

Research Group).  And 48 states plus the District of Columbia opposed the

Settlement.  JA__{DE2623}.

Among those merchants who expressed a view, opposition to the

Settlement is virtually unanimous.  The *only* merchants that voiced approval of the

Settlement, other than the remaining named Plaintiffs, were the "Individual

Plaintiffs."  SPA6.  These are 22 merchants whose separate lawsuits, filed

contemporaneously with the Class Complaint, were consolidated with this action.

*See* SPA111 (Settlement ¶ 1(aa)) (identifying Individual Plaintiffs).  Visa and

MasterCard settled separately with the Individual Plaintiffs in agreements (whose

terms were not disclosed) that were a condition precedent to the class settlement.

JA__{DE1588 at 1}.

## B.  RILA's and NRF's Objections

NRF and RILA objected to the (b)(2) Settlement and opted out of the

(b)(3) settlement class.  JA__¶ 4-5{DE2538-2}; JA__, __ ¶¶ 2, 11{DE2469}.  As

trade associations, RILA and NRF represent their own interests and the interests of

their merchant members.  *See* JA__, __ ¶ 2, 4{DE2538-2}; JA__, __ ¶¶ 2-

4{DE2469}.  NRF's and RILA's memberships account for over $1.5 trillion in

annual retail sales, millions of American jobs, and more than 100,000 store

locations nationwide.  *See* JA__, __ ¶¶ 2-4.

26

### C.    The District Court's Decision

Notwithstanding this overwhelming negative response, on December 13, 2013 the district court granted final approval.  SPA55.  The district court's order is noteworthy in a number of respects.

First, the district court did not separately analyze the (b)(2) and (b)(3) Settlements.  Instead, it balanced the relief provided to the *(b)(3)* class against the Release required of the *(b)(2)* class.

Second, the district court treated the reaction of the class as a "mixed bag," and dismissed the arguments of sophisticated, well-represented merchants (some of the largest merchants in the nation) as "needless hyperbole."  SPA14.  As the record reveals, these objections were substantive and thoughtful, and they reflected the strong opposition of merchants who are trapped in a settlement they fervently oppose.

Third, the district court found that Plaintiffs were unlikely to succeed on their antitrust claims, ignoring this Court's decision in *U.S. v. Visa* striking down similar restraints.  Partially on that basis, but also based on the district court's perception of the limits of its authority, the district court concluded that it "would be in no position to grant the sweeping relief the objectors seek."  SPA17.

Fourth, the district court recognized that most merchants will be precluded from surcharging.  SPA41.  The court appointed Professor Alan Sykes,

27

an economist, to determine the economic "benefits of the proposed rules changes to the merchant class," SPA15, but it disregarded Sykes's conclusion that the Settlement's modification of the no-surcharge rule was of "uncertain" value, and may very well "have only a small impact" on interchange fees.  JA__{DE5965 at 3}.

Finally, though the district court's opinion initially states that "Class Plaintiffs face the risk that the classes would not be certified," the opinion later concludes that the certification requirements are "easily met."  *Compare* SPA34, *with* SPA52 n.20.  The district court certified (b)(2) and (b)(3) settlement classes,[20] approved the Settlements, and entered judgment.

## STANDARD OF REVIEW

This Court generally reviews a district court's approval of a class settlement for abuse of discretion.  *See Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)*, 957 F.2d 1020, 1026 (2d Cir. 1992).  But where, as here, "the validity of the settlement . . . rests on the determination of novel issues of . . . law," "a higher degree of judicial scrutiny is required" and the district court's decision is reviewed *de novo*.  *Id.*

---

[20] The Rule 23(b)(3) class consists of entities that have accepted Visa or MasterCard from January 1, 2004, to November 28, 2012.  SPA118.  The Rule 23(b)(2) class consists of all present and future entities that have accepted Visa or MasterCard since November 28, 2012, or will accept them in the future.  *Id.*

Even if abuse of discretion is applied, a district court's opinion must be reversed where it lacks "a factual basis in the record," *Emp'rs. Ins. of Wausau Cty. v. Fox Entm't Group*, 522 F.3d 271, 276 (2d Cir. 2008), or is based on "a clearly erroneous finding of fact" or "mistaken application of the law," *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

## SUMMARY OF ARGUMENT

**I.** The district court erred as a matter of law in failing to conduct a separate analysis limited to the Rule 23(b)(2) Settlement, and by conflating the (b)(3) and (b)(2) settlements. This was error because the (b)(2) Settlement must be evaluated on its own merits, based on the limited relief it provides to the (b)(2) class and the mandatory Release that it imposes. The (b)(2) and (b)(3) classes have different constituencies and a substantial portion of the (b)(2) class—including an incalculable number of future merchants and opt-outs from the (b)(3) class—will receive no relief from the (b)(3) settlement fund.

**II.** The Class has strong antitrust claims. The banks, through Visa and MasterCard, collectively set rules to (i) suppress competition between the banks for merchant acceptance (Honor-all-Cards) and (ii) fix the fees banks charge merchants (default interchange). An explicit condition of Visa's and MasterCard's reorganizations was that they would preserve these anti-competitive rules—and they have.

29

The district court's legal analysis that the challenged rules may "quite easily withstand" antitrust scrutiny is riddled with legal errors. SPA16. It ignored this Court's holding in *U.S. v. Visa* that Visa and MasterCard have "market power" and that their member banks collusively set rules that, like the Honor-all-Cards and default-interchange rules challenged here, injured competition. And it ignored evidence of the anti-competitive effects of these rules, namely, the continued increases to interchange rates without cost justification. The court also improperly relied on DOJ's inaction as evidence of a determination on the merits and mistakenly drew comfort from the reorganizations of these entities—when in reality those reorganizations locked in the prior anti-competitive rules and changed nothing.

**III.**    The district court erred in finding the (b)(2) Settlement adequate, particularly when weighed against the best trial recovery. At trial, the Class could have obtained a rescission of the rules at issue (here, Honor-all-Cards and default-interchange), as was obtained in *U.S. v. Visa* and *Visa Check*. In contrast, this Settlement ratifies and codifies these rules. The Settlement's primary relief is a limited and inconsequential "right" to surcharge. Weighed against this illusory relief is a broad Release that entrenches Defendants' anti-competitive rules—even rules that were not at issue—rendering them immune from future challenge by merchants. The Release unfairly bars merchants from obtaining damages for the

30

future effects of these continuing antitrust violations. In the face of changing

technology that threatens Visa's and MasterCard's market dominance, this

Settlement enshrines the anti-competitive status quo.

    **IV.** The district court unfairly dismissed the industry-wide objections to

the Settlement. The objecting merchants, including sophisticated entities

responsible for a large proportion of credit-card transactions, offered detailed,

substantive business and legal rationales for their objections to the Settlement.

Their objections should be afforded additional weight because the absent (b)(2)

class members cannot opt-out.

## ARGUMENT

## I.    THE LEGAL STANDARD FOR ANALYZING A MANDATORY (B)(2) CLASS SETTLEMENT

    Rule 23(e) permits the approval of only those class settlements that

are "fair, reasonable, and adequate." "[I]n the settlement phase of a class action[,

the district court is] a fiduciary of the class, [and] is subject therefore to the high

duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial Nat'l

Bank*, 288 F.3d 277, 280 (7th Cir. 2002). Class settlements "that are essentially

hollow should be avoided so that the public retains or grows its confidence in class

actions and the legal system." *City of Livonia Emps.' Ret. Sys. v. Hanson*, 238

F.R.D. 476, 482 (D.S.D. 2006). The settlement's proponents have the "burden of

proving the fairness of the settlement."  4 Alba Conte & Herbert B. Newberg,

*Newberg on Class Actions* § 11:42, at 118 (4th ed. 2002)  (hereinafter "Newberg").

Because the Settlement here was "negotiated prior to class

certification," it "is subject to "a higher degree of scrutiny in assessing its

fairness."  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).  And the

"settlement context" "demand[s] undiluted, even heightened, attention" to

"unwarranted or overbroad class definitions" to "protect absentees," especially

where absent class members are bound to a mandatory class.  *Amchem Prods., Inc.

v. Windsor*, 521 U.S. 591, 620 (1997).

The analysis of the substantive fairness of a settlement involves

consideration of a range of factors—termed the *Grinnell* factors:

> (1) the complexity, expense and likely duration of the
> litigation; (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial; (7)
> the ability of the defendants to withstand a greater
> judgment; (8) the range of reasonableness of the
> settlement fund in light of the best possible recovery; (9)
> the range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of
> litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*")

(internal citations omitted), *abrogated on other grounds by Goldberger v.

Integrated Res., Inc.*, 209 F.3d 43, 48-50 (2d Cir. 2000).  Basically, the court must

32

"compare the terms of the compromise with the likely rewards of litigation." *W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir. 1971) (internal quotation marks omitted).

Because *Grinnell* arose from a Rule 23(b)(3) settlement, the factors are reoriented when analyzing the fairness of a mandatory (b)(2) settlement.[21]  For example, while the *Grinnell* factors speak of the reasonableness of the "settlement fund," in a (b)(2) settlement the court must analyze the reasonableness of the "terms of the compromise," i.e., weigh the relief against the attendant release.[22]

Two points are essential.  *First*, the court must *separately* analyze the benefits received by the (b)(2) class as distinct from the money obtained by the (b)(3) class.  *Second*, the court must closely scrutinize a (b)(2) settlement from which there is no ability to opt-out, particularly where there is broad opposition. Here, the district court did neither.

---

[21] *See, e.g.*, *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000) (noting that certain *Grinnell* factors "were irrelevant" to approval of (b)(2) settlement); *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 CM, 2012 WL 2505644, at *5 (S.D.N.Y. June 27, 2012) ("In evaluating settlements involving only injunctive or declaratory relief, courts have chosen not to examine the *Grinnell* factors pertaining to damages.").

[22] *Chas. Pfizer*, 440 F.2d at 1085.

## A.    The District Court Erred in Justifying the (b)(2) Settlement With the Value of the (b)(3) Relief

The Rule 23(b)(2) class of present and future merchants will receive no monetary relief; it will instead receive only "certain reforms of the defendants' rules and practices," SPA6.

As the Merchants' Joint Brief persuasively argues, the district court erred in creating two settlement classes; instead, a single (b)(3) class should have been created, with attendant opt-out rights.  But, having created two distinct classes, the monetary (b)(3) Settlement cannot then be used to justify the onerous terms of the mandatory (b)(2) Settlement.  Doing so heightens the risk—as happened here—that class counsel will waive valuable claims by (b)(2) class members (such as claims for future damages) to secure monetary payments to the (b)(3) class, which then become the basis for a lucrative fee award.  SPA61-62 (basing fees on (b)(3) relief); *see also* Merchants' Joint Brief, Argument § III.B.

An appropriate (b)(2) *Grinnell* analysis must focus exclusively on the value of the rules changes, the impact of the mandatory release, and the risks of litigating the injunctive claims.  The (b)(3) Settlement's terms, including the settlement fund, are irrelevant for several reasons.

First, the (b)(3) class's monetary relief does not benefit substantial portions of the (b)(2) class.  In material respects, the (b)(3) class consists of different members than the (b)(2) class.  Most importantly, the (b)(3) class does not

34

include future merchants and opt-outs. Given the different constituents of each settlement class, the appropriate legal analysis must evaluate the merits of the relief given to *each* settlement class *independently* under Rule 23(e). *See Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982) (court must "weigh [the] advantages [of the proposed relief from the settlement] against the disadvantages, if any, that may result from the proposed decree").

Second, the district court's erroneous belief that, at trial, damages would be difficult to prove should not have been weighed against the adequacy of the (b)(2) relief. The (b)(2) class, by definition, should have nothing to do with damages; it solely seeks *injunctive* relief. The district court's claim that Plaintiffs will need to overcome the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), SPA27-28, which bars Sherman Act *damages* claims by indirect purchasers, is wholly inapposite in this context,[23] and its identification of *Illinois Brick* as a risk justifying the (b)(2) Settlement was legal error.

The district court's core error, however, was to treat the (b)(2) and (b)(3) Settlements as unitary, blurring their important legal and procedural distinctions, and "counting" the (b)(3) monetary relief in the fairness calculation for the (b)(2) Settlement. This permeated the lower-court decision. Once the

---

[23] *Laumann v. NHL*, 907 F. Supp. 2d 465, 480 n.80 (S.D.N.Y. 2012) ("*Illinois Brick* bars only damages under Clayton Act § 4, not injunctive relief under § 16.").

damage award is removed from the inquiry—an analysis the district court never performed—it becomes clear that *no* meaningful relief is afforded the (b)(2) class, and the unfairness of the Settlement emerges in stark relief.

### B.     Trapping Class Members into an Objectionable Settlement Raises Serious Fairness Concerns

A mandatory (b)(2) class settlement deprives class members of their claims "in return for" relief that class counsel obtained without input from absent class members. In a settlement without opt-out rights, the "legal rights of absent class members . . . are resolved regardless either of their consent, or, in a class with objectors, their express wish to the contrary." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 (1999). In contrast, the opt-out provision of Rule 23(b)(3) "protect[s] objecting class members," and may counsel approval of an otherwise controversial settlement. *Cobell v. Salazar*, 679 F.3d 909, 920 (D.C. Cir. 2012).

Fairness thus dictates that, though the Federal Rules permit mandatory injunctive settlements in appropriate cases, a court must carefully weigh that this Settlement binds large numbers of the unwilling without an opt-out provision.[24] Here the chorus of opposition to the (b)(2) Settlement strongly suggests that the district court's approval was based on a misguided and paternalistic finding that

---

[24]  *See* Manual for Complex Litigation (Fourth) § 21.62 (2004) (court must consider "whether the class is mandatory or opt-out" in analyzing class settlement fairness).

class members cannot determine their own best interests.  The district court

improperly dismissed the reaction of the class, the very issue that this Circuit

identified as "perhaps the most significant factor" in a fairness inquiry.  *Visa*

*Check*, 396 F.3d at 119.  This was also error.

Rather than scrutinize whether the (b)(2) class here met the

"heightened" Rule 23 standard applicable to proposed settlement classes, which

provide no subsequent opportunity to "adjust the class," *Amchem*, 521 U.S. at 620,

the district court held that the possibility that its certification decision was

erroneous *supports* approving the Settlement, SPA34.  But after *Amchem*, 521 U.S.

at 621, a risk of decertification of a mandatory (b)(2) class—i.e., a risk that absent

parties are improperly bound by a judgment—militates against, not in favor of,

approving a classwide settlement.  The district court erred as a matter of law in

concluding otherwise.

## II.    THE DISTRICT COURT'S CONCLUSION THAT THE MERCHANTS' ANTITRUST CLAIMS WERE WEAK IS ERRONEOUS, AS IT MISAPPLIED GOVERNING LAW

In determining whether to approve or reject a classwide settlement

under Rule 23, the trial judge must consider the merits of the underlying action.

*Grinnell*, 495 F.2d at 463 (court must balance "risks of establishing liability").

Here, the district court did so—but its "analysis" was incomplete and riddled with

error.

37

In evaluating the strength of claims under the rule-of-reason framework applied here, a court must consider: *first*, whether the defendants have "market power" within the relevant market; *second*, whether the exercise of such market power has resulted in anti-competitive effects, such as supra-competitive prices; *third*, whether the challenged restraints have a pro-competitive justification; and *fourth*, if a pro-competitive justification is shown, whether the restraint is reasonably necessary to achieve the pro-competitive ends, or whether a less restrictive alternative is available.  *U.S. v. Visa*, 344 F.3d at 238.  The district court failed even superficially to undertake this analysis, bypassing three of the four steps entirely.

The evidence is overwhelming that (i) Visa and MasterCard exercise "market power" in the U.S. market for card acceptance and (ii) Defendants' enforcement of the Honor-all-Cards and related anti-steering rules have allowed them to fix interchange rates at supra-competitive rates, which have inexorably risen even as processing costs have declined.  The district court mentioned neither this market power nor the anti-competitive effects, skipping the first two parts in the antitrust analysis.  Having done so, the district court compounded its error by declaring the key restraint at issue, HAC, to be "pro-competitive" while failing to consider whether, in a mature payment-card market, HAC and default interchange are still necessary, assuming they ever were.  Finally, to bolster its flawed inquiry,

the district court assigned weight to the DOJ's alleged "inaction" on HAC and cited the networks' corporate reorganizations, which did nothing to change the nature and impact of the challenged restraints. The district court's determination that default-interchange rules and Honor-All-Cards "could quite easily withstand" a rule-of-reason analysis, SPA16, is grounded in these errors.

## A. Visa and MasterCard Have Market Power, and Have Imposed Ever-Increasing Interchange Fees on Merchants—Key Facts the District Court Ignored

The analysis begins with the fact that, as this Court expressly held, Visa and Master Card have "market power"—i.e., the "power to control prices or exclude competition"—in the market for card acceptance. *U.S. v. Visa*, 344 F.3d at 239-40 (internal quotation marks omitted).[25] And a 2011 consent judgment entered upon a DOJ determination rested on the same conclusion.[26] This Court's holding was based on evidence that: (i) merchants "could not refuse to accept payment by Visa or MasterCard, even if faced with significant price increases [in interchange fees]," (ii) where interchange fees increased, "no merchant had discontinued

---

[25] *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004); *U.S. v. Visa*, 344 F.3d at 238-39.

[26] The DOJ found that Defendants were able to "maintain high prices [i.e., interchange rates] for years without threat of price competition by new entry or expansion in the market," and that Visa's and MasterCard's interchange rates were supra-competitive and not grounded in their costs. Competitive Impact Statement, at 6-7, *United States v. Am. Express Co.*, No. 10-cv-4496-NGG-RER (E.D.N.Y. Oct. 4, 2010), ECF No 5.

acceptance" of Visa or MasterCard, and (iii) Visa and MasterCard held "large shares of a highly concentrated market." *Id.* Even the district court's independent expert concluded that the merchants had a "fairly high" likelihood of demonstrating Visa's and MasterCard's continued market power. JA__{DE5965 at 9}.

The district court's failure to account for Visa's and MasterCard's market power is more than a technical misstep in the rule-of-reason analysis. It reflects a failure to appreciate the severely compromised position in which merchants find themselves. Unable, by dint of the Honor-all-Cards and anti-steering rules, to influence the networks' pricing practices as reflected in default interchange, or to turn to other banks' cards for better pricing, merchants must "choose" between accepting what Visa and MasterCard "offer," or exiting the debit- and credit-card markets. In a world where over 90% of transactions are performed on MasterCard and Visa products, that is no choice at all. JA__{DE2670-8 at 102}.

Having disregarded the first step of the rule-of-reason analysis, the district court then bypassed the second: the substantial record evidence of the anti-competitive *effects* caused by the banks' agreements not to compete (i.e., Honor-All-Cards), including the consistent increases in interchange fees despite decreasing costs. JA__-__ ¶ 22{DE2670-5}. Such evidence was front and center

40

in this case, and was largely undisputed by the Defendants.[27]  The district court's

failure to recognize its significance was clear error.[28]

### B. The District Court's Analysis of HAC and Default Interchange's Purported Pro-competitive Justifications Was Flawed and the Court Did Not Analyze the Necessity of These Restraints

If the district court's failure to consider the networks' "market power"

and its anti-competitive effects was error, its claim that the default-interchange and

Honor-All-Cards rules are pro-competitive, while never considering the necessity

of these rules, was error compounded.  SPA16.

#### 1. The District Court Erred in Evaluating the Pro-competitive Effects of the Challenged Rules

The district court made three legal errors in finding that the HAC and

default-interchange rules are pro-competitive.  First, the district court asserted that

the costs imposed on merchants by high interchange fees are justified by the fact

that such fees make "card features and rewards"—favorites of consumers, and

important tools for banks to lure them—possible.  SPA29.  This effort to justify

harm in one market—the market for card acceptance by merchants—through

benefits in another—the market for consumers—is wrong as a matter of antitrust

---

[27] *Compare* JA__-__, __ ¶¶ 45(g), 93(a) (Class Pls.' Statement of Undisputed Facts){DE1543} *with* JA__-__, __ (Defs.' Counter-Statement in Opp. To Class Pls.' Statement of Undisputed Facts){DE1550 at 159-60, 336}.

[28] The Federal Reserve found that, in 2011, Visa's and MasterCard's signature-debit and PIN-debit card interchange rates—fees at issue in this case—were substantially above cost.  JA__, __-__{DE 2670-6 at 78, 88-92}.

41

law.  The markets for cards issued to consumers, and for network services offered to merchants, are "two interrelated, but *separate*, product markets."  *U.S. v. Visa*, 344 F.3d at 238.  It is a well-established antitrust tenet that supposed pro-competitive benefits in one market cannot justify a competitive restraint in another.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("[The freedom to compete] cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy.").  Put differently, it was error for the district court to justify the supra-competitive prices merchants pay on the basis that "consumers benefit" from rewards programs that such prices allegedly subsidize.  Such cross-subsidization is proof of an antitrust problem, not a defense to one.

Second, the district court erred by holding that, because HAC and default interchange may have been helpful to encouraging banks to issue credit cards when the system was first established decades ago, such restraints are "pro-competitive."  SPA31.  The issue is not what may have been justifiable in the networks' infancy; the question is the effect of the challenged rules *today*.  Today, the effect of such rules is ever-rising interchange fees—precisely the outcome that the district court ignored.  "MasterCard and Visa have been mature, ubiquitous

networks with substantial market power for some time."[29]  Because "market power

bears a particularly strong relationship to a party's ability to injure competition,"

increased market concentration as an industry "matures" is precisely what can

*cause* antitrust violations.  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med.*

*Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993).

      Third, the district court relied on inapposite case law.  The district

court erred in claiming that "a number of courts" have found the "the Honor-all-

Cards rule . . . to be *procompetitive* under the Rule of Reason."  SPA31 (emphasis

in original).  No court has addressed that question,[30] and it is difficult to understand

how a court could bless HAC, given that it is a clear horizontal agreement not to

compete of the sort traditionally condemned by the antitrust laws, regardless of

whether the "rule- of-reason" or per se analysis is employed.  *Compare NCAA v.*

*Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 106-07 (1984) (under rule-of-

reason, anti-competitive consequences of  arrangement are "apparent" when

---

[29] Report of Alan S. Frankel, Ph.D. (July 2, 2009), JA__-__ ¶ 218{July 2, 2009 Report at p108-109}; *see also id.* at JA__-__ ¶¶ 216-220{July 2, 2009 Report at 107-110}; Expert Report of Joseph Stiglitz, Ph. D. (Jun. 25, 2009), JA__ ¶ 9{June 25, 2009 Report at 4}.

[30] That the district court cited only a journal article and a talk given by an antitrust practitioner to support its conclusion underscores the conclusion's weakness.  SPA 31-32.  After seven years of litigation, there should have been at least some record evidence to support the proposition that these rules "made (and continue to make) the networks successful."  SPA32.  Yet the court cited none.  *See Fox Entm't*, 522 F.3d at 276 (reversing lower opinion that lacked "a factual basis in the record").

"competitors lose their freedom to compete," and "[p]rice is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference"), *with Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (competitors' agreement not to compete in one another's territories was illegal per se).

The district court also cited *Buffalo Broadcasting Co., Inc. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), which upheld ASCAP's blanket music copyright license.  SPA31.  *Buffalo Broadcasting* is inapposite.  There, ASCAP's blanket license only survived antitrust scrutiny because there were "realistically available alternatives" to that license.  *Buffalo Broad.*, 744 F.2d at 933.  Here, there are *no* alternatives for merchants:  All merchants are required by HAC to accept all issuers' cards.  Had ASCAP *required* all licensees to accept the blanket license without alternatives, the analogy to this case would have been apt—but the *Buffalo Broadcasting* court would clearly have held that practice unlawful.  *Id.* at 922-23 (citing with approval *Alden-Rochelle, Inc. v. ASCAP*, 80 F. Supp. 888 (S.D.N.Y. 1948)).

Finally, having recognized that *National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986) ("*NaBanco*"), is no longer useful

44

precedent on the legality of interchange,[31] the district court erroneously relied on

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), for the proposition that

the default-interchange rules do not violate antitrust law.  SPA30.  *Kendall*,

however, was resolved on a motion to dismiss and has no precedential value.

There, the plaintiffs mistakenly alleged that interchange fees are paid *to Visa and*

*MasterCard*, rather than to the banks, and the court thus held that the complaint

alleged no facts to support their theory that defendant banks conspired or agreed

with each other.  *Id*. at 1048-50.

> **2.     The District Court Never Considered Whether HAC and
> Default Interchange Remain Necessary Today, or Whether
> a Reasonable Alternative to Them Exists**

The district court undertook absolutely no consideration of the last

factor in a "rule-of-reason" analysis:  It never considered whether the alleged pro-

competitive purposes behind the restraints are still necessary or can be achieved

through other, less restrictive means.  In an economic environment where Visa and

MasterCard acceptance is ubiquitous and fully expected by the purchasing public,

there is no basis to conclude that HAC and default-interchange remain necessary to

ensure broad merchant acceptance.  There is no logical reason why merchants

---

[31] The district court acknowledged that the factual underpinning for the claimed
justification for interchange—that issuers need such fees to have adequate
incentives to participate in the system—"has eroded" since the 1980s when that
rationale convinced the Eleventh Circuit in *NaBanco* to uphold Visa's default-
interchange rule.  SPA30.

could not be permitted to refuse the highest-priced cards.  Nor need every

merchant pay the dictated default interchange price.

In *U.S. v. Visa*, this Court balanced the "anticompetitive effects" of

Visa's and MasterCard's rules against their "procompetitive benefits."  344 F.3d at

242.  On balance, this Court held, Visa's and MasterCard's rules in that case—

"agree[ments] not to compete by issuing cards of Amex or Discover"—were

horizontal restraints of trade in violation of Sherman Act § 1.  *Id.*  In so

concluding, this Court held that the member banks "effectively operated" Visa and

MasterCard and "set the policies of Visa U.S.A. and MasterCard."  *Id.*

The district court here did not so much as mention, much less conduct,

such a balancing.  Although the "policies" "set" collusively by the banks in *U.S. v.*

*Visa* include the very rules challenged here (Honor-all-Cards and default-

interchange), the district court failed to explain how similar agreements not to

compete, jointly set by competitors, could survive the rule-of-reason in light of this

Court's holding in *U.S. v. Visa*.

### C.    The District Court Erred by Relying on DOJ Inaction and the Corporate Reorganizations to Bolster Its Conclusions

#### 1.    DOJ's Inaction Is Not Evidence of Government Approval

The district court cited DOJ's inaction as evidence that Plaintiffs'

antitrust claims were weak.  SPA10, 30.  DOJ's inaction is irrelevant as a matter of

law to determining the legality of a business practice, and is certainly not

tantamount to a governmental blessing.[32]  DOJ's discretionary decisions about how to deploy its limited resources are based on many factors, including whether the private "antitrust class action bar had both the desire and the resources to prosecute such a suit vigorously."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 665 (7th Cir. 2002) (rejecting same argument).

Here, this private suit was well underway at the time of DOJ's investigation.  DOJ took no position on the legality of HAC or default interchange, and expressly reserved the right to challenge them at a later date.[33]  The absence of enforcement action by DOJ does not support the proposition that HAC and default-interchange rules would withstand a rule-of-reason inquiry.  *Cf.* SPA16, 30, 45.

### 2. Visa's and MasterCard's Corporate Reorganizations Did Not "Strengthen[]the Defendants' Argument" That Their Anti-competitive Rules Were Not Horizontal Restraints of Trade

The district court erred in finding that Visa's and MasterCard's reorganizations "strengthened" Defendants' claim that "the setting of interchange fees cannot constitute horizontal price fixing."  SPA28.

---

[32] *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 659 (E.D. Mich. 2011); *In re Carbon Black Antitrust Litig.*, No. 03 Civ. 10191-D, MLD 1543, 2005 WL 2323184, at *1 (D. Mass. Sept. 8, 2005).

[33] Competitive Impact Statement at 16 n.3, *United States v. Am. Express Co.*, No. 10-cv-4496 (E.D.N.Y. Oct. 4, 2010), ECF No. 5.

Visa and MasterCard claim that their reorganizations cleansed them of *U.S. v. Visa*'s finding of antitrust liability.  But the new corporate forms imported and maintained the same illegal policies as existed before the reorganizations.  *See* JA__-__ ¶¶ 33-40{DE1543}.  Indeed, Visa and MasterCard owner/member banks *required* that the networks' anti-competitive rules remain in place as an express precondition to the reorganizations.[34]  The banks thus "locked in" the preexisting horizontal restraints.

Enshrining illegal restraints in reorganized companies fixes nothing, and certainly does not "strengthen" Defendants' case.  The European Commission found that "MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the [interchange fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny."  JA__ ¶ 378{DE1573-3}.  "The member banks effectively 'outsourced'" their interchange pricing decisions "to a new management body . . . after MasterCard's management assured them that the banks' interests will continue to be preserved."  *Id.*  As the European General Court affirmed in May 2012, "the MasterCard payment organisation [. . . ] continued to be an institutionalised form of coordination of the conduct of the

---

[34]  *E.g.*, JA__{DE2670-9 at 177} ("[T]he Parties shall . . . cause the Board of Directors of Visa USA to cause the By-Laws of Visa USA to be amended and restated in their entirety . . . .").

banks." JA__ ¶ 259{Case T-111/08, *MasterCard, Inc. and Others v. Eur. Comm'n* (May 24, 2012)}.

The European Commission's analysis mirrors long-standing U.S. antitrust jurisprudence, which looks to the parties' *functional* relationship rather than their corporate form in assessing whether there is a horizontal restraint. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191, 195-96 (2010). In *American Needle*, the Supreme Court emphasized that "[a]n ongoing § 1 [of the Sherman Act] violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." *Id.* at 197.

Since their reorganizations, as before, the networks enforce horizontal inter-bank restraints on trade, such as HAC and default interchange. And interchange rates have continued to increase since the reorganizations. JA__-__ ¶ 22{DE2670-5}. No signs of newfound competition have emerged. In concluding that the reorganizations strengthened Defendants' position, the district court did not engage in the required "functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 560 U.S. at 191. Had the district court performed even a cursory functional analysis, it would have concluded, just as the European Commission did, that the reorganizations were a change in *form* designed to be "less exposed to antitrust scrutiny," while preserving the *substance* of the preexisting agreements not to compete.

49

## III.  THE (B)(2) SETTLEMENT IS NOT REASONABLE IN LIGHT OF ITS COST AND AS COMPARED TO THE BEST POSSIBLE RECOVERY

In evaluating the Settlement's reasonableness, the district court should have compared the best possible recovery to the "advantages" of the proposed relief coupled with the "disadvantages" of the Release.  *Plummer*, 668 F.2d at 660.  At trial, the Class could have obtained a clean rescission of the challenged rules.  In contrast, the (b)(2) Settlement provides *no* meaningful relief, yet its Release exacts a dear price: immunization of Honor-all-Cards and default-interchange rules, and a release of future damages worth billions of dollars.

The Settlement even seeks to extinguish claims that are beyond this lawsuit's scope and claims that are not yet ripe, including claims challenging Visa's and MasterCard's attempts to quash emerging technologies that may pose the clearest threat to the networks' dominance.  Such a settlement is not fair, reasonable, or adequate.

### A.  The Best Possible Recovery Is a Clean Rescission of the Challenged Rules

The district court should have compared the Settlement against the "best possible recovery."  *Grinnell*, 495 F.2d at 463.

Here, the best possible recovery would be the rescission of the Honor-all-Cards, default-interchange, and no-surcharge rules.  In every previous antitrust action against Visa and MasterCard reviewed by this Court, the rules at issue were

50

rescinded. *See Visa Check*, 396 F.3d at 101 (revoking by settlement rule tying debit to credit cards); *U.S. v. Visa*, 344 F.3d at 234 (rescinding prohibition on issuance of AmEx and Discover cards). This is the only case that has not rescinded the challenged rules.

Court injunctions against anti-competitive policies or agreements are commonplace in antitrust litigation. The district court's suggestion that something different is required here, or that striking down various anti-competitive rules would somehow enmesh the district court in price-setting or "regulation" of the payments industry, is incorrect. SPA17, 52. Removal of the challenged restraints would let the market function freely.

### B. The (b)(2) Settlement Unjustifiably Releases Merchants' Claims for Future Damages and Injunctive Relief and Makes Things Worse by Immunizing Future Anti-competitive Behavior—All for Little or No Relief

The (b)(2) Release gives Visa and MasterCard a *perpetual* "get out of jail free" card. It applies not only to current wrongdoing, but to "future effects" of future rules and policies—such as the effect on developing mobile payment technologies—so long as the new rules are "substantially similar" to existing rules and policies. In exchange for the illusory and *uncertain* relief provided to the (b)(2) class, Visa and MasterCard purchased the *certain* right to free themselves of antitrust scrutiny from merchants and to immunize the core restraints supporting their market power. Effectively, the Release enshrines the current broken system.

51

It is no surprise that Visa and MasterCard sought this broad Release, but this Court should not force merchants to accept it.

It is not, as the district court suggested, "hyperbole," SPA14, to say that the Release creates a worse result than if the Plaintiffs tried and lost the case: The Settlement is far broader than the preclusive effects of a judgment for Defendants.[35]  Each instance of Defendants enforcing their anti-competitive rules—e.g., by requiring a merchant to honor all cards—"constitute[s] a continuing violation" of the Sherman Act, giving rise to a separate antitrust claim.  *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).  Thus, claim preclusion does not bar a subsequent antitrust suit when defendants continue their objectionable conduct after a judgment in an earlier suit; the earlier judgment "cannot be given the effect of extinguishing claims which did not even then exist."  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).[36]  Likewise, issue preclusion would not preclude litigation over new facts.  Here, if the challenged conduct survived rule-of-reason analysis at trial, Objectors still could

---

[35]  If the class were decertified, as the district court indicated was possible, any judgment would have bound only the named Plaintiffs, not Objectors, making the Settlement an even worse deal.  *See Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997) (res judicata applies only to parties and those in privity with parties).

[36] *See also Interoceanica*, 107 F.3d at 91 (claim preclusion did not preclude second maritime suit that had similar facts; second suit involved "distinct voyages after those litigated in [the prior case]").

challenge Defendants' conduct in a subsequent suit based on "new facts in any way distinguishable" from the facts alleged herein, e.g., the new effects of mobile technologies.[37]  The Release would preclude such challenges, allowing the indefinite perpetuation of Defendants' illegal conduct.

The district court ignored these issues.  It failed to address the language purporting to release claims concerning the "future effects" of current rules and policies, and it failed to circumscribe the scope of the Release as it will apply to "substantially similar" future rules and policies.  SPA46.  A release of future damages claims is legally improper, *see* Merchants' Joint Brief, Argument § I, and requiring merchants to release billions of dollars of future claims is grossly unfair.

The Release's impact on new technologies is particularly worrisome.  As the district court's expert stated, the Release could "insulate the application of such rules or conduct to new payments technologies in ways that harm competition significantly but cannot be fully appreciated or anticipated presently."  JA__{DE5965 at 4}.  If there were any doubt about the impact the Release might

---

[37] 18 Charles Alan Wright, Arthur K. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisprudence* § 4417, at 426 (2d ed. 2002); *see also Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 465 (3d Cir. 1997) (no collateral estoppel bar to second environmental suit just months after first was dismissed, because plaintiffs discovered additional evidence of harm to endangered species).

have on emerging technologies, Defendants' counsel confirmed their position that the Release covers *all* existing mobile technologies, and even new devices using such technology.  JA__{Corrected 9/12/13 Tr. at 39}.  Given the concerns raised by both the merchant Objectors and the court's expert, the district court's silence on this issue is a striking example of its failure to apply the appropriate degree of scrutiny to this mandatory settlement.

### C.    The (b)(2) Settlement Provides Illusory Relief to Merchants

Weighed against the billions in released future damages and the broad Release is the illusory injunctive relief provided by the (b)(2) Settlement.  Because the Settlement will "continue in effect the very provisions . . . challenged as violative of the anti-trust laws," it should not have been approved.  *Helfenbein v. Int'l Indus., Inc. (In re Int'l House of Pancakes Franchise Litig.)*, 487 F.2d 303, 304 (8th Cir. 1973) (disapproving settlement).  The Settlement offers no relief from the principal harms at issue in this case.  Honor-all-Cards is not rescinded; default interchange remains in place.  Absent such fundamental changes, the Settlement is merely a fig leaf designed to justify the "litigation peace" that the district court noted was a primary goal of the Defendants.  SPA44.

### 1.    The Primary Relief—Surcharging—Is Illusory

The (b)(2) Settlement offers merchants an ability to surcharge under very limited circumstances—indeed, as discussed above, none that are practically

54

available. Forty percent of merchants are barred from surcharging due to 10 states' laws.[38] National merchants that operate in those states will not surcharge in any of their stores, because it is costly to implement different surcharging practices in different parts of the country.[39]

And merchants who accept AmEx cannot surcharge Visa or MasterCard, due to the Settlement's so-called level-playing-field provision. *See supra* at 19-20 (describing provision). By making the newfound right to surcharge meaningless for the 90% of merchants (by volume) who accept AmEx, this provision swallows the Settlement's surcharging relief.[40] The result is that "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products," as the district court found. SPA41. It is no surprise that

---

[38] The district court speculated that these state no-surcharging laws might be struck down, relying on the recent invalidation of the New York law. SPA38. But it offered no basis to conclude that such laws would be invalidated within the seven years remaining for the surcharging relief. Moreover, if merchants were to begin surcharging in earnest, it is more likely that additional states would pass prohibitions against the practice. In fact, after the Settlement, anti-surcharging legislation was introduced in 23 states. JA__ ¶¶ 3-5{DE 5939-6}; *see also* JA__ ¶ 6{DE2670-1}.

[39] *See, e.g.*, JA__-__ ¶¶33-35{DE2644} (Walmart Obj.); JA__-__ ¶¶ 15-18{DE2606} (Starbucks Obj.); JA__-__ ¶¶ 22-25{DE2445} (Best Buy Stores, L.P. Obj.).

[40] Many merchants cannot realistically stop accepting AmEx because of the volume of business from consumers using AmEx cards. *See, e.g.*, JA__ ¶ 23{DE2538-2}, JA__{DE2495-1 at 8}. DOJ's lawsuit against AmEx is premised on its market power over most merchants.

MasterCard's CEO described the "level-playing-field" requirement as "protect[ing]" the networks from surcharging.  JA__{DE2670-8 at 370}.

The district court characterized the impact of AmEx's rules on the right to surcharge as beyond its purview.  SPA41-42.[41]  But the problem is not a natural consequence of revoking the no-surcharging rule; it is instead the deliberate result of Defendants' insistence on the level-playing-field provision.  Had Defendants not insisted upon this term, there would be nothing to prevent merchants who accept AmEx from surcharging Visa or MasterCard cards.  In any event, the Settlement's fairness must be evaluated from the class members' perspective.  From that vantage point, the tying of the surcharge relief to the terms of their AmEx agreements renders the relief worthless.

Even Visa and MasterCard concede that the surcharging relief will have little effect.  Visa's CEO stated:  "[W]e do not look at surcharging *per se* as it relates to this litigation as something that will . . . significantly affect us at all.  I mean, that's our feeling about it."  JA__{DE2670-8 at 45}.  Similarly,

---

[41] AmEx's rules have been challenged by DOJ; also pending is a private settlement that, if anything, compounds the problem.  *See United States v. Am. Express Co.*, 10-cv-04496-NGG-RER, 2014 WL 1817427 (E.D.N.Y. May 7, 2014) (denying summary judgment on DOJ's challenge to AmEx's anti-steering rules); Mem. of Law in Supp. of Mot. for Final Approval of Class Action Settlement, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 11-MD-02221 (NGG) (RER) (E.D.N.Y. Apr. 15, 2014), ECF No. 362.  As of this brief's filing, these lawsuits have not been resolved.

MasterCard's CEO stated that based on his "experience of [allowing limited] surcharging in other markets . . . frankly it didn't really lead to a great deal of actual surcharg[ing]," except for "online airline bookings and the like," "because of the obvious consumer dissatisfaction." JA__, __{DE2670-8 at 370, 388}.

      For the millions of merchants who cannot surcharge, the Settlement is unfair and cannot be approved. "[A] total lack of value exchanged for a release of claims is a strong indicator that a settlement is unfair, at least with respect to those disadvantaged members of the class." *Parker v. Time Warner Entm't Co.*, 239 F.R.D. 318, 337 (E.D.N.Y. 2007). A class settlement must be rejected if it does not secure "an adequate advantage for the class in return for the surrender of litigation rights." 4 Newberg § 11:46, at 133.[42]

      Even merchants who can surcharge are unlikely to do so for fear of losing customers to their competitors. JA__ -___ ¶¶ 74-76{DE2670-5}; JA__{DE5965 at 36}.

---

[42] *See also* Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment (nonmonetary settlements "deserve careful scrutiny to ensure that these provisions have actual value to the class"); *Eubank v. Pella Corp.*, 13-cv-2091, 2014 WL 2444388, *3 (7th Cir. June 2, 2014) (calling for "intense judicial scrutiny of proposed class action settlements" and rejecting settlement of highly uncertain value); *Pls.' Class v. Bd. of Comm'rs (In re Katrina Canal Breaches Litig.)*, 628 F.3d 185, 195 (5th Cir. 2010) (rejecting settlement where "there has been no demonstration on the record below that the settlement will benefit the class in any way").

The district court attempted to sidestep the lack of direct relief by speculating that surcharging might provide *indirect* relief, in that "surcharging (or the threat of surcharging) by merchants in the states where it is permitted *may well* inure to the benefit of merchants in those ten states [where surcharging is banned]." SPA38 (emphasis added). Professor Sykes, the court's expert, concluded to the contrary: "[T]he value of surcharging to plaintiffs is highly uncertain and may be small." JA__{DE5965 at 43}.

Ignoring this conclusion, the district court instead cited Plaintiffs' expert's speculation "that the ability to surcharge *could* save merchants between $26.4 and $62.8 billion in acceptance costs over the next decade." SPA35 (emphasis added). But the Plaintiffs' expert only provided an "illustration"; he explicitly disavowed reaching any firm conclusion of the *expected* result. JA__-__ ¶ 77{DE5939-5 at 45-46} (Frankel Reply). The court-appointed expert dismissed this statement as conjecture premised on "shaky" and "questionable" conclusions and "imagin[ed]" assumptions about the extent to which U.S. merchants might surcharge. JA__{DE5965 at 39}.

At best, the value of surcharging will be "small," JA__{DE5965 at 43}, because the economic mechanism envisioned by the district court—that merchants will "disfavor one network at the point of sale by surcharging . . . [which] will incentivize both networks to moderate or lower their interchange fees

to avoid being disfavored," SPA37—will not work. It will not work because, whereas large numbers of surcharging merchants are necessary to potentially exert downward pressure on interchange via surcharging, few merchants will actually surcharge, for the reasons discussed above. It also will not work because Visa and MasterCard retain the right to "buy off" a merchant's right to surcharge, SPA149, 162-63 (Settlement ¶¶ 42(f), 55(f)), which may benefit individual merchants, but will almost certainly ensure that system-wide rates remain at non-competitive levels. Faced with this record, the Settlement's proponents cannot carry their burden of proving that the injunctive relief "has actual value" for merchants. *Greenberg v. Proctor & Gamble Co. (In re Dry Max Pampers Litig.)*, 724 F.3d 713, 719 (6th Cir. 2013) (reversing settlement approval).

When balanced against the *certainty* of the release, the *uncertainty*—and likely worthlessness—of the surcharging relief is insufficient to support approval.

### 2. The Buying Group Provision Is Valueless

The district court, in a tellingly short discussion, concluded that the group-buying provision in which Visa and MasterCard promise to negotiate with merchants is a "meaningful reform that is favorable to merchants." SPA44. This conclusion lacked a factual basis, since merchant groups could negotiate previously, *id.*, yet no negotiation occurred because merchants lacked leverage,

JA__{DE5965 at 45}.  The Settlement thus changes nothing.  The only leverage the court's expert theorized was that merchants could "perhaps" threaten to collectively surcharge, assuming they could overcome the attendant "transaction costs or antitrust concerns." *Id.*  Even assuming that such conduct is legal under the antitrust laws, these tactics would be ineffective where over 90% of merchants (by volume) cannot surcharge.  It is no wonder Professor Sykes concluded that he could not "quant[ify]" this provision's value.  JA__{DE5965 at 31, 44}.[43]

***

In short, the "injunctive relief" provided to the (b)(2) class is inadequate.  The record demonstrates that such relief is illusory—designed not to afford a real remedy to merchants, but rather to provide a basis for certifying a (b)(2) class and imposing a sweeping, mandatory release on its absent members.

## IV.   THE OBJECTIONS OF THOUSANDS OF MERCHANTS THAT WERE POWERLESS TO ESCAPE THE SETTLEMENT IS NOT A REACTION THAT "FAVORS" SETTLEMENT APPROVAL

The retail industry is deeply dissatisfied with the Settlement.  Thousands of merchants, large and small, objected and/or opted out; 19% of merchants, by card volume, objected, and more than 25% opted-out of the (b)(3)

---

[43]  By its silence, the decision below recognized that the remaining (b)(2) relief cannot justify the release of the merchants' claims.

Settlement.[44]  Dozens of trade associations objected.  Even the majority of the

named Plaintiffs objected.

In *Visa Check*, 396 F.3d at 119, this Court stated that reaction of the

class "is perhaps the most significant factor in our *Grinnell* inquiry."  This factor

takes on greater importance where, as here, the settlement is mandatory.  Against

that backdrop, the massive, negative reaction of the class weighs heavily against

approval.

The district court erred in concluding that the "reaction of the class"

supported approval.  SPA23-25.  In unfairly dismissing the Objectors' concerns,

the district court sidestepped the mandatory nature of the settlement.  Had it taken

that into account, it never would have found that the reaction of the class—which

included thousands of objections from sophisticated merchants, large and small—

favored trapping merchants into a settlement that they oppose.  These Objectors

made rational business determinations that the Settlement was a bad deal.[45]

---

[44] The district court minimized the breadth of objection by focusing on the raw percentage of objecting merchants—.05% of the total number of class members by the district court's calculation, which it admitted was little more than a guess. SPA23.  But the parties recognized that the more appropriate metric was the extent of opposition by volume of transactions, a metric that recognizes that larger merchants have more resources to file an objection.  JA__ ¶ 97{DE1588-1}.

[45]  *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995) (finding it significant that "many of the better-informed absentees . . . did object," even if "the absolute number of objectors was

That said, the district court also erred in characterizing the reaction of the class as "a mixed bag," with "intelligent and thoughtful merchants . . . part[ing] company" on support for the Settlement.  SPA24.  The merchants' reaction is not "mixed."  Not a single merchant uninvolved in the settlement negotiation voiced support for the Settlement.

The district court relied on class counsel's claim that 27 of the 60 largest (by transaction volume) merchant opt-outs did not object.  SPA23; JA__-__{Corrected 9/12/13 Tr. at 25-26}.  However, these included many of the 22 Individual Plaintiffs,[46] who received separate, undisclosed deals.  *See* JA__{DE1588 at 1}.[47]  The district court abused its discretion in relying on the

---

relatively low"); *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 673 & n.6, 676 (S.D.N.Y. 2011) (finding that the reaction of a class that may number in the "millions" weighed strongly against approval when 6,800 class members opted out and 500 objections were filed).

[46] While the record does not identify which merchants are included in the 27, it includes many of the 22 Individual Plaintiffs, which are some of the largest grocery and drug store chains in the nation.  *Compare* SPA111 (Settlement ¶ 1(aa)) (listing Individual Plaintiffs), *with* Nat'l Retail Fed'n, Top 100 Retailers (2013), https://nrf.com/resources/top-retailers-list/top-100-retailers-2013 (last visited June 10, 2014).

[47] The class Settlement was expressly contingent on the "successful negotiation of a settlement agreement" with the Individual Plaintiffs, whose effective veto almost certainly resulted in their getting a superior deal:  Their monetary recovery exceeded $525 million, and the other terms of their settlement are unknown.  JA__, __{Visa Form 10K (Annual Report) filed 11/22/2013 at 31, 98, available at http://visa.q4cdn.com/de11876c-2110-47d2-9026-367deae048e9.pdf?noexit=true}; JA__{DE1588 at 1}.  While RILA and NRF take no exception with an individual

support of parties who received special, additional consideration, especially

without examining the separate deals.  Their support cannot outweigh the strong

negative reaction of the remainder of the retail community.

That large numbers of "thoughtful merchants" analyzed the

Settlement and found it to be of no value weighs heavily against a mandatory

settlement.  Put differently, even assuming the district court's characterization of

the reaction of the class as a "mixed bag" was correct, such divisions should have

warranted disapproval of a mandatory settlement.

## CONCLUSION

This Court should reverse.

---

litigant's right to settle its lawsuits as it sees fit, such side deals must be considered
before crediting these litigants' position.  And the district court erroneously refused
Objectors' request to review these side deals, though Fed. R. Civ. P. 23(e)(3)
requires identification of "agreement[s] made in connection with" a class
settlement.  *See* JA__ (09/19/2013 Order).

Dated:      June 16, 2014
            New York, New York

                            EMERY CELLI BRINCKERHOFF
                            & ABADY LLP

                            _____/s/_____

                            Andrew G. Celli, Jr.
                            Debra L. Greenberger
                            75 Rockefeller Plaza, 20th Floor
                            New York, New York 10019
                            (212) 763-5000

                            *Attorneys for Objectors-Appellants*
                            *NRF and RILA*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman at a font size of 14 (12 for footnotes).

Dated:  June 16, 2014

New York, New York

S/ Andrew G. Celli, Jr.

Andrew G. Celli, Jr., Esq.
Emery Celli Brinckerhoff & Abady
*Attorneys for Objectors-Appellants*
*NRF and RILA*
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone: (212) 763-5000