# 12-4671-cv(L)

**12-4708-cv(CON), 12-4765-cv(CON), 13-4719-cv(CON),**
**13-4750-cv(CON), 13-4751-cv(CON), 13-4752-cv(CON), 14-32-cv(CON),**
**14-117-cv(CON), 14-119-cv(CON), 14-133-cv(CON), 14-157-cv(CON),**
**14-159-cv(CON), 14-192-cv(CON), 14-197-cv(CON), 14-219-cv(CON),**
**14-225-cv(CON), 14-241-cv(CON), 14-250-cv(CON), 14-266-cv(CON),**
**14-303-cv(CON), 14-331-cv(CON), 14-349-cv(CON), 14-404-cv(CON),**
**14-422-cv(CON), 14-443-cv(CON), 14-480-cv(CON), 14-497-cv(CON),**
**14-530-cv(CON), 14-567-cv(CON), 14-584-cv(CON), 14-606-cv(CON),**
**14-663-cv(CON), 14-837-cv(CON)**

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

_____

*On Appeal from the United States District Court*
*for the Eastern District of New York*

## PAGE PROOF BRIEF FOR OBJECTORS-APPELLANTS
## U.S. PIRG AND CONSUMER REPORTS

Robert L. Begleiter, Esq.
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, New York 10004
212-344-5400

*Attorneys for Objectors-Appellants*
*U.S. PIRG and Consumer Reports*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................1

JURISDICTION.............................................................................................3

ISSUE PRESENTED ......................................................................................3

STATEMENT OF THE CASE............................................................................4

   I.   Factual Background ..............................................................................4

      A.  Interest of U.S. PIRG and Consumer Reports.............................4

      B.  The Market Power of Visa and MasterCard and the Harm
          to Consumers ............................................................................9

STANDARD OF REVIEW ..............................................................................16

SUMMARY OF ARGUMENT ..........................................................................17

ARGUMENT ...............................................................................................18

   I.   The Surcharging Modifications Are Anticompetitive.....................19

   II.  The Release Locks in Visa's and MasterCard's Substantial
       Market Power..................................................................................25

CONCLUSION .............................................................................................32

i

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Trans Union, LLC*,
   243 F.R.D. 377 (C.D. Cal. 2007) .................................................. 27-28

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) ..................................................................27

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ................................................................. 21-22

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) .....................................................................25

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ...........................................................25

*Gerber v. MTC Elec. Tech. Co.*,
   329 F.3d 297 (2d Cir. 2003) .........................................................16

*In re Int'l House of Pancakes Franchise Litig.*,
   487 F.2d 303 (8th Cir. 1973) ........................................................27

*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*,
   957 F.2d 1020 (2d Cir.1992) ........................................................16

*In re Visa Check/MasterMoney Antitrust Litig.*,
   No. 96-cv-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)............26

*Lawlor v. Nat'l Screen Serv. Corp.*,
   349 U.S. 322 (1955).....................................................................27

*Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*,
   No. 96 Civ. 3839(MBM), 1997 WL 166497 (S.D.N.Y. Apr. 9, 1997)...............27

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) .............................................................31

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
   279 F.2d 128 (9th Cir. 1960) ........................................................22

*Robertson v. Nat'l Basketball Ass'n*,
  556 F.2d 682 (2d Cir. 1977) ...................................................................28

*Temple v. Circuit City Stores, Inc.*,
  Nos. 06-cv-5303(JG), 06-cv-5304(JG), 2007 WL 2790154
  (E.D.N.Y. Sept. 25, 2007)............................................................... 26-27

*United States v. Nationwide Trailer Rental Sys., Inc.*,
  156 F. Supp. 800 (D. Kan. 1957)...........................................................22

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940).................................................................................21

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ............................................................. 9, 14

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ....................................................................31

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir.1982) .....................................................................16

*Zervos v. Verizon N.Y., Inc.*,
  252 F.3d 163 (2d Cir. 2001) ...................................................... 16-17, 25

iii

## PRELIMINARY STATEMENT

Two of the nation's leading consumer organizations—Objectors-Appellants United States Public Interest Research Group ("U.S. PIRG" or "PIRG") and Consumers Union of United States, Inc., d/b/a Consumer Reports—join in this brief to urge this Court to reverse final approval of this class action settlement. Through a new horizontal agreement not to compete by adopting identical rule changes and an extremely broad, mandatory release, this settlement further entrenches the anticompetitive regime Appellees Visa and MasterCard and their member banks have imposed on the payment card industry to the detriment of hundreds of millions of U.S. consumers and merchants.

U.S. PIRG and Consumer Reports are members of the mandatory settlement-only class that the district court below certified under Federal Rule of Civil Procedure 23(b)(2), because each accepts Visa and MasterCard payment cards. These consumer watchdogs opposed the settlement because not only are they unlikely to receive any meaningful benefit from the illusory injunctive relief provided to the class, but also—and more importantly—consumers are unlikely to receive any meaningful relief either.

Consumers are the ultimate victims of high interchange fees that Visa, MasterCard, and their member banks have imposed on merchants for payment card transactions. Although the complaint below broadly challenged the

anticompetitive rules of Visa and MasterCard that propped up these inflated

interchange rates, the settlement leaves that anticompetitive regime undisturbed.

In sum, the settlement permits Visa and MasterCard to obtain a broad release

of any claims challenging those payment networks' anticompetitive rules—now or

in the future—in return for a multi-billion dollar payment to a Rule 23(b)(3)

settlement class of merchants and illusory injunctive relief to a Rule 23(b)(2)

settlement class of merchants. The centerpiece of this injunctive relief is a limited

rule modification to only one of the restraints of trade used by Visa and

MasterCard to suppress competition in the payment card industry. This limited

rule modification is a revision to the Visa and MasterCard rules that prohibit

merchants from surcharging credit card transactions. Under the revised rules,

merchants gain a circumscribed right to surcharge under very limited

circumstances. Indeed, the right is so limited that even the district court, in

certifying the (b)(2) class, found that "most merchants will, as a practical matter,

be precluded from surcharging Visa and MasterCard products." SPA 41.

Consumers are not likely to benefit from this limited right to surcharge. Far

from making the payment industry more competitive, this revision to the

surcharging rules imposes a new restraint on competition that is the result of Visa

and MasterCard making a horizontal agreement on the surcharging terms that they

will offer merchants. Not only does this revised rule represent a new horizontal

2

restraint of trade, but the settlement immunizes both this new rule and all of Visa's and MasterCard's other anticompetitive practices—now, and even in the future—from antitrust challenges from merchants.

U.S. PIRG and Consumer Reports are very concerned that the effect of this settlement—and, in particular, the release—will be to lock in place the anticompetitive regime this case was originally brought to challenge. Unless this Court reverses the district court's approval of the settlement, competition and, ultimately, consumers will be the losers as Visa and MasterCard impose a new restraint of trade and gain broad antitrust immunity from future antitrust challenges.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1337, 2201, and 2202. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The parties to this brief timely filed notices of appeal on January 13, 2014. JA__{DE6189, DE6190}. *See also* FRAP 4(a)(2).

## ISSUE PRESENTED

Should the Court reverse the approval of a class action settlement that threatens harm to consumers by decreasing competition and innovation in the already highly concentrated payment card industry?

# STATEMENT OF THE CASE

This is an appeal from a judgment of the United States District Court for the Eastern District of New York (Gleeson, J.), certifying settlement-only classes and approving a final class-action settlement. The opinion is not yet reported, but is available at 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013).

## I.    Factual Background

### A.    Interest of U.S. PIRG and Consumer Reports

Appellant United States Public Interest Research Group ("U.S. PIRG" or "PIRG") is a federation of independent, state-based, citizen-funded organizations advocating for the public interest. Since 1970, state PIRGs have delivered results-oriented citizen activism, stood up to powerful special interests, and used the time-tested tools of investigative research, media exposés, grassroots organizing, advocacy, and litigation to win real results on issues that matter. Across the country, state PIRGs employ close to 400 organizers, policy analysts, scientists and attorneys, and are active in 47 states, with a federal lobby office in Washington, D.C. On national issues, state PIRGs coordinate their efforts, pool resources, and share expertise as U.S. PIRG so that they can have the strongest impact.

U.S. PIRG played a significant role in fighting for the passage of the Credit Card Accountability Responsibility and Disclosure Act of 2009, and for the consumer protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 which, among other things, established the

4

Consumer Financial Protection Bureau.  U.S. PIRG has also conducted

groundbreaking investigations of the marketing and use of credit and debit cards

on college campuses.

Appellant Consumers Union of United States, Inc., d/b/a Consumer Reports,

is a not-for-profit membership organization, with its headquarters in New York

State, and affiliated offices in California, Texas, Washington, D.C., and

Connecticut.  Its mission is to work for a fair, just, and safe marketplace for all

consumers and to empower consumers to protect themselves.  Consumer Reports is

the largest independent consumer protection organization in the world.  It

publishes one of the United States' top 10 general interest magazines and runs the

country's largest advertiser-free, paid subscriber website.  It has close to eight

million subscribers to its various print and online publications, and works with

about one million on-line citizen activists, as well as tens of thousands of other

grass roots consumer activists.  The organization runs the largest consumer survey

in the country, after the national census.  To retain its independence, Consumer

Reports accepts no advertising and no corporate funding, and its secret shoppers

anonymously purchase the products and services it tests.

Consumer finance is one of Consumer Reports' primary areas of focus and

has been since the organization's founding in 1936.  For decades, Consumer

Reports has educated and advocated on personal finance, including on credit and

debit cards.  It ranks payment cards annually on a variety of criteria; exposes

hidden fees; and explains the effects that new mobile and other payment

technologies have on fees.  Consumer Reports played a significant role in fighting

for the passage of the Credit Card Accountability Responsibility and Disclosure

Act of 2009, and for the consumer protection provisions of the Dodd-Frank Wall

Street Reform and Consumer Protection Act of 2010.  With a repository of more

than 20,000 stories told by cardholders about their concerns and issues with their

payment cards, Consumer Reports is able to put a human face on the problems of

unfair fees and lack of transparency.

        Both Consumer Reports and U.S. PIRG have long supported interchange fee

reform, and both organizations filed objections to final approval in the district

court.  JA__ (Objection of U.S. Public Interest Research Group to Final Approval

of Proposed Class Settlement, May 23, 2013, ECF No. 2361 ("U.S. PIRG

Objection")); JA__ (Objection of Consumers Union of United States, Inc. to Final

Approval of Proposed Class Settlement, May 28, 2013, ECF No. 2598 ("Consumer

Reports Objection")).

        As organizations representing U.S. consumers, U.S. PIRG and its member

organizations, and Consumer Reports (as well as its individual members and

subscribers) have a strong interest in ensuring the fairness of the settlement.  These

two consumer protection and advocacy organizations occupy a unique position

among class members as they alone represent the interests of consumers—and it is consumers who are the ultimate losers where there is anticompetitive conduct. Accordingly, both organizations believe an appropriate settlement of an antitrust lawsuit should end the illegal behavior, compensate injured parties, and introduce competition that will benefit consumers going forward. The settlement of this litigation will directly affect every consumer in the U.S., every merchant, and a significant percentage of the economy—now and for the foreseeable future.

In light of their commitment to consumer interests, combined with their long-term research on and advocacy against unfair practices in the payment card industry, U.S. PIRG and Consumer Reports believe their views can be of special assistance to the Court in evaluating the fairness of the settlement, and can provide unique insights not offered by other parties in this litigation. This conclusion is reinforced by the consumer welfare purpose of the antitrust laws. Accordingly, U.S. PIRG and Consumer Reports have a strong interest in assisting the Court to correct the errors made by the district court in approving this settlement.

U.S. PIRG is a member of the two classes at issue in this case. Consumer Reports, for its part, opted out of the Cash Settlement Class (Rule 23(b)(3) Settlement Class) as a result of its objections to the fairness of the settlement, thus accepting the potentially permanent loss of any compensation for economic injury it suffered. Consumer Reports remains in the mandatory Rule Changes Settlement

Class (Rule 23(b)(2) Settlement Class).  Both U.S. PIRG and Consumer Reports
have accepted in the past and currently accept Visa and MasterCard credit and
debit cards, as well as Discover and American Express cards—U.S. PIRG, for the
donations that sustain U.S. PIRG, and Consumer Reports, for subscriptions to its
publications and services, as well as for donations.  Indeed, neither has the realistic
ability to reject such payments—as the district court noted, Visa and MasterCard
are "ubiquit[ous]" forms of payment.  SPA37, 47.  A substantial portion of the two
organizations' transactions occur over the Internet, where payment card acceptance
is required.  JA__{ECF No. 2361, 2598}.  Excessive interchange rates—including
especially high rates for the card-not-present transactions which make up the bulk
of their payment card transactions—directly impact the bottom lines of both
organizations and their ability to fulfill their missions.  JA__{ECF No. 2361,
2598}.

　　　　From January 2004 until November 2012, U.S. PIRG paid thousands of
dollars, and Consumer Reports paid millions of dollars, in interchange fees—at an
interchange rate of approximately 2.5%—for credit and debit card transactions
running over the Visa and MasterCard networks, and both continue to pay such
fees each month.  U.S. PIRG members (as well as state and local PIRG chapters)
rely on grassroots canvassers in the field to accept credit and debit card
transactions.  The two organizations have little choice but to accept Visa and

8

MasterCard cards to facilitate payments, despite their high rates of charges for interchange.

### B.    The Market Power of Visa and MasterCard and the Harm to Consumers

Visa and MasterCard, and the banks that control them, have possessed and exercised substantial market power since at least the 1990s.  This market power has been directly exercised over merchants—as this Court recognized in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003)—and it has also imposed significant costs on consumers.

Various courts and enforcement agencies have concluded that Visa and MasterCard have been consistently setting interchange fees at supracompetitive levels for years.  *See, e.g.*, Competitive Impact Statement, at 6-7, *United States v. Am. Express Co.*, No. 10-cv-4496-NGG-RER (E.D.N.Y. Oct. 4, 2010), ECF No. 5, *available at* http://www.justice.gov/atr/cases/f262800/262873.pdf (citing Visa and MasterCard's "ability to maintain high prices for years without threat of price competition by new entry or expansion in the market"); JA __ {DE 2670-6 (Board of Governors of Federal Reserve System, *2011 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (Mar. 5, 2013)) at 4, 14-18 (pp. 78, 88-92 of PDF)} (Federal Reserve Board report showing that Visa's and MasterCard's signature-debit and PIN-debit card interchange rates—fees at issue in this case—were substantially

9

above cost in 2011). The increase in credit card interchange rates is visible on the chart shown below from a 2009 GAO Report: [1]



When a market is not competitive, it limits entry by both lower-cost and more innovative competitors, which means consumers not only pay more, but they have fewer, and less attractive, choices.

The harmful impact of excessive interchange fees on merchants is especially strong, given the low margins in the retail industry. Merchants now pay in excess of $40 billion a year in interchange fees. JA__ {DE-1533 (Plaintiffs' Summ. J.

---

[1] JA__ {*Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, But Options for Reducing Fees Pose Challenges*, U.S. Government Accountability Office, Nov. 2009, at 16-17, *available at* http://www.gao.gov/assets/300/298664.pdf} (GAO report showing increases in Visa and MasterCard credit card interchange rates ranging from 22% to 82% from 1991 to 2009).

Opp. 20-21)}; JA__ {Rebuttal Report of Alan S. Frankel, Ph.D.} ¶216; JA__

{Expert Report of Robert H. Topel} at 22 n.52).  Historically, for U.S. retailers,

interchange fees represent one of the largest operating expenses after payroll.  *See,*

*e.g.*, JA__ {DE2438 ¶4; DE2469 ¶6; DE2591-2 ¶9}.  The excessive fees harm

consumers by increasing prices for goods and services.  All customers pay the

same prices at the point of sale—prices which reflect the interchange fees that

merchants must pay.  The result is that "[c]onsumers who do not have credit cards,

disproportionately poorer consumers, are injured the most since they pay higher

prices yet do not receive 'rewards' offered by banks who issue credit cards."  JA__

{DE2670-5 (Hausman Report)} ¶¶ 10, 110.  Excessive interchange fees are a tax

imposed by those banks on the entire retail economy.

The district court acknowledged that excessive interchange fees are paid by

consumers—including cash customers—in the form of higher retail prices.

SPA33, 40, 41 (discussing artificial subsidy of credit by other payment forms).

The current payment industry structure is unfairly regressive, because it forces

less-affluent consumers who may not qualify for credit cards to fund, through the

excessive interchange fees they pay indirectly, the rewards that banks give to their

more affluent customers.  From a consumer welfare perspective, this system

reflects a failure of competition.  Put differently, in a competitive market, one

would not see such regressive cross-subsidies and such a blatant wealth transfer

11

from merchants (and their customers) to the banks that issue Visa and MasterCard cards.

Visa's and MasterCard's dominance of the payment industry has harmed consumers in another way—by enabling and perpetuating a fraud-prone payment system that unnecessarily exposes consumers to fraud and identity theft because it does not incorporate chip-based authentication technologies widely used in other developed countries. This payment system results directly from the supracompetitive interchange fees that Visa and MasterCard enable the banks to charge, as those fees diminish incentives for banks to implement new technologies that are more protective for consumers.[2] *See, e.g.*, JA__ {DE2670-6 (Stephen C. Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920, submitted to The Board of Governors of the Federal Reserve System*, October 29, 2010 (pp. 51-53 of PDF))} ¶ 62 (discussing "the costs of interchange . . . , which merchants likely never would have paid had they had a choice, and which reflect issuers' decisions to push a product that is much more prone to fraud because of

---

[2] The Chairwoman of the House Subcommittee on Emerging Threats, Cybersecurity, and Science and Technology concluded four years ago that "[m]agnetic stripe-based technology is outmoded and inherently less secure . . . [and] the payment card industry and issuing banks should be ashamed about the current state of play and doing everything possible to immediately institute improvements in infrastructure." Statement of Subcommittee Chairwoman Yvette D. Clarke, *Do the Payment Card Industry Data Standards Reduce Cybercrime?* (Mar. 31, 2009), *available at* http://chsdemocrats.house.gov/SiteDocuments/20090331141915-60783.pdf.

the high interchange associated with it"); ¶ 64 ("Issuing banks have the most tools at their disposal to combat fraud. . . . At the outset, the issuer chooses the authentication technology."); ¶ 66 ("issuers lack strong incentives to police fraud in large part because of the interchange system that more than makes up for the charge-off expenses to issuers").

Although interchange fees in the United States are among the highest in the world,[3] the United States is the only member country of the Organisation for Economic Co-operation and Development (OECD) in which payment systems have failed to achieve widespread deployment of chip-based authentication technologies.[4]  That is no accident given the impact that supracompetitive interchange fees have on networks' and banks' incentives to reduce fraud, and given the reduced innovation that results from a system without genuine competition.  The fraud-prone payment system is an additional significant consumer harm resulting from Visa's and MasterCard's substantial market power.

---

[3] JA__{DE5939-5 (Reply Declaration of Alan S. Frankel, Ph.D., Relating to the Proposed Class Settlement, Aug. 16, 2013)} ¶ 22 ("The Networks' interchange fee rates in the United States are among the highest in the world, and substantially higher than any other country in which surcharging was permitted as of 2008.").

[4] *See, e.g.*, JA__ {DE2670-9 at (Reserve Bank of Australia, *Reform of Australia's Payments System, Preliminary Conclusions of the 2007/08 Review*, Apr. 2008, at 23 (p. 58 of PDF))}; *see also* Tom Groenfeldt, *American Credit Cards Improving Security With EMV, At Last*, *Forbes*, Jan. 28, 2014, *available at* http://www.forbes.com/sites/tomgroenfeldt/2014/01/28/american-credit-cards-improving-security-with-emv-at-last/.

13

While Visa's and MasterCard's substantial market power has endured, *see United States v. Visa*, 344 F.3d at 239 and authorities cited supra at 9-10, the advent of mobile payments poses a significant competitive challenge to their entrenched dominance. New, potential game-changing competitors, such as Google and Isis (a consortium of the telecommunications carriers), have entered the industry. *See, e.g.*, JA__ {DE1616-3 (Robin Sidel, *Payments Network Takes On Google*, *The Wall Street Journal*, Aug. 15, 2012) (p. 6 of PDF)}. Meanwhile, merchants, for the first time, have formed their own payments network, the Merchant Customer Exchange, to compete for customers. *Id.* And third-party marketing platforms that enable the distribution of targeted marketing offers that leverage the unique geo-locational capabilities of mobile phones or the rich data that mobile transactions can generate could overcome interchange fees as the financial driver for the system.[5]

Although mobile payments are still a relatively new development, the track record of new technologies undermining entrenched market power offers consumers a realistic hope that mobile payments will foster competition in payment systems. *See, e.g.*, Jerry A. Hausman & William E. Taylor, *Telecommunication in the US: From Regulation to Competition (Almost)*, Review of Industrial Organization, Vol. 41, No. 3 (discussing how the development of new

---

[5] *See, e.g.*, David Murphy, *The Geo-Targeting Revolution*, Mar. 4, 2011, *available at* http://mobilemarketingmagazine.com/geo-targeting-revolution/.

14

technologies "undermined the natural monopoly characteristics of the telecommunications industry and opened parts of the network to the possibility of competitive entry").

In light of the continuing excessive costs and other harms that the current payment system inflicts on consumers, U.S. PIRG and Consumer Reports have long supported reforms designed to bring greater competition to that system. *See generally*, JA__ (U.S. PIRG Objection); JA__ (Consumer Reports Objection). Such reforms could include eliminating the rules supporting supracompetitive interchange fees—the Honor All Cards and default interchange rules—which PIRG understands was among the injunctive relief sought by the class. PIRG and Consumer Reports objected to the settlement of this lawsuit, as class members and in keeping with their mission to advocate for consumers, because the settlement not only fails to address the market failure that has injured consumers, but it actually threatens to perpetuate that failure by enabling the extension of Visa's and MasterCard's market power into new technologies. JA__ (U.S. PIRG Objection{ at 5}); JA__ (Consumer Reports Objection{ at 8}). From the standpoint of consumer protection and public interest advocacy organizations, this settlement of an antitrust lawsuit should be rejected because it poses a serious threat of entrenching further an anticompetitive system and making it even worse going forward.

15

## STANDARD OF REVIEW

"A court can endorse a settlement only if 'the compromise is fair, reasonable and adequate.'" *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir.1992) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982) (Friendly, J.)). This Court has also observed that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id.* Although the district court normally has discretion to approve a settlement, this Court reviews the district court's decision de novo where an appellant's challenge to the authority of the district court to approve the settlement raises novel issues of law. *Id.*; *see also Weinberger*, 698 F.2d at 73 (noting that deference may not be appropriate when settlement is negotiated before certification); *Gerber v. MTC Elec. Tech. Co.*, 329 F.3d 297, 302 (2d Cir. 2003) (same) (Sotomayor, C.J.).

To the extent that the district court may exercise its discretion in approving a class action settlement, "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous

16

factual finding—cannot be located within the range of permissible decisions."
*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted).

## SUMMARY OF ARGUMENT

The settlement fails to disturb the anticompetitive regime that Visa, MasterCard, and their member banks have imposed on the payment card industry. Instead, the settlement gives the mandatory settlement-only (b)(2) class a limited right to surcharge that is unlikely either to be used by most merchants or to benefit consumers.

Far from providing effective relief, the new limited right to surcharge is itself anticompetitive. It is effectively a horizontal agreement by Visa and MasterCard concerning what limited surcharging terms to offer merchants. Not only does this horizontal agreement guarantee that Visa and MasterCard will not compete on what surcharging terms they will offer merchants, but it provides them with an incentive to match each other's interchange rates—in order to blunt any attempt to use surcharging to bring down rates. Thus, at the very least, it discourages price competition, and even facilitates collusive pricing.

The overbroad release that the settlement forces the (b)(2) class of merchants to give to Visa and MasterCard would further enhance Visa's and MasterCard's substantial market power. In return for making identical, ineffective modifications to their rules restricting surcharging, under the settlement Visa and MasterCard

17

would receive a broad release from any merchant challenge to their current anticompetitive rules and all substantially similar rules and practices in the future—for all time.  Such a broad waiver of future antitrust claims is contrary to both the interests of consumers and public policy.

## ARGUMENT

The settlement will not correct the market failures and market power that have inflicted harm on consumers.  The settlement does not require Visa and MasterCard to rescind, or even modify, rules underpinning their power over merchants—and their customers.  SPA152, 166 (Settlement ¶¶ 51, 64) ("Nothing in this Class Settlement Agreement shall limit the ability of any Visa [or MasterCard] Defendant to set interchange rates . . . ."); SPA134-35, 169-70 (Settlement ¶¶ 33(a)-(c), 68(a)-(c)) (releasing claims concerning interchange fees and rules, merchant fees, and Honor All Cards rules).

Instead, the settlement gives merchants a limited right to surcharge, which many merchants, large and small, contend they cannot or will not use.  *See, e.g.*, JA__ ¶¶ 10-18{DE2441 (Family Dollar Obj.)}; JA__¶¶ 11-21{DE2442 (7-Eleven Obj.)}; JA__¶¶ 11-20{DE2451 (Barnes & Noble Obj.)}; JA__¶¶ 10-20{DE2546 (NCGA Obj.)}; JA__¶¶ 9-18{DE2606 (Starbucks Obj.)}; JA__¶¶ 21-29{DE2619 (NCPA Obj.)}.  Even if a handful of merchants do surcharge, under the settlement's level-playing-field provision, described more fully below, if Visa and

18

MasterCard maintain the same cost of acceptance, merchants cannot differentially surcharge (i.e., surcharge one brand over another, or in different amounts). Without the ability to differentially surcharge—or at least to threaten to do so—merchants cannot use this limited right to surcharge as a means to apply competitive pressure to induce Visa and MasterCard to reduce interchange fees. Under these constraints, surcharging is highly unlikely to generate significant benefits to consumers. But, as discussed below, the level-playing-field concept is even more pernicious than that, because it essentially locks in an agreement between Visa and MasterCard not to compete on price or surcharging.

PIRG's and Consumer Reports' concerns do not end there. The release perpetuates a collusive duopoly that prevents innovation that would reward consumers with better, lower-cost, safer products. While the settlement entrenches an anticompetitive (and thus anti-consumer) structure, its broad release threatens to perpetuate that system and extend it to future technologies. Given the potential benefits of such new competition, there is simply no justification for the settlement of a case that has very little, if anything, to do with future technologies such as mobile payments to influence the development of that potentially vital new source of competition.

## I.    The Surcharging Modifications Are Anticompetitive

While PIRG and Consumer Reports concur with the view shared by various merchants (and the court-appointed independent expert) that the surcharging modifications provided in the settlement are unlikely to have any impact on system-wide interchange fees going forward, both organizations are particularly concerned about the consumer harm that is likely to result due to anticompetitive elements of the rules changes.  JA__ {DE2670-5 (Hausman Report)} ¶¶ 10, 100, 110, 115.

The settlement, which was jointly negotiated by Visa and MasterCard, requires them to implement *identical* changes to their surcharging rules.  Those changes permit merchants to surcharge Visa and MasterCard credit card transactions, but only on "the same conditions on which the merchant would be allowed to surcharge transactions" of a "Competitive Credit Card Brand" that is as or more expensive, and which limits surcharging "in any manner."  SPA141, 154-55 (Settlement ¶¶ 42(a)(iv); 55(a)(iv)).  The settlement defines "Competitive Credit Card Brand" to include Visa, MasterCard, American Express, Discover and PayPal.  Because this provision enables Visa and MasterCard to borrow American Express's effective prohibition against surcharging, merchants that accept American Express are precluded from surcharging, as the district court found.  SPA41 ("Since many merchants accept American Express, which carries an even higher cost of acceptance, and the American Express rules prohibit surcharging,

most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products.").

Essentially, this settlement enables Visa and MasterCard to make a horizontal agreement on the limited terms on which they will permit surcharging, and then immunizes that agreement from any future challenges. The district court missed the competitive issues raised by this horizontal agreement because it only focused on whether the conduct challenged by the complaint was clearly illegal. SPA45. The district court should also have considered whether the settlement agreement itself allowed competitors to agree to a clearly anticompetitive horizontal restraint of trade. Outside the context of a court-approved settlement, such an agreement would be a per se illegal horizontal restraint.

There is a long line of Supreme Court cases that hold that agreements among horizontal competitors "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). This prohibition on horizontal agreements affecting prices applies equally to agreements to offer standard terms relating to prices. *See, e.g., Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 645 (1980) (finding that horizontal agreement to standardize credit terms offered to purchasers was "just as plainly anticompetitive as a direct agreement to raise prices").

21

Courts applying these Supreme Court precedents have uniformly held that horizontal agreements setting the pricing terms to be offered customers are illegal per se regardless of whether the competitors are free to negotiate other terms. *See, e.g.*, *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (holding that agreement to use a uniform list price as a common starting point for bargaining with customers was per se illegal after finding that "fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence," and fact "that they cut prices in bidding against each other, is irrelevant"); *United States v. Nationwide Trailer Rental Sys., Inc*., 156 F. Supp. 800, 804 (D. Kan.), *aff'd*, 355 U.S. 10 (1957) (holding that competitors' agreement to circulate "suggested" price list was per se illegal even though competitors "did not strictly adhere to the price list," never inflicted "any punishment . . . for deviation," and apparently did not even agree "to adhere to the price list").

Under this controlling Supreme Court precedent, the per se unreasonableness of Visa's and MasterCard's agreement to offer uniform surcharging terms to merchants is not a close call. Given that it is per se unreasonable for horizontal competitors to agree on such terms that affect price, it is detrimental to the interests of consumers, and contrary to public policy, for a court to immunize such an agreement.

22

While it is not necessary to analyze the anticompetitive effects of such a per se unreasonable restraint of trade, analyzing those effects provides a useful illustration of just how consumers are being harmed by this settlement.

This settlement effectively guarantees that surcharging will never be an effective means to induce reductions in interchange fees and lower costs to merchants and consumers alike. The broad (b)(2) release bars merchants from seeking modification of these new, restrictive rules on surcharging. Moreover, the settlement provides a tremendous disincentive for Visa and MasterCard to negotiate more liberalized surcharging rules with merchants because any such revision of the surcharging rules might lose the immunity granted by the release.

This means that Visa's and MasterCard's horizontal agreement on the surcharging terms to offer merchants severely limits any potential consumer benefits that could be realized by surcharging. For as long as American Express's rules limit surcharging, the level-playing-field provision Visa and MasterCard inserted into the settlement agreement will guarantee that "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products." SPA41.

But even if American Express's rules were completely rescinded, the level-playing-field restriction would still likely ensure that merchants cannot impose differential surcharges on Visa or MasterCard transactions as a means of putting

competitive pressure on the two payment card behemoths to reduce their interchange rates. Under the settlement, because Visa and MasterCard are Competitive Credit Card Brands, a merchant may surcharge one brand and not the other only if the cost of accepting the other brand is lower. As long as Visa and MasterCard maintain pricing parity—which they often have done and easily could do going forward—the merchant will not be allowed to surcharge one without surcharging the other on equal terms. Critically, Visa and MasterCard now post on their websites their average costs of acceptance, ostensibly to inform merchants about the caps that the settlement imposes on the amounts they can surcharge. That pricing information, however, could all too easily be used as a signaling mechanism to align pricing and eliminate differential surcharging.

This anticompetitive restriction, therefore, could easily facilitate price collusion. And, in doing so, it will eliminate the principal way that surcharging might benefit competition. This restriction will likely ensure that merchants cannot extract price concessions from Visa or MasterCard—and thus stimulate interbrand competition—by playing one network off against the other with threats to surcharge. That will eliminate the threat of surcharging as a brake against price increases by the networks.

All of the anticompetitive effects discussed above are the result of Visa's and MasterCard's horizontal agreement to implement identical anticompetitive

24

changes to their surcharging rules.  In not evaluating any of these effects, the

district court erred as a matter of law.  *See Zervos v. Verizon*, 252 F.3d at 175;

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court

would necessarily abuse its discretion if it based its ruling on an erroneous view of

the law or on a clearly erroneous assessment of the evidence").

The district court compounded that failure by justifying this anticompetitive

result by positing that, because mediators and the court were involved, the

proceedings were "free of collusion and undue pressure."  SPA22 (citing *D'Amato

v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  But *D'Amato* and the cases

that address mediators and court-supervised settlements concern their ability to

ensure arms-length negotiations between the parties.  That is not the issue raised by

the level-playing-field requirement.  Instead, that provision raises the question of

whether Visa's and MasterCard's agreement to jointly settle a lawsuit by

implementing the same facially anticompetitive changes to their surcharging rules

should be considered an unreasonable restraint of trade under the antitrust laws.

Visa and MasterCard engineered that result through a horizontal agreement—their

joint settlement with the class—that they have made no attempt to conceal.  The

district court's reliance on *D'Amato* to ignore these defects was error.

## II.    The Release Locks in Visa's and MasterCard's Substantial Market Power

25

The settlement locks in, forever, the current system that forces merchants (and their customers) to pay supracompetitive interchange fees.  The settlement expressly does not "limit the ability of [Visa or MasterCard] to set interchange rates . . . ."  SPA152, 166 (Settlement ¶¶ 51, 64).  And it releases any merchant claim that "relates in any way" to the Honor All Cards rules or default interchange rules or fees, or "substantially similar" new versions of such practices, including claims concerning the future effects of such rules or fees, forever.

Thus, the core rules that underpin Visa's and MasterCard's anticompetitive abuse of their substantial market power, and the resulting harm to consumer welfare, are immune from challenge from merchants, the entities who are first in line of those injured by these practices.  *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-cv-5238, 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003) ("The merchants are direct consumers of the defendants' debit card services and are directly injured by their allegedly anticompetitive conduct."); *Temple v. Circuit City Stores, Inc.*, Nos. 06-cv-5303(JG), 06-cv-5304(JG), 2007 WL 2790154, at *1, *5 (E.D.N.Y. Sept. 25, 2007) (merchants were the best-placed parties to "'vindicate the public interest in antitrust enforcement' by bringing an action against Visa and MasterCard themselves").[6]

---

[6] Indeed, as defendants asserted in *Temple*, Visa and MasterCard would likely raise *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), as a defense to any antitrust challenge by consumers based upon interchange fees charged to merchants.

Even if such rules or fees impose new effects on competition or harms to consumers going forward, merchants cannot challenge them.  Such a waiver of prospective antitrust claims is void as against public policy.  *See, e.g.*, *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328-29 (1955) ("extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case . . . would in effect confer on [defendants] a partial immunity from civil liability for future violations"); *see also Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013); *Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*, No. 96 Civ. 3839(MBM), 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("GFI could not have waived this claim in the releases because a prospective waiver of an antitrust claim violates public policy"); *In re Int'l House of Pancakes Franchise Litig.*, 487 F.2d 303, 304 (8th Cir. 1973) ("In view of the fact that members of the plaintiff class opposed the settlement and that it would continue in effect the very provisions of the franchise agreement challenged as violative of the anti-trust laws, we think [the district court] properly exercised his discretion in disapproving the settlement"); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 395 (C.D. Cal. 2007) ("The Court is very concerned about the possibility that ratifying these provisions would effectively bless illegal conduct.").

The district court erred in relying on this Court's decision in *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977), to justify such forward-

27

looking immunity.  SPA45.  *Robertson* did not involve a release that purported to bar claims concerning the "future effects" of rules that may not ripen into anticompetitive restraints of trade for years or even decades from now.  Nor did *Robertson* purport to bar claims challenging future rules and future conduct on the basis that such new conduct was "substantially similar" to current conduct.  The district court does not explain how a release of unripe claims concerning "future effects" can be squared with *Lawlor*.  Moreover, its statement that the release does not "release the defendants from liability for claims based on new rules or new conduct" is contradicted by the plain terms of the release, which bars claims concerning future, "substantially similar" rules and conduct.[7]  SPA46.  The district court erred in approving such a release of future claims.

The release also threatens to lock in Visa's and MasterCard's market power in other ways.  The release is not limited to claims concerning the restraints that were at the core of this litigation.  Instead, it covers all of Visa's and MasterCard's rules, and the settlement defines "rule" to literally cover everything Visa and MasterCard do, from formal rules, to practices and "courses of conduct."  SPA113 (Settlement ¶ 1(mm)).  The release also covers "substantially similar" future

---

[7]  The district court, in another section of its opinion, contradicted itself by acknowledging that the release's language concerning "substantially similar" rules would cover "future rules" and "rules changes" going forward.  SPA47.

versions of these formal rules, practices, or conduct, as well as claims concerning the "future effects" of them.

The expansive scope of the release was readily apparent at the final fairness hearing, where Visa and MasterCard took the position that claims concerning any technology in the marketplace as of November 28, 2012, the date the settlement was preliminarily approved, are subject to the release.  JA__ {(Corrected Fairness Hearing Tr., Sept. 12, 2013) at 39} ("[a] mobile phone transaction, in my judgment, is clearly released"); and JA__ {*Id.* at 202} (claims concerning "what's out there today" are released)).  Such claims would be barred, in Visa's and MasterCard's view, irrespective of whether the technology was at issue in this case.  And if that were not enough, Visa and MasterCard reserved the right to assert the release against claims concerning future technologies if the technology has some relationship to technology in the market today.  JA__ {*Id.* at 40} ("There may be a new product that is actually really different.  And then a court is going to have to make a judgment, and the court is going to look at what that new product is and it[']s going to compare it to what the products were that are here today" to determine whether it is subject to the release).[8]

---

[8] This statement vividly shows how virtually any claim by merchants against Visa or MasterCard—even if not properly subject to the release—will have to clear the high hurdle of the release's broad terms.  This specter alone may chill further challenges.

The ramifications of such a breathtakingly expansive and forward-looking release are troubling for competition going forward, given the industry's historic lack of competition and the prospect that new technologies, and new players, may finally be poised to inject some much-needed competitive vigor into the industry. The court-appointed expert recognized this when he stated in his report that "a release covering the future effects of all existing or 'substantially similar' conduct or rules raises a danger of adverse, unintended consequences in a technologically dynamic industry, consequences that are inevitably somewhat speculative at this time." JA__ {DE5965 (Memorandum of Prof. Sykes, Aug. 28, 2013, at 50)}.

The district court expressed similar concerns during oral argument on the final approval motion, that the release was too broad. JA__ {(Corrected Fairness Hearing Tr., Sept. 12, 2013) at 32} ("I think there's a well-grounded concern here that this release places the line of scrimmage in that future dispute as an antitrust claim that's based on the application of these rules to a new technology, places that line of scrimmage in the wrong spot"); JA__ {*Id.* at 202} ("But if you're right about the breadth of the release, given the overwhelming adverse reaction from a substantial part of the class, why shouldn't I refuse to approve it?").  Yet, in its decision approving the settlement, the district court avoided the question entirely.

The district court's decision to do so was error.  There is no basis in law for a release to have such anticompetitive potential going forward.  The release of

30

claims concerning mobile payments or future technologies is void as against public policy. Such a release is also beyond the permissible scope of a class action release under this Court's identical factual predicate doctrine precedents, which prohibit the release of claims that are not part of the "identical factual predicate" of the settled case. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 109 (2d Cir. 2005) (approving settlement and concluding that scope of release was proper because all released claims arose out of the "identical factual predicate" as claims in the complaint); *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16-18 (2d Cir. 1981) (reversing approval of settlement in class action alleging harm to those who liquidated their positions in certain futures contracts during specific period, when release extended to claims by persons who had not liquidated their positions by the end of that period).

Furthermore, such a release should not have been deemed fair, reasonable, or adequate in any event. For relief that is both illusory and anticompetitive, the mandatory (b)(2) class is being forced to give a release that will bar the ability of class members to challenge Visa and MasterCard, on virtually everything they do, as competition evolves going forward. That result—imposed on a mandatory class no less—cannot possibly be fair, and should it be approved, the losers at the end of the day will be consumers.

31

## CONCLUSION

In the interest of consumers, the judgment below should be reversed.

Dated:  New York, New York
June 16, 2014

Respectfully submitted,

SCHLAM, STONE & DOLAN, LLP

_____/s_____
Robert L. Begleiter
26 Broadway, 19th Floor
New York, New York 10004
Telephone: (212) 344-5400
Fax: (212) 344-7677
RBegleiter@schlamstone.com

32

## CERTIFICATE OF COMPLIANCE

This brief complies with FRAP 32(a)(7)(B)(i) and this Court's order dated May 27, 2014 (ECF No. 936), because it contains 7,069 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

SCHLAM, STONE & DOLAN, LLP

_____/s_____
Robert L. Begleiter
26 Broadway, 19th Floor
New York, New York 10004
Telephone: (212) 344-5400
Fax: (212) 344-7677
RBegleiter@schlamstone.com