# 12-4671-cv(L)

12-4708-cv(con), 12-4765-cv(con), 13-4719-cv(con), 13-4750-cv(con), 13-4751-cv(con),
13-4752-cv(con), 14-32-cv(con), 14-117-cv(con), 14-119-cv(con), 14-133-cv(con), 14-157-cv(con),
14-159-cv(con), 14-192-cv(con), 14-197-cv(con), 14-219-cv(con), 14-225-cv(con), 14-241-cv(con),
14-250-cv(con), 14-266-cv(con), 14-303-cv(con), 14-331-cv(con), 14-349-cv(con), 14-404-cv(con),
14-422-cv(con), 14-443-cv(con),14-480-cv(con), 14-497-cv(con), 14-530-cv(con), 14-567-cv(con),
14-584-cv(con), 14-606-cv(con), 14-663-cv(con), 14-837-cv(con)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

On Appeal from the United States District Court
for the Eastern District of New York

## JOINT PAGE-PROOF BRIEF FOR
## OBJECTORS-APPELLANTS AND PLAINTIFFS-APPELLANTS
## (MERCHANT APPELLANTS' JOINT BRIEF)

Stephen R. Neuwirth*
Sanford I. Weisburst
Steig D. Olson
Cleland B. Welton II
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212-849-7000

Jeffrey I. Shinder†
Gary J. Malone
A. Owen Glist
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

Thomas C. Goldstein*†‡
Eric F. Citron
GOLDSTEIN & RUSSELL P.C.
5225 Wisconsin Avenue, N.W., Suite 404
Washington, D.C. 20015
202-362-0636

Michael J. Canter‡
Robert N. Webner
Kenneth J. Rubin
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
614-464-6327

Gregory A. Clarick‡
CLARICK GUERON REISBAUM LLP
220 Fifth Avenue, 14th Floor
New York, New York 10001
212-633-4310

*(Parties listed on inside cover)*

*Attorneys for Objector-Appellant*
   Home Depot U.S.A., Inc.

†*Attorneys for Plaintiffs-Appellants*
   Coborn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC;
   Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience
   Stores (NACS); National Community Pharmacists Association (NCPA);
   National Cooperative Grocers Association (NCGA); National Grocers
   Association (NGA); National Restaurant Association (NRA); and NATSO Inc.;

And Objectors-Appellants
   7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors;Aldo US Inc. d/b/a Aldo
   and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.; American Eagle
   Outfitters, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC;
   Best Buy Stores, L.P.; BJ's Wholesale Club, Inc.; The William Carter Company (Carter's);
   Costco Wholesale Corporation; Crate & Barrel Holdings, Inc.; Darden Restaurants, Inc.;
   David's Bridal, Inc., DBD Inc. and David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.;
   Dillard's, Inc.; Family Dollar Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.;
   Gap Inc.; GNC Holdings, Inc. (General Nutrition Corporation); Genesco Inc.;
   The Gymboree Corporation; HMSHost Corporation; IKEA North America Services, LLC;
   J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon Petroleum LP;
   Martin's Super Markets, Inc.; Michaels Stores, Inc.; National Railroad Passenger
   Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant Group, Inc.;
   Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal Supplies, Inc.;
   PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI);
   Roundy's Supermarkets, Inc. d/b/a Pick 'N Save, Rainbow, Copps, Metro Market and
   Mariano's; Sears Holdings Corporation; Speedway LLC; Starbucks Corporation;
   Stein Mart, Inc.; Thermo Fisher Scientific Inc.; The Wendy's Company; The Wet Seal, Inc.;
   Whole Foods Market, Inc.; Zappos.com, Inc.; Fleet Wholesale Supply Co., Inc.;
   Mills Motor, Inc.; Mills Auto Enterprises, Inc.; Willmar Motors, LLC; Mills Auto Center, Inc.;
   Fleet and Farm of Alexandria, Inc.; Fleet Wholesale Supply of Fergus Falls, Inc.; Fleet and
   Farm of Green Bay, Inc.; Fleet and Farm of Menomonie, Inc.; Mills Fleet Farm, Inc.;
   Fleet and Farm of Manitowoc, Inc.; Fleet and Farm of Plymouth, Inc.; Fleet and Farm
   Supply Company of West Bend, Inc.; Fleet and Farm of Waupaca, Inc.; Mills E-Commerce
   Enterprises, Inc.; Brainerd Lively Auto, LLC; Ashley Furniture Industries Inc.; Beall's, Inc.;
   Boscov's, Inc.; The Buckle, Inc.; Buc-ee's Ltd.; The Children's Place Retail Stores, Inc.;
   Cracker Barrel Old Country Store, Inc.; Cumberland Farms, Inc.; Express, LLC;
   Family Express Corporation; New York & Company, Inc.; Republic Services, Inc.;
   Swarovski U.S. Holding Limited; The Talbots, Inc.

‡*Attorneys for Objectors-Appellants*
   Target Corporation; Macy's, Inc.; Kohl's Corporation; The TJX Companies, Inc.;
   Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.;
   Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.;
   Ascena Retail Group, Inc.; Abercrombie & Fitch Co.; OfficeMax Incorporated;
   Saks Incorporated; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.;
   Luxottica U.S. Holdings Corp. and American Signature, Inc.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The parties to this brief have submitted contemporaneously herewith a

Compendium of Corporate Disclosure Statements Pursuant to Rule 26.1 of the

Federal Rules of Appellate Procedure.

# TABLE OF CONTENTS

<b><u>Page</u></b>

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................v

PRELIMINARY STATEMENT ................................................................1

JURISDICTION.................................................................................6

ISSUES PRESENTED........................................................................6

STATEMENT OF THE CASE................................................................7

I.      The Underlying Anticompetitive Conduct ....................................7

II.     The Settlement Negotiations And Agreement..............................10

III.    Reactions To The Settlement ....................................................18

IV.     The Objections And Their Rejection By The District Court........................21

        A.      Objections To The Release Of Monetary Claims ...............21

        B.      Cohesion Objections .................................................22

        C.      Objections To Adequacy Of Representation.......................25

        D.      Objections To The Scope Of The Release .........................26

STANDARD OF REVIEW ...................................................................28

SUMMARY OF ARGUMENT ................................................................28

ARGUMENT ....................................................................................32

I.      The District Court's Judgment Impermissibly Extinguishes Class
        Members' Individualized Claims For Money Damages Without
        Providing Opt-Out Rights.............................................................32

        A.      Both the Due Process Clause and Rule 23 mandate that class
                members have the right to opt out and pursue their
                individualized legal claims...............................................32

B.   The certification of the (b)(2) settlement class must be vacated because it extinguishes merchants' individualized legal claims without providing an opt-out right. ......................................................38

    1.   The settlement, on its face, releases individualized monetary claims. .......................................................38

    2.   The settlement has the effect of releasing a host of individualized legal claims. ......................................39

C.   There is no legitimate justification for denying merchants opt-out rights. ...............................................................44

    1.   There is no merit to the district court's theory that a non-opt-out class was permissible because the settlement provides its members no monetary relief. ..................................44

    2.   Rule 23(b)(2) does not allow the certification of monetary claims that arise in the future for the purpose of creating "litigation peace." ......................................47

II.   The Mandatory Class Lacked The Required Cohesion Of Interests. ............48

A.   The greatest degree of cohesion is required for mandatory settlement classes. ................................................48

B.   The merchants bound to the (b)(2) class in this case were too diverse for a single, indivisible injunction, and the settlement does not treat those class members equally. .......................................52

    1.   Class members had varying interests in the broad set of claims that the settlement purported to release. .......................53

    2.   Class members had varying interests in the one claim on which limited relief was actually provided. ..............................56

    3.   The relief on the Complaint's surcharging claim does not constitute an indivisible injunction. .........................................61

C.   The district court's cohesion analysis ignored these flaws. ...............63

III.   The Settlement Violates The Requirement Of Rule 23(a)(4) That The Class Members Receive Adequate Representation. ......................................66

iii

A.   Adequate representation requires separate representatives and counsel for subgroups with divergent interests. ...................................66

B.   The (b)(2) and (b)(3) classes had antagonistic interests and could not be adequately represented by common representatives and counsel. ........................................................................................68

C.   There is no substitute for independent and adequate representation. ...................................................................74

   1.   Overlap ...................................................................75

   2.   Results ...................................................................78

IV.   By Releasing All Future Antitrust Claims, Including Claims That Far Exceed The Scope Of The Complaint, The Settlement Violates Controlling Precedent And Exceeds The Power Of A Federal Court. ..........80

A.   The settlement unlawfully releases future antitrust claims. ................80

B.   The settlement unlawfully releases claims beyond the scope of the present litigation. ...........................................................82

   1.   The settlement improperly releases unripe future claims. ........84

   2.   The settlement improperly releases present claims beyond the scope of the case. ...................................................87

CONCLUSION ...................................................................91

CERTIFICATE OF COMPLIANCE ...................................................................94

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Express Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013)............................................................... 31, 81

*In re Am. Int'l Grp. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ...........................................................57

*Am. Safety Equip. Corp. v. J. P. Maguire & Co.*,
  391 F.2d 821 (2d Cir. 1968) ...........................................................81

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................. 4, 35, 42, 45, 48, 49, 51, 52, 53, 57,
                       59, 64, 67, 68, 71, 73, 75, 77, 78

*Authors Guild v. Google Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................ 32, 87, 90

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998) ...........................................................49

*Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortgage Ass'n*,
  624 F.3d 185 (5th Cir. 2010) ..........................................................50

*Charron v. Wiener*,
  731 F.3d 241 (2d Cir. 2013) ................................................... 28, 37

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) .............................................................85

*Eubank v. Pella Corp.*,
  2014 WL 2444388 (7th Cir. June 2, 2014)......................................75

*Fox Midwest Theatres, Inc. v. Means*,
  221 F.2d 173 (8th Cir. 1955) ..........................................................82

*Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*,
  386 F.2d 757 (6th Cir. 1967) ..........................................................82

*Gerber v. MTC Elec. Techs. Co.*,
    329 F.3d 297 (2d Cir. 2003) ..........................................................................28

*Hecht v. United Collection Bureau, Inc.*,
    691 F.3d 218 (2d Cir. 2012) ..........................................................................36

*Jefferson v. Ingersoll Int'l Inc.*,
    195 F.3d 894 (7th Cir. 1999) ..........................................................................36

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000) ..........................................................................37

*In re Joint E. and S. Dist. Asbestos Litig.*,
    982 F.2d 721 (2d Cir. 1992) ..........................................................................75

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ..........................................................................50

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955).................................................................... 31, 81, 82, 84

*Lemon v. Int'l Union of Operating Eng'rs*,
    216 F.3d 577 (7th Cir. 2000) ..........................................................................49

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) .................... 2, 28, 37, 46, 52, 65, 68, 73, 74, 77,
                                                  78, 83, 85, 86

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982).........................................................................................32

*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*,
    957 F.2d 1020 (2d Cir. 1992) ..........................................................................28

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ..........................................................................50

*Minn. Mining & Mfg. Co. v. Graham-Field, Inc.*,
    1997 WL 166497 (S.D.N.Y. Apr. 9, 1997) ....................................................82

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)................................................................................. 81, 82

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981) ....................................................................... 83, 86

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).................................. 5, 31, 33, 36, 42, 43, 48, 51, 64, 65,
    67, 71, 72, 73, 77

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)................................ 12, 21, 29, 32, 33, 36, 37, 42, 43, 49

*Prime Mgmt. Co., Inc. v. Steinegger*,
    904 F.2d 811 (2d Cir. 1990) ..........................................................................84

*Robertson v. NBA*,
    556 F.2d 682 (2d Cir. 1977) ..........................................................................86

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) ..................................................................... 48-49

*In re St. Jude Med., Inc.*,
    425 F.3d 1116 (8th Cir. 2005) .......................................................................49

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ...........................................................................82

*Stephenson v. Dow Chem. Co.*,
    273 F.3d 249 (2d Cir. 2001),
    *vacated in part on other grounds*,
    539 U.S. 111 (2003).................................................................. 36, 42, 43, 77

*TBK Partners, Ltd. v. Western Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ..................................................................... 37, 83

*Three Rivers Motor Co. v. Ford Motor Co.*,
    522 F.2d 885 (3d Cir. 1975) ..........................................................................82

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ..................................................................... 7, 40

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ........................................................ 2, 36, 52, 89

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)............................ 4, 12, 21, 29, 30, 33, 34, 35, 38, 39,
                                                          43, 45, 46, 49, 50, 55, 61, 63

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ............................................................... 7, 46, 86

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) ........................................................................86

## Constitution, Statutes, and Rules

U.S. Const. amend. V............................ 1, 2, 6, 21, 29, 32, 42, 43, 44, 49, 52, 64, 77

28 U.S.C. § 1291 .........................................................................................6

28 U.S.C. § 1331 .........................................................................................6

28 U.S.C. § 1332 .........................................................................................6

28 U.S.C. § 1337 .........................................................................................6

28 U.S.C. § 2201 .........................................................................................6

28 U.S.C. § 2202 .........................................................................................6

Fed. R. Civ. P. 23 ................................................................................. passim

Fed. R. Civ. P. 23(a)(4) .......................................... 66, 67, 71, 74, 75, 78

Fed. R. Civ. P. 23(b)(1) .................................................................... 45, 47

Fed. R. Civ. P. 23(b)(2) ....................................................................... passim

Fed. R. Civ. P. 23(b)(3) ....................................................................... passim

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................34

Fed. R. Civ. P. 23(c)(4)(B) ......................................................................71

## Other Authorities

James Grimmelmann, *Future Conduct and the Limits of Class-Action
    Settlements*, 91 N.C. L. Rev. 387 (2013)................................................84, 85

Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356 (1967) ........................................................................................45

Moore's Federal Practice § 23.25[5][e] ................................................................67

## **PRELIMINARY STATEMENT**

Unless reversed, the district court's class-certification ruling in this case will inaugurate a new and dangerous model for settlement class actions.  The settlement approved below forces a diverse collection of tens of millions of class members to release a wide array of individualized monetary claims against the defendants.  Supreme Court precedent unambiguously bars that result; class members have the right under both the Due Process Clause and Federal Rule of Civil Procedure 23 to opt out of any settlement resolving monetary claims so that they may pursue those claims individually.  But the purpose and effect of this settlement is to evade that established rule:  It creates contrived opt-out and non-opt-out classes, represented by the same lawyers and class representatives, in order to require all the members of the larger, non-opt-out class to release all of their claims.

In approving the settlement, the district court allowed the defendants to pay money to the opt-out class in exchange for a *compulsory* release from the non-opt-out class of claims against the defendants' ongoing and future conduct—money damages claims included.  That trade violates the right of objecting class members—like the *more than 200 objectors* joining this "Merchant Appellants' Joint Brief"—to litigate their own individualized claims and so to preserve their only chance to stop conduct they believe is unlawful.  The district court's judgment approving this design should be reversed.

1

Here, in sum, are the facts:  The plaintiffs are merchants that accept Visa and MasterCard.  They brought suit under the Sherman Act against Visa, MasterCard, and certain of their member banks.  The Complaint targeted specific anticompetitive practices that defendants use to inflate the "interchange" fees merchants pay for accepting their cards.  The plaintiffs sought to proceed on behalf of a massive collection of diverse merchants that take such cards—from the largest chain stores to the smallest food trucks.

The plaintiffs' lawyers then negotiated a settlement with the defendants. Consistent with the Due Process Clause and Rule 23, the settlement could have resolved the plaintiffs' claims on an opt-out basis.  *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.* ("*Visa Check*"), 280 F.3d 124, 147 (2d Cir. 2001) (Sotomayor, J.); *In re Literary Works in Elec. Databases Copyright Litig.* ("*Literary Works*"), 654 F.3d, 242, 246 (2d Cir. 2011).  But these defendants conditioned a multi-billion dollar payment—and commensurate fee award to class counsel—on a *non*-opt-out agreement that immunized the defendants from any future challenge by any merchant to their ongoing conduct.  The appellants joining this brief are among the large proportion of merchants that objected to such a settlement as not only substantively inadequate, but also a wrongful deprivation of their fundamental right to protect their interests individually.

One set of counsel and representative plaintiffs negotiated the settlement for both classes; the non-opt-out class, despite its divergent interests, was not afforded independent representation. The unprecedented settlement they reached involves two key elements.

First, the settlement defines a conventional opt-out class of merchants that accepted Visa or MasterCard in the past. The settlement grants these merchants cash as compensation for past damages, if they do not opt out.

Second, and critically, the settlement defines a non-opt-out class consisting of all merchants that accept Visa or MasterCard at any time after November 28, 2012 (the date the district court granted the settlement preliminary approval). This class includes all the members of the opt-out class who remain in business—even those who have actually opted out—plus all the millions of merchants that will ever be founded and accept credit cards at any point in the future. In substance, the settlement grants these merchants limited prospective relief with respect to only one challenged practice, while immunizing the defendants from suit regarding the other practices challenged by the Complaint. Indeed, the immunity is substantially broader than even that: From the date of preliminary approval, the settlement forces all the non-opt-out class members to forever release their claims against the defendants with respect to *all* the conduct challenged in the Complaint, *all* of

3

defendants' other existing policies and practices, and *any* substantially similar practices they ever adopt in the future.

This settlement scheme is unlawful. The Supreme Court recently and unanimously reiterated that class-action judgments may not resolve individualized monetary claims without an opt-out right. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558-59 (2011). Yet this settlement does just that, granting defendants sweeping prospective immunity from suit—including suits for money damages. Defendants retain that immunity forever, even if economic circumstances change in a manner that exacerbates the anticompetitive effects of their practices or creates new harms.

This settlement thus forces a group of motivated and well-equipped commercial entities—standing ready and willing to litigate the unlawfulness of defendants' conduct—to surrender their high-value monetary claims forever. That result inverts the "core" utility of class actions, which is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citation and quotation omitted).

The settlement is plainly unlawful in other respects as well. It binds together an astonishingly disparate class with tens of millions of members—essentially,

4

every imaginable merchant—each with radically different interests in the many claims it releases.

Further, one set of class counsel and representatives bargained on behalf of two classes with conflicting interests. The substantially larger non-opt-out class—including new, growing, and yet-to-be-created merchants—naturally favored forward-looking relief that would protect against future harms. The smaller, opt-out class necessarily had a relatively greater interest in retrospective relief—*i.e.*, money damages. The class representatives and counsel thus had an incentive to sacrifice the future-looking interests of the former for the money immediately available to the latter. The Supreme Court has held that just such a design is "obvious[ly]" unlawful. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999).

This settlement structure is surely a boon to defendants, who can secure permanent immunity for their ongoing practices. But Rule 23 does not exist to strip objecting class members of the right to pursue their own legal claims. Those claims vindicate not only private rights, but also the substantial public interest in enforcement of the antitrust laws. If this settlement stands, class members will not get their day in court, and practices that raise prices for everyone will be immunized from any future challenge. Nothing—and certainly not defendants' desire for "litigation peace," SPA44—can justify that result.

5

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1337, 2201, and 2202.  This Court has jurisdiction under 28 U.S.C. § 1291.   The district court entered a memorandum and order on December 13, 2013, SPA1, and a final judgment on January 14, 2014, SPA73.  The parties to this brief timely filed their notices of appeal on December 13, 2013 and filed supplemental notices on January 21, 2014 and February 13, 2014 after the district court entered judgment. JA[__]{DE6125; DE6126; DE6128; DE6212; DE6248; DE6249}.

## ISSUES PRESENTED

1.  Does the certification of a non-opt-out settlement class that extinguishes class members' individualized monetary claims violate the Due Process Clause and Rule 23?

2.  Does a non-opt-out settlement class lack cohesion when its millions of existing and future members have inconsistent interests with respect to the defendants' many practices and policies—all of which are simultaneously immunized from suit under the settlement?

3.  Does a single set of class representatives and counsel provide inadequate representation when they negotiate a settlement under which (i) one class receives a large cash payment, while (ii) a second, non-opt-out class that receives only

modest injunctive relief is required to grant the defendants a sweeping release from future liability?

4.  Does this settlement unlawfully release future antitrust claims, unripe claims against future conduct, and claims that exceed the scope of the Complaint?

## STATEMENT OF THE CASE

This is an appeal from a judgment of the U.S. District Court for the Eastern District of New York (Gleeson, J.), certifying settlement-only classes and approving a final class-action settlement.  The opinion is not yet reported but is available at 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013).

## I.    The Underlying Anticompetitive Conduct

Merchants are charged an "interchange fee" every time they accept a Visa or MasterCard credit or debit card.[1]  These fees are lucrative:  U.S. merchants alone pay more than $40 billion per year.  *See* JA[__]{DE-1533 (Plaintiffs' Summ. J. Opp. 20-21; Rebuttal Report of Alan S. Frankel, Ph.D. ¶216; Report of Robert H. Topel at 22 n.52)}.  The high price reflects the fact that interchange fees are set on

---

[1]     For further industry background, see *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 101-02 (2d Cir. 2005), and *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 234-37 (2d Cir. 2003).  Further detail is also provided in the Merchant Trade Groups' Brief, which focuses on the unfairness of the settlement. These appellants join those arguments and incorporate them by reference, along with the arguments advanced in the briefs of the Retailers and Merchants Objectors, and U.S. PIRG and Consumer Reports.

a non-competitive, industry-wide basis through the Visa and MasterCard networks that nominally exist to facilitate payments among merchants and banks.

This case arises from a consolidated class-action Complaint asserting antitrust claims against Visa and MasterCard, as well as their member banks, relating to these interchange fees.  Visa and MasterCard have some 5,000 pages of rules, spread over sixteen rulebooks, governing acceptance of Visa and MasterCard transactions.  See JA[__] (public rulebooks); JA[__]{Corrected 9/12/13 Tr. 100; DE2605 (Amazon.com Obj. ¶14)}.  But the Complaint challenged only a tiny fraction of those rules and practices as restraining competition among banks over interchange fees.[2]

The plaintiffs' core allegation is that the defendants fix interchange fees by adhering to published schedules of so-called "default" rates.  *See* JA[__] (Complaint ¶¶1, 443-68).  These schedules provide a rate in the absence of a bilateral agreement between a given bank and a particular merchant.  In practice, however, the default rate is the actual rate.  Although banks and merchants can theoretically negotiate individual agreements, that does not happen in reality.  The default rates—together with other practices—eliminate any incentive for the banks

---

[2]     There were ultimately three complaints in the case, two of which were addressed to the Visa and MasterCard IPOs.  The operative complaint for present purposes is the Second Consolidated Amended Class Action Complaint, and is referred to as "the Complaint."  *See* JA[__].

to compete with each other and to negotiate with merchants over rates or terms of acceptance. So Visa and MasterCard set the default fees at supra-competitive levels, and the banks in turn apply those rates without risk that their competitors will offer merchants a lower price.

The most important additional restraint supporting this anticompetitive regime is the collection of rules known as "Honor-All-Cards," which requires any merchant that accepts any credit (or debit) card on the Visa or MasterCard network to accept all credit (or debit) cards on that network. It makes no difference which bank issued the card or—critically—what interchange fee applies to the card. So, for example, if a merchant wants to take Visa credit cards, it must accept not only basic Bank of America Visa cards but also Chase's premium Sapphire Preferred Visa cards, even if the merchant must pay a substantially higher interchange fee for the latter. JA[__] (Complaint ¶¶8(m), 240, 244, 436). As a consequence, no bank has an incentive to offer a merchant a lower interchange rate to accept any of its cards: A merchant cannot reject any issuing bank's Visa or MasterCard credit card without dropping the entire network, including the less expensive cards of every other bank.

Visa and MasterCard have other "anti-steering" rules that reinforce the barriers to interchange competition among the banks. JA[__] (Complaint, ¶8(d)). Although the settlement in this case does not provide any relief with respect to

9

default interchange or Honor-All-Cards, it does address one such restraint: the "no-surcharging" rule.  Before the settlement, Visa and MasterCard barred merchants from charging a customer any additional fee for using any kind of payment card. If merchants could impose such "surcharges," they could theoretically encourage consumers to use lower-cost options.  *See, e.g.*, JA[__] (Complaint ¶¶8(d), 94, 97, 189-99).  But many states prohibit surcharging by statute, making the networks' no-surcharging rules irrelevant in those parts of the country.  *See infra*, at 22-23, 56-60.

## II.    The Settlement Negotiations And Agreement

Class counsel and the defendants sought to negotiate a comprehensive settlement that would bind every kind of merchant that accepts payment cards. Their putative class has tens of millions of members and is breathtaking in scope. It includes Amazon's nationwide delivery service and the local pizza delivery shop; big-box retailers and mobile food trucks; tech-savvy online sellers and local corner stores; high-fashion retailers where almost everyone uses credit cards and low-margin food marts where consumers routinely use debit, cash, or personal checks.  Indeed, the pervasive presence of payment cards stretches the class far beyond recognizable retail merchants to include health insurers, state governments, public utilities, and all other entities that accept Visa or MasterCard.

Class counsel's stated goal in the litigation was to secure not only compensation for the merchants' past damages, but also lasting reform for the future.  As lead counsel explained:  "While th[e] … action contained a damage claim, and we certainly expected damages to be enormous, the primary goals were to reform the market by eliminating the horizontal agreements among the banks to fix the levels of interchange fees and enforce the rules that we were challenging." JA[__]{DE2113-6 (Wildfang Decl. ¶24)}.

For their part, the defendants also had an overriding goal in settlement negotiations: complete and permanent litigation peace extending well beyond the limited structural changes they were willing to make to their practices going forward.  Because banks receive $40 billion annually in interchange fees, they could easily afford to make a nominally large cash payment to the class, as well as minor rules changes.  But in return, they required assurances that they would never face additional private suits by merchants relating to any of their policies or practices.  Throughout the negotiations, the two objectives were bound together. As lead counsel further explained:  "The negotiations before the mediators were always—one issue was monetary, the other issue was equitable relief.  One was not going to be reached without reaching the other."  JA[__]{DE1732 (11/9/12 Tr. 9)}.

The interests of the negotiating parties culminated in the sweeping settlement at issue in this appeal.  It seeks to grant the defendants an expansive,

11

permanent immunity from suit by any merchant, including from legal claims for money damages. But the settling parties faced the obstacle that Supreme Court precedent unambiguously prohibits a mandatory class-action judgment that resolves class members' individualized monetary claims. *See, e.g.*, *Dukes*, 131 S. Ct. at 2558-59; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). The settlement attempts to avoid that rule by defining two classes: (1) an opt-out class that would receive money damages, and (2) a non-opt-out class that would release all its claims prospectively as of the settlement's preliminary approval.

First, the settlement creates an opt-out class certified under Rule 23(b)(3). This class encompasses all merchants with damages claims arising *before* the date of preliminary approval (November 28, 2012). SPA118 (Settlement ¶2(a)). Class counsel estimated that this class contains more than 12 million members. SPA23. Members of the (b)(3) class that did not opt out would receive payments from "two cash funds totaling up to an estimated $7.25 billion." SPA13.[3] The participating members of this class must release all existing and future claims against defendants

---

[3] The cash payment was set at $6.05 billion, subject to reductions of up to 25% for opt-outs. SPA77-78 (Judgment ¶9(a)); SPA120-21, 125-26 (Settlement ¶¶9-11, 18-20). Because opt-outs exceeded 25% of the transaction volume at issue, the $6.05 billion was reduced to about $4.5 billion. SPA77-78 (Judgment ¶¶8, 9(a)); JA[__]{DE5940 (Class Plaintiffs' Fee Reply at 7)}. Those remaining in the (b)(3) class will also receive an estimated ten-basis-point interchange fee reduction for eight months. SPA54; SPA78 (Judgment ¶9(b)); SPA121-24 (Settlement ¶¶11-15). Together, this consideration is actually worth about $5.7 billion (or about $5.2 billion after deduction of counsels' fees).

with respect to any of their current rules or practices, as well as any future rules or practices that are substantially similar. SPA131-39 (Settlement ¶¶31-38). The release granted by *this* class is non-mandatory, however, because merchants may opt out.

The settlement also creates a second, non-opt-out class certified under Rule 23(b)(2). This class encompasses all merchants that have accepted Visa or MasterCard *since* the date of preliminary approval or will accept either of them in the future. SPA118 (Settlement ¶2(b)).[4] The members of this class are defined by their possession of claims arising any time after preliminary approval—including individualized claims for money damages that accrue at any point in the future. This class includes all the members of the opt-out class that remained in business after preliminary approval (even if they opted out), plus tens of millions of additional merchants that will subsequently open their doors and accept Visa or MasterCard. In sum, because this class is mandatory, every merchant in the country that now or in the future accepts Visa or MasterCard is bound by its terms and barred from opting out.

---

[4]     Because acceptance of those brands is ubiquitous, and the settlement is only relevant to merchants that do accept Visa or MasterCard, we use "all merchants" as shorthand for "all merchants to the extent they ever accept a Visa or MasterCard transaction."

The settlement with the non-opt-out (b)(2) class leaves in place—and indeed immunizes from any later suit—the default interchange schedules and Honor-All-Cards rules that were the focus of the plaintiffs' antitrust claims.  Instead, Visa and MasterCard agreed to three limited forms of prospective relief.  *See* SPA85-87 (Judgment ¶13(c)-(f), (i)-(j)).  These limited changes remain in place only until July 20, 2021.  SPA87 (Judgment ¶13(m)); SPA151, 164 (Settlement ¶¶45, 58).

First, the settlement permits merchants to accept Visa or MasterCard at some outlets, but not others, if those outlets operate under separate trade names or banners.  SPA85 (Judgment ¶13(c)-(d)); SPA140-41, 153-54 (Settlement ¶¶41, 54).  Visa and MasterCard never explicitly prohibited this practice, however.  *See* JA[__]{DE2448 (Costco Obj. ¶20); DE2644 (Wal-Mart Obj. ¶41)}.  Further, this relief is irrelevant to the vast majority of U.S. merchants, who operate exclusively under one trade name.

Second, the settlement provides that Visa and MasterCard will negotiate in good faith with merchant-organized buying groups.  SPA86-87 (Judgment ¶13(i)-(j)); SPA149-50, 163-64 (Settlement ¶¶43, 56).  But here too, Visa and MasterCard never expressly prohibited this practice before.  SPA43.  Further, the obligation is only to negotiate; there is no enforceable duty to reach agreement.  Finally, this relief is of limited practical value for the many merchants who are unlikely to join with competitors because of their size or business model.

14

Third—and embodying the only form of relief the district court thought had any material significance—the settlement provides that merchants may engage in certain forms of surcharging. The settlement permits surcharging at the "Brand Level" (*i.e.*, all Visa and/or MasterCard transactions) or the "Product Level" (*i.e.*, transactions on cards of the same type, such as all Visa Traditional Rewards cards but not Visa Classic cards). SPA85-86 (Judgment ¶13(e)-(f)); SPA141-49, 154-63 (Settlement ¶¶42, 55). But while the settlement addresses defendants' surcharging bans, many class members will remain foreclosed from surcharging by substantial legal, contractual, and practical barriers, including state law prohibitions and pre-existing contracts. *See infra*, at 22-23, 56-60.

Whatever the value of these three forms of relief to individual class members, the settlement mandates that, in exchange, the entire (b)(2) class grant defendants a sweeping immunity from suit—including suits for money damages. All of the millions of existing and future (b)(2) class members are forced to release their claims regarding defendants' post-November 28, 2012 conduct. That release covers all of Visa's and MasterCard's existing rules, all their unwritten practices, and any future rules or practices that "may in the *future* exist in the same or *substantially similar*" form. SPA169-72, 173-74 (Settlement ¶¶68, 71) (emphasis added).

15

Unlike the changes described above, this broad release continues in perpetuity. And it extends to new merchants that do not yet even exist. Merchants that start accepting Visa and MasterCard transactions only after July 20, 2021 release their claims even though they will not receive any of the settlement relief at all.

The (b)(2) release explicitly extends not only to claims in the Complaint on which the class receives no relief, but also to claims that were not—indeed, could not have been—asserted in the Complaint. The settlement requires the (b)(2) class to grant the defendants immunity from suit with respect to "any other actual or alleged Rule," SPA170 (Settlement ¶68(c)), defined to mean "*any* rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity or course of conduct relating to any Visa-Branded Card or any MasterCard-Branded Card," SPA113 (Settlement ¶1(mm)) (emphasis added). It thus reaches the entirety of defendants' detailed rulebooks, as well as all of their unwritten rules, policies, and practices.

The release applies to all manner of claims, including money damages claims, even if they did not exist at the time the Complaint was filed. It also encompasses claims that could only arise in the future—for example, because circumstances change to make a current policy unlawfully anticompetitive. The release extinguishes "any and all manner of claims" including:

16

> any form of declaratory, injunctive, or equitable relief, *or any damages or other monetary relief* relating to the period after the date of the Court's entry of Class Settlement Preliminary Approval … that any Rule 23(b)(2) Settlement Class Releasing Party *now has, or hereafter can, shall, or may in the future have*….

SPA169 (Settlement ¶68) (emphasis added); *see also* SPA173-74 (Settlement ¶71). These are claims that may not ripen for years, or decades, because the release extends to the "future effect" of present rules or conduct, or substantially similar rules or conduct, whether or not those practices have any current anticompetitive effects. SPA171 (Settlement ¶68(g)-(h)).

For example, the settlement provides no relief from the default interchange or Honor-All-Cards rules. But the mandatory (b)(2) release expressly bars all claims "arising out of or relating in any way" to those specific practices. SPA169-72 (Settlement ¶68. The release also specifically provides that it does not in any way limit the ability of any "Visa Defendant" or "MasterCard Defendant" to set interchange rates. SPA152, 166 (Settlement ¶¶51, 64).

The release also expressly includes damages claims against Visa's Fixed Acquirer Network Fee ("FANF"). SPA174 (Settlement ¶72(d)). But the plaintiffs could not have asserted such a claim in the Complaint because Visa did not even implement the FANF until after the close of summary judgment briefing.

17

### III.    Reactions To The Settlement

When announced, the settlement was met with widespread opposition. There were originally nineteen named plaintiffs in the case, including six major trade associations.  Ten—the majority, including all the trade associations acting in the interest of their many members—objected to the mandatory (b)(2) settlement. *See* JA[___]{DE2447 (Coborn's Obj. ¶¶7-12); DE2449 (D'Agostino Obj. ¶¶8-11); DE2459 (Jetro Obj. ¶6); DE2563 (Affiliated Foods Obj. ¶7); DE2561 (NACS Obj. ¶¶11-22); DE2619 (NCPA Obj. ¶¶13-18); DE2546 (NCGA Obj. ¶7); DE2475 (NGA Obj. ¶¶7-12); DE2464 (NRA Obj. ¶¶7-8); DE2461 (NATSO Obj. ¶¶6-11); DE6006-1 (NACS Supp. Decl. ¶¶5-16); DE6006-2 (NCGA Supp. Decl. ¶¶5-18); DE6006-3 (NCPA Supp. Decl. ¶¶6-13); DE6006-4 (NGA Supp. Decl. ¶¶5-17)}. Lead class counsel reacted by dropping them as class representatives and excluding them from all further negotiations, even though they would remain bound, as members of the mandatory (b)(2) class, to the representation of class counsel and the settlement's broad release of claims.

In total, several thousand merchants—large and small—objected to the mandatory (b)(2) class.  "[T]he roster of objectors include[d] some of the nation's largest retailers," representing almost 20% of all Visa and MasterCard U.S. transaction volume.  SPA23.

18

The over 200 appellants joining this brief are large and small merchants that believe, for individualized reasons, that releasing all future claims against every existing Visa or MasterCard practice is unacceptable.  Some—like appellant Amazon—are large, growing, and particularly likely to engage in credit-card transactions, and so have an especially keen interest in future-looking claims.  Others—like appellant 105 Degrees—are small merchants located exclusively in states that prohibit surcharging, and so would have pursued a very different mix of prospective relief.  *See* Retailers and Merchants Br. 30.  Yet others, like appellants Wal-Mart, Target, and Home Depot, represent huge transactional volume, and believe that the most important objective is ending the restraints that prevent them from using that volume to negotiate better deals directly with card-issuing banks.

These well-equipped and motivated commercial entities stood ready, willing, and able to litigate against defendants' ongoing restraints; indeed, many are now litigating those issues as opt-outs from the (b)(3) class.  Nevertheless, the mandatory (b)(2) settlement requires them to lay down their injunctive and continuing monetary claims in exchange for relief they think does them no good.  Thus, the opt-out complaints that they have filed are limited to asserting damages through November 28, 2012, even though the challenged conduct is ongoing, because the settlement extinguishes their rights to seek any relief thereafter.  *See, e.g.*, JA[__]{Second Amended Complaint, *7-Eleven, Inc. v. Visa Inc.*, Nos. 13-cv-

5746(JG)(JO), 14-md-1720(JG)(JO) (E.D.N.Y.), ECF No. 38; DE2495-2 (Target Complaint)}.

The (b)(3) settlement similarly generated widespread opt-outs from merchants, representing over 25% of transaction volume.  JA[__]{DE5940 (Class Plaintiffs' Fee Reply at 7)}.  These merchants elected to pursue their claims individually, despite the fact that the value of those claims was substantially limited by the mandatory release from the non-opt-out class binding every merchant that remained in business.  Indeed, the volume of opt-outs was so great that it gave defendants the option to jettison the settlement entirely.  SPA124-26, 190 (Settlement ¶¶17-20, 97).  They declined to do so, however, preserving their mandatory perpetual release.

The district court recognized that "the motion for final approval … caused a rift among large United States retailers," and showed that "divisions among the major merchants run deep."  SPA23.  It noted that ten of the top twenty-five convenience stores objected, and that many merchants regarded the (b)(2) relief as essentially valueless to them.  *See, e.g.*, SPA24, 36, 38-43.  Other merchants, such as major airlines, opted out, believing they could obtain a larger cash recovery on their own, but did not object because "they apparently see value in the (b)(2) relief."  SPA23.

## IV.    The Objections And Their Rejection By The District Court

Merchants and their representatives submitted four relevant categories of objections to the district court, which rejected each of them.

### A.    Objections To The Release Of Monetary Claims

Many merchants objected that the mandatory release imposed on the (b)(2) class violated the Due Process Clause and Rule 23, both of which prohibit a class-action judgment from resolving claims for individualized relief, including claims for money damages, without providing an opt-out right. *See, e.g.*, JA[__]{DE2591 (Home Depot Obj. 15-30); DE2613 (1001 Property Solutions Obj. 5-10); DE2670 (Objecting Plaintiffs' Obj. 21-24); DE2495-1 (Target Obj. 7-17); *see also* DE2427 (First Data Obj. 9-17)}. The objectors stressed that the unanimous portion of the Supreme Court's recent decision in *Dukes*, 131 S. Ct. at 2558, as well as the Court's prior opinion in *Shutts*, 472 U.S. at 797, held that individualized monetary claims could not be resolved through a mandatory (b)(2) class.

The district court addressed these central objections in only one brief paragraph, holding that "[t]here is no due process right to opt out of the (b)(2) class" because "[t]he (b)(2) settlement here is limited to going-forward injunctive relief that changes the structure of the network practices." SPA46. Limiting its analysis to the relief members of the non-opt-out class *obtained*, the court did not address the far broader collection of individualized, monetary claims *extinguished*

by the (b)(2) release. *See supra*, at 15-17. The court also suggested, without

citation, that the mandatory (b)(2) class was lawful because it helped to ensure

"litigation peace." SPA44.

### B.    Cohesion Objections

Numerous appellants objected that the far-flung mandatory (b)(2) class

lacked sufficient cohesion. They explained that merchants did not share a common

interest in the Complaint's allegations, as demonstrated by their unequal ability to

make use of the limited surcharging relief granted to the (b)(2) class. Further, they

had significantly varying interests in the many claims the class was required to

release. *See, e.g.*, JA[__]{DE2591 (Home Depot Obj. 3-4, 19-27); DE2670

(Objecting Plaintiffs' Obj. 24-27)}. For example, merchants that did not yet exist

were bound by the settlement and therefore required to release their claims against

defendants. But they received *none* of the cash settlement because they were

excluded from the (b)(3) class (since they were not in business before November

28, 2012). *See, e.g.*, JA[__]{DE2591 (Home Depot Obj. 21); DE2670 (Objecting

Plaintiffs' Obj. 38-39); *see also* DE2670-8 (Ex. 68, 16-17)}.

Objectors also explained that the class lacked cohesion because merchants

have significantly varying interests in obtaining relief against the no-surcharging

rule. For example, merchants located in ten states and Puerto Rico are prohibited

as a matter of law from engaging in surcharging. *See* SPA215-32 (state laws

barring surcharging).  Also, because the settlement's surcharging provisions contain a most-favored-nation clause, merchants that accept American Express (which effectively prohibits surcharging) cannot surcharge Visa and MasterCard under the settlement.  SPA41, 141-44, 154-57 (Settlement ¶¶42(a), 55(a)); JA[__]{DE5965 at 41-42}(court-appointed expert concluding that approximately ninety percent of the (b)(2) class by volume would be unable to surcharge for this reason).  The district court itself acknowledged that, for these reasons, "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products."  SPA41.

For those merchants not subject to the foregoing blanket prohibitions, the settlement still limits how they may surcharge.  If a merchant wants to surcharge Visa or MasterCard transactions, for example, the merchant must add the same surcharge to all such transactions "regardless of the card's issuer or product type." SPA141, 154 (Settlement ¶¶42(a)(i), 55(a)(i)).  This maintains the restraint on inter-bank competition that was the principal target of this suit.  And other conditions further limit merchants' ability to surcharge or explain to consumers the defendants' role in the higher prices they pay.  *See* SPA148, 161-62 (Settlement ¶¶42(c)(iii)-(iv), 55(c)(iii)-(iv)).

Ajaypal Banga, MasterCard's CEO, revealed that MasterCard insisted on these restrictions to minimize any impact from surcharging:

We believe the best thing to do was looking at our experience of surcharging in other markets where, frankly, it didn't really lead to a great deal of actual surcharges being placed other than in a couple of kinds of areas where cash isn't quite able to compete. So for example, online airline bookings and the like…. So when I think about that here, *in this agreement, we have also managed to get in some of those protections*,… the declaration to the consumer with clarity, both on the receipt and in the store, the level playing field concept that we think we've got in there. *All these were attempted as a way to sort of try and box the issue while moving forward....* That's kind of how I approached it …. And so it is friction. *I don't like the friction but I'm trying to minimize it with as much lubricant as I can put in the system.*

JA[__]{DE2670-8 (Ex. 94 (p. 370))}(emphasis added).

Many objectors also voiced unique concerns that had not been addressed in any way by the settlement. For example, certain health insurers objected, noting that the Affordable Care Act raised special regulatory concerns with interchange fees and surcharging. JA[__]{DE2493-1; DE2643 (WellPoint and Blue Cross Objections)}. A host of objectors noted that their individual circumstances made surcharging relief valueless to them, or otherwise affected their perspective on the mix of relief the case should have pursued. *See, e.g.*, JA[__]{DE2411 (Boscov's Obj. ¶¶3-4); DE2434 (David's Bridal Obj. ¶¶9-23); DE2446 (Carter's Obj. ¶¶7-18); DE2540 (Wawa Obj. ¶¶2-4); DE2458 (IKEA Obj. ¶¶16-33); DE2437 (Lowe's Obj. ¶¶14-29); DE2450 (Alon Obj. ¶¶15-33); DE2561 (NACS Obj. ¶¶23-37); DE2644 (Wal-Mart Obj. ¶¶12-39); DE4640 (SIGMA Obj. ¶¶12-24)}.

Conceding that some of these concerns had not even been considered in the negotiations, *see, e.g.*, SPA48, the district court nonetheless addressed them only

briefly, concluding that the (b)(2) class was sufficiently cohesive because "[t]he network rules regimes that gave rise to this case applied generally to every merchant accepting Visa or MasterCard credit cards, and the injunctive relief in the proposed settlement does as well."  SPA51.  Although the court did address arguments that surcharging relief was valueless *to all*, it did not address whether the relief on that claim had *different* value to different class members.  Nor did it focus on class members' different valuations of the claims the settlement released.

### C.    Objections To Adequacy Of Representation

Objectors also raised the settlement's failure to provide adequate representation to the entire class.  Numerous objectors explained that binding future merchants that could not participate in the litigation and had no separate representation could not be reconciled with Supreme Court precedent.  *See, e.g.*, JA[__]{DE2670 (Objecting Plaintiffs' Obj. 28-36, 38-39); DE2592 (Dell Obj. 15); DE2281 (Retailers and Merchants Obj. 11-20); DE3074 (Bridgestone Obj. 5-6); DE4237 (Williams-Sonoma Obj. 5)}.

The district court did not analyze these objections with any particularity, concluding merely that "the interests of the Class Plaintiffs and the rest of the (b)(2) class are not antagonistic."  SPA52.  The court did not address conflicts created by the settlement's release of claims by generations of future merchants—including merchants that will start operating after the structural changes in the

25

settlement sunset in 2021. Like the settling parties, the district court never explained how it was permissible to create two separate classes without providing each with separate representatives and separate counsel.

### D.    Objections To The Scope Of The Release

Class members also objected to the scope of the release because, among other things, it immunizes Visa and MasterCard from merchant lawsuits with respect to all existing rules and policies and future versions thereof that are "substantially similar." Objectors emphasized that releasing ongoing and future claims against default interchange and Honor-All-Cards would cement defendants' substantial market power. *See* JA[__]{DE2605 (Amazon.com Obj. ¶12); DE2444 (Amtrak Obj. ¶¶7-8, 24); DE2439 (Roundy's Supermarkets Obj. ¶20); DE2451 (Barnes & Noble Obj. ¶23); DE2670 (Objecting Plaintiffs' Obj. 28-36)}. They also argued that it would protect defendants against competition from new payment methods, such as payments from mobile devices. *See, e.g.*, JA[__]{DE2279 (City of Oakland Obj. ¶17); DE2598 (Consumers Union Obj. 8); DE2361 (U.S. PIRG Obj. 5); DE2364 (Jo-Ann Stores Obj. ¶2); DE2435 (Dillard's Obj. ¶27); DE2670 (Objecting Plaintiffs' Obj. 33)}. Professor Sykes, the court-appointed expert, echoed these concerns, stating that "a release covering the future effects of all existing or 'substantially similar' conduct or rules raises a danger of adverse,

26

unintended consequences in a technologically dynamic industry, consequences that are inevitably somewhat speculative at this time." JA[__]{DE5965 at 50}.

Visa and MasterCard confirmed these fears at the final fairness hearing. Even though the Complaint did not concern mobile payments or emerging technologies, they asserted that the settlement required merchants to release any claim concerning the application of Visa's or MasterCard's Honor-All-Cards rules to such technology. JA[__]{Corrected 9/12/13 Tr. 39}("A mobile phone transaction, in my judgment, is clearly released."). The district court itself expressed concern about this issue at the hearing.[5] But its decision approving the settlement was silent on the issue. The district court deemed it sufficient that the settlement does not "release the defendants from liability for claims based on new rules or new conduct," and is therefore limited to claims that "are or could have been alleged on the identical factual predicate of the claims in this case." SPA46. The court also held that immunizing defendants against future antitrust challenges based on all present and "substantially similar" future conduct was permissible because such conduct is not clearly illegal. SPA45-47.

---

[5]    *See* JA[__]{Corrected 9/12/13 Tr. 32}("I have … a well-grounded concern here that this release places the line of scrimmage in that future dispute as an antitrust claim that's based on the application of those rules to a new technology, places that line of scrimmage in the wrong spot.").

## STANDARD OF REVIEW

Class certification and the approval of class-action settlements are generally reviewed for abuse of discretion. *Literary Works*, 654 F.3d at 249; *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013). However, this Court reviews the decision de novo when, as here, "the validity of the settlement … rests on the determination of novel issues of … law." *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992); *see also Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297, 302 (2d Cir. 2003). Moreover, where certification "rests on an error of law," the district court necessarily abuses its discretion. *Charron*, 731 F.3d at 247.

## SUMMARY OF ARGUMENT

The central feature of this settlement is the certification of a mandatory Rule 23(b)(2) class that is forced to release all claims against defendants' ongoing and future conduct. This structure was designed to permit a single set of class representatives and counsel to provide defendants with a global, prospective immunity from suit—including suits for money damages—in exchange for a substantial cash payment. Class members could opt out of receiving the money (which went to the (b)(3) class), but could not save their claims from the all-encompassing, forward-looking release (which came from the mandatory (b)(2) class). This feature violates four separate doctrines designed to protect absent and

objecting class members from being bound against their will to a settlement that benefits others at their expense.

*First*, this settlement expressly terminates the individualized monetary claims of all the (b)(2) class members with no opt-out right. *See* SPA169 (Settlement ¶68). Indeed, the settlement pays billions of dollars to the (b)(3) class on the exact same monetary claims—claims that are distinguished only by the date on which the damages accrue. *Shutts* held that such claims belong to individual class members under the Due Process Clause and must be protected by the right to opt out. *Dukes* unanimously held that Rule 23 channels all such claims to opt-out classes certified under Rule 23(b)(3).

The district court nonetheless approved the settlement on the theory that the *relief* the (b)(2) class *obtained* did not include money damages. But what matters are the *claims* that are *resolved* by the settlement—in particular, the claims that the class has been forced to relinquish. It does not matter that the (b)(2) class received no money, or that the defendants insisted on "litigation peace." SPA44. The court's certification of a mandatory (b)(2) class extinguishing individualized monetary claims violated the Due Process Clause and Rule 23.

*Second*, the (b)(2) class was not cohesive, particularly under the heightened standard that applies to mandatory classes. The (b)(2) class is massive, consisting of millions of existing merchants of every possible variety and many millions more

29

that do not even exist yet. More than that, the (b)(2) class settlement resolves not just one claim, nor just the claims in the Complaint, but essentially every possible merchant claim against defendants' existing rules and practices (and those that are substantially similar) now and indefinitely into the future. Such a sprawling class, resolving such a broad swath of claims, cannot be expected to bargain together for a single, indivisible injunction benefitting all the members at once, as Rule 23(b)(2) requires. *See Dukes*, 131 S. Ct. at 2558. The best possible proof of that is the deal that emerged: In exchange for releasing every other claim—including the claims that mattered most to many of the class members—the (b)(2) class got relief only on surcharging, even though class members in ten states are forbidden from surcharging *by law*.

*Third*, the (b)(2) class was inadequately represented. The (b)(2) class was limited to prospective relief and included millions of members (including recently founded merchants, future businesses, and (b)(3) opt-outs) that had no interest in the (b)(3) monetary relief at all. But the (b)(2) class had no lawyer and no class representative whose role was solely to represent its predominantly future-looking interests. Instead, both classes were represented by the same counsel and representatives, who could not get their pecuniary reward through the (b)(3) settlement without providing defendants with the global release they wanted from the (b)(2) class.

30

This representation was structurally inadequate.  As an initial matter, classes with divergent interests need their own counsel and representatives.  That is especially so where, as here, parties cannot opt out and obtain their own representation, even when they know that their putative representatives are not protecting their interests.  And it is triply true here, where there is a well-understood conflict of interest between the predominantly future-looking (b)(2) class and the predominantly backwards-looking (b)(3) class.  Class representatives who can obtain immediate monetary relief have a recognized incentive to trade away future-looking interests in return for more money now.  The settling parties' decision to structure their deal to create past- and future-looking classes, while providing those classes with no independent representation, thus embodies an "egregious" and "obvious" violation of settled class-action precedents.  *See, e.g.*, *Ortiz*, 527 U.S. at 853, 856.

*Finally*, the (b)(2) release in this case—extinguishing essentially every present and future challenge to defendants' existing, and substantially similar, practices—exceeds the permissible scope of class-action litigation.  It prospectively releases future conduct from antitrust attack, a result the Supreme Court has condemned.  *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013); *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328-29 (1955).  It also extinguishes claims well beyond the scope of the Complaint,

including future claims that are not yet ripe and present claims that are utterly

unrelated to the facts at issue.  Ultimately, the settlement represents an effort to use

class-action litigation to structure a regulatory solution for an entire industry, much

like the settlement Judge Chin rejected in *Authors Guild v. Google Inc.*, 770 F.

Supp. 2d 666, 669 (S.D.N.Y. 2011) ("*Google Books*").  This is not the proper role

of federal litigation; Congress provided these appellants with a cause of action

under the Sherman Act, and they should be allowed to vindicate it as they see fit.

## ARGUMENT

I.    **The District Court's Judgment Impermissibly Extinguishes Class Members' Individualized Claims For Money Damages Without Providing Opt-Out Rights.**

A.    **Both the Due Process Clause and Rule 23 mandate that class members have the right to opt out and pursue their individualized legal claims.**

The Fifth Amendment prohibits the federal government from depriving

persons of their property "without due process of law."  U.S. Const. amend. V.

SPA207.  That prohibition governs the entry of a judgment resolving a claim in

litigation.  Because the claim—a "chose in action"—is a "species of property

protected by the … Due Process Clause," *Logan v. Zimmerman Brush Co.*, 455

U.S. 422, 428 (1982), the individual's right to pursue the claim is "a

constitutionally recognized property interest," *Shutts*, 472 U.S. at 807.

On that basis, the Supreme Court held in *Shutts* that if a court "wishes to

bind an absent plaintiff concerning a claim for *money damages or similar relief at*

32

*law*, it must provide minimal procedural due process protection," including not only the "best-practicable" notice but also—critically—"an opportunity to remove himself from the class." *Id.* at 811-12 (emphasis added). The right to object to the settlement is not enough: Class members must have the right to remove themselves from the judgment and pursue their claims on their own.

In the thirty years since *Shutts*, the Supreme Court has not once approved a class-action judgment that purported to resolve individualized legal claims without affording class members the right to opt out and pursue their personal claims as they saw fit. Rather, the Court has reaffirmed that "mandatory class actions aggregating damages claims implicate the due process principle … deep-rooted [in our] historic tradition that everyone should have his own day in court." *Ortiz*, 527 U.S. at 846.

Federal Rule of Civil Procedure 23(b) embodies the same principles, authorizing a non-opt-out, (b)(2) class only in unique circumstances where no "claims for *individualized* relief," such as "individualized award[s] of monetary damages," are at issue. *Dukes*, 131 S. Ct. at 2557. Instead, "individualized monetary claims belong in Rule 23(b)(3)," the separate provision of the Rule that guarantees absent class members the right to opt out. *Id.* at 2558. Under Rule 23, class members' individualized claims cannot be "*precluded* by litigation they had no power to hold themselves apart from." *Id.* at 2559. Instead, "plaintiffs with

33

individual monetary claims [must] decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have." *Id.*

Indeed, as the Supreme Court explained, permitting a judgment to bind members of a (b)(2) class with respect to their individualized monetary claims would be "inconsistent with the structure of Rule 23(b)." *Id.* at 2558. Subsection (b)(3) is designed for individualized legal claims in which class members may have distinct interests. Accordingly, Rule 23(b)(3) permits class litigation controlled by a representative only if common questions "predominate over any questions affecting only individual members" and the class action is "superior" to individual adjudication. Because those standards do permit the aggregation of some individualized claims, Rule 23(b)(3) guarantees class members notice and the opportunity to opt out. *See* Fed. R. Civ. P. 23(c)(2)(B).

By contrast, subsection (b)(2) contemplates a judgment binding the entire class *without* notice and opt-out rights, and *without* regard to whether common questions predominate, because it applies only when the case consists *exclusively* of common claims in which the class has a single, indivisible interest. This provision is never appropriate with respect to a "class member's individualized claim for money." *Dukes*, 131 S. Ct. at 2558-59. In the Supreme Court's words, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or

declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* at 2257.

The "prime examples" of such situations are "[c]ivil rights cases against parties charged with unlawful, class-based discrimination." *Amchem*, 521 U.S. at 614. But Rule 23(b)(2) treatment is not even available for every claim seeking only injunctive relief: "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class," and is limited to cases where "the relief sought must perforce affect the entire class at once." *Dukes*, 131 S. Ct. at 2557-58.

If counsel drafts a class complaint to include a truly common injunctive claim alongside individualized legal claims, that of course does not strip class members of their right to pursue the latter individually. The right to opt out cannot be nullified "whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction." *Id.* at 2559. If that were permissible, "individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from." *Id.*[6]

---

[6]    In this regard, *Dukes* "abrogated" this Court's cases allowing monetary claims to be certified in mandatory (b)(2) classes as long as injunctive claims

Applying these principles, this Court has consistently disapproved class-action judgments that purport to resolve individualized claims of class members who did not get a chance to opt out. This Court has done so where the damages claim already existed at the time the court entered the class-action judgment (as in *Shutts*), if individual class members received inadequate notice of their opt-out right. *See Hecht*, 691 F.3d at 222-23. It has also done so where the opt-out right was ineffective because the precluded claim arose only after the court entered the class-action judgment (as in *Ortiz*). *See Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001), *vacated in part on other grounds*, 539 U.S. 111 (2003).

The district court identified no case approving the release of past, present, or future individualized claims—especially compensatory damages claims—without allowing class members to opt out. The precedents cited by the settling parties below to justify using Rule 23(b)(2) to deprive merchants of their opt-out rights only highlight that this settlement is unprecedented.

The most analogous decision, *Visa Check*, approved the certification of a class of merchants under *only* Rule 23(b)(3), precisely to avoid "the primary concern … about Rule 23(b)(2)," *i.e.*, "the absence of mandatory notice and opt-out rights." *Visa Check*, 280 F.3d at 147 (Sotomayor, J.) (citing *Jefferson v.*

---

"predominated." *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222-23 (2d Cir. 2012).

*Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir. 1999)).  The recent settlement in

*Literary Works* released the defendants from future litigation over subsequent use

of the copyrighted works at issue.  But, critically, it permitted class members to (1)

opt out of the settlement entirely or (2) "opt out of the release for future use" in

particular.  654 F.3d at 246-47.  Even in the civil-rights cases at the core of Rule

23(b)(2), settlements in this Circuit have been carefully scrutinized to preserve

class members' rights to pursue any individualized claims that might arise from the

defendants' ongoing conduct.  *See, e.g.*, *Joel A. v. Giuliani*, 218 F.3d 132, 142 (2d

Cir. 2000) (settlement preserved "the right of an individual plaintiff to sue for

damages or equitable relief tailored solely to the specific circumstances of that

individual plaintiff") (internal citation and quotations omitted); *Charron*, 731 F.3d

at 252 (noting that while (b)(2) settlement provided no relief on certain monetary

claims, it also "d[id] not *extinguish* them").[7]

---

[7]     The only possible exception, *TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982), predates the opt-out right announced in *Shutts*, and
the parties in that case did not dispute whether the class had been "improperly
certified as a non-opt-out class."  *Id.* at 460 n.4.

**B. The certification of the (b)(2) settlement class must be vacated because it extinguishes merchants' individualized legal claims without providing an opt-out right.**

    *1. The settlement, on its face, releases individualized monetary claims.*

The judgment in this case presents precisely the scenario anticipated—and unanimously forbidden—by the Supreme Court in *Dukes*.  It disposes of every class member's claims "whether *individual* … or otherwise in nature, for any form of … *damages or other monetary relief* relating to the period after [November 28, 2012], regardless of when such claims accrue…, *in law* or in equity."  SPA169 (Settlement ¶68) (emphasis added); SPA90 (Judgment ¶16(c)).  Indeed, it does so in the most extreme way possible:  It releases such claims entirely and for all time, with no changes to the ongoing conduct that precipitated this case aside from limited surcharging relief.

The settlement and release terminate the (b)(2) class members' rights to recover damages by artificially splitting the damages claims pertaining to defendants' ongoing conduct, permitting class members to pursue individually only the subset of damages that accrued before November 28, 2012 (if they opted out of the (b)(3) class), and forever extinguishing any right to recover the damages they subsequently suffer from the same conduct.  That release applies indefinitely into the future, no matter how great the damages merchants incur; indeed, it applies even if circumstances change and seriously exacerbate the anticompetitive effects

38

of the released rules and practices or their impact on individual class members.

SPA171 (Settlement ¶68(g)-(h)).

No one can foresee how the payment card industry will evolve, how defendants' present or future conduct might harm future competition, or how heavily the economic harms might fall on particular class members given their particular market circumstances. But under this settlement, it does not matter: In direct contravention of *Dukes*, the settlement releases all those legal claims without regard to individual merchants' desires to preserve them for themselves. *See* 131 S. Ct. at 2557 ("[A]t a minimum, claims for individualized relief … do not satisfy" Rule 23(b)(2).).

### 2. The settlement has the effect of releasing a host of individualized legal claims.

It is easy to illustrate that the release extinguishes individualized legal claims, not injunctive claims common to the class as a whole. This case looks nothing like the civil-rights suits classically resolved under Rule 23(b)(2). The released claims are individualized and monetary—whether the damages associated with the challenged practices accrued in the past, are accruing today, or will accrue in the future—because the entire dispute is over whether defendants' practices restrain competition and thereby raise prices or otherwise take dollars out of merchants' pockets. As the district court found, "supracompetitive interchange

39

fees" are "the precise anticompetitive effect" the claims here "were brought to challenge."  SPA42.

In fact, the character of the (b)(2) class's claims is evident from the relief provided to the separate (b)(3) class.  While the relief the settlement provides to the (b)(3) and (b)(2) classes is different (several billion dollars to the former; minor rule changes to the latter), the *claims* that are settled on behalf of those classes are identical—distinguished only by the date on which the damages accrue.

The released claims themselves also illustrate the point.  Take the Honor-All-Cards rules.  *See supra*, at 9.  Under this Court's holding in *United States v. Visa*, 344 F.3d at 229, merchants allege that those rules are unlawful horizontal restraints preventing competition among banks for merchant acceptance of their cards.  The harm that merchants suffer from those rules is the inflated fees they pay, giving rise to a classic money damages claim under the Sherman and Clayton Acts.  JA[__] (Complaint ¶¶292-312, 371-84, 409-15, 443-56).  The same is true of default interchange rates, which plaintiffs have attacked as price fixing.  *Id.*  Yet, going forward, the settlement expressly extinguishes all such claims.  SPA169-72 (Settlement ¶68).

Also illustrative is the settlement's release of claims regarding the Fixed Acquirer Network Fee, which Visa charges merchants for attaching to its network. The FANF notably was under investigation by the Justice Department at the time

of the settlement.  *See* JA[__]{DE2670 (Objecting Plaintiffs' Obj. 34 n.43); DE2670-8 (Ex. 82 (p. 300))}.  Although the settlement allows individuals to seek future *injunctive* relief against the FANF, it extinguishes every merchant's individualized *monetary* claim for post-November 28, 2012 damages caused by this practice, even if the merchant later prevails in proving that the fee is unlawful and caused significant monetary harm.  SPA93 (Judgment ¶16(g)(iv)); SPA174 (Settlement ¶72(d)).  This is exactly the opposite of what Rule 23(b)(2) allows.

The structure of this settlement, if approved by this Court, would thus eviscerate the opt-out right that Rule 23 protects.  As Rule 23 has been consistently construed, an individual considering whether to opt out from a (b)(3) class will expect that, if she prevails in her individual suit, she will secure monetary relief extending to the date of the judgment, as well as an injunction protecting her from future injury.  But under the model of this settlement, as of the date on which the (b)(2) class is defined, opt-out claimants cannot recover for their ongoing damages or obtain an injunction to prevent future harm.

The implications of approving such a mandatory class release are sweeping, and startling.  If this settlement is affirmed, virtually any class action implicating ongoing conduct may be split into a backwards-looking (b)(3) class and a mandatory, forward-looking (b)(2) class.  Lead class-action plaintiffs will always have an incentive to take this step because it provides them an enormous benefit to

41

offer the defendants—categorical immunity from civil liability to every class member (including class members that do not even exist yet) for harmful conduct the defendants want to continue.  Other parties are already adopting this model as a template for their settlement-only class actions.  *See*, *e.g.*, JA[__] (AmEx Settlement).  Unless this Court reverses the judgment below, this innovation will almost certainly become the next "stock device" in the world of class-action litigation and settlement.  *Cf. Amchem*, 521 U.S. at 618.

Not surprisingly, precedents regarding claims for money damages that will arise in the future have treated them as claims for legal relief to which the procedural protections of Rule 23 and the Due Process Clause fully apply.  In particular, *Ortiz* regards the termination of monetary claims as a serious due-process problem even though a large segment of the disputed claims were by "future claimants" who had no claim for damages at the time of the settlement.  *Ortiz*, 527 U.S. at 846.

In *Stephenson*, this Court likewise recognized that the Due Process Clause does not permit a class-action judgment to release future damages claims without "adequate representation … and an opportunity to opt out."  273 F.3d at 260 (citing *Shutts*, 472 U.S. at 811-12).  *Stephenson* thus refused to preclude a later-arising damages claim for particular plaintiffs based on their absentee class-membership in an earlier "global settlement" because, among other things, the plaintiffs "likely

42

received inadequate notice" of the class action and thus inadequate opportunity to opt out. *Id.* at 261 n.8 (citing *Shutts*, 472 U.S. at 812). And that was true despite the fact that the court that initially approved the *Stephenson* settlement was virtually certain that these contingent monetary claims would not arise. *Id.* at 261.

These holdings confirm the commonsense point that claims accurately described as "claims for money damages that arise in the future" are, of course, *claims for money damages* and thus a species of individualized legal claim for purposes of the Due Process Clause and the unanimous holding in *Dukes*. Indeed, the fact that the settlement releases future damages creates an unavoidable constitutional dilemma. As the Supreme Court has recognized, such releases impermissibly negate the one process the Constitution has expressly provided for the resolution of individualized legal claims: the jury trial. *See Ortiz*, 527 U.S. at 846 ("*By its nature*, … a mandatory settlement-only class action with legal issues and *future* claimants compromises their Seventh Amendment rights without their consent.") (emphasis added). The same is true, of course, for present objectors that are actively withholding their consent and trying to preserve their jury trial rights.

43

### C.    There is no legitimate justification for denying merchants opt-out rights.

   *1.    There is no merit to the district court's theory that a non-opt-out class was permissible because the settlement provides its members no monetary relief.*

Although appellants argued at length below that the Due Process Clause and Rule 23 guaranteed them the right to opt out of this settlement, the district court dealt with those arguments in only one paragraph.  The court held as a matter of law that "there is no due process right to opt out of the (b)(2) class" because the "(b)(2) settlement here is limited to going-forward injunctive relief that changes the structure of the networks' practices."  SPA46.  In other words, the court determined no opt-out right was necessary because the relief provided to the non-opt-out class was "injunctive," rather than monetary.  That reasoning fails for two reasons.

First, whatever the character of the settlement's relief to the (b)(2) class, it still extinguishes individualized claims—including claims for money damages—with no opt-out right.  Even the district court effectively acknowledged that the released claims are inherently individualized.  *See, e.g.*, SPA52 (noting judicial relief on interchange fee claims "would affect the class unequally").  The Due Process Clause and Rule 23 guarantee the right to opt out with respect to the resolution of those individualized claims, even if the class gets no relief.  Indeed, that right is especially important if the class has agreed to take nothing in exchange

for forever forfeiting its monetary claims.  In such a case, a (b)(2) class has been impermissibly certified with respect to the class members' monetary claims, and those claims have been "*precluded* by litigation they had no power to hold themselves apart from"—the exact thing *Dukes* forbids.  *See* 131 S. Ct. at 2559.

The district court's analysis ignores altogether the monetary claims subject to the mandatory release.  The court noted that "[t]o allow [merchants] to opt out and pursue their own *rules-based injunctive relief* would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create."  SPA46 (emphasis added).  But the release extends well beyond claims for "rules-based injunctive relief":  It also bars class members from pursuing compensation for any monetary injuries those practices—or any others in the voluminous rulebooks—have caused or will cause at any point after November 28, 2012.  The settlement thus expressly releases "all manner of claims … whether individual … or otherwise in nature, for any … damages or other monetary relief."  SPA169 (Settlement ¶68); SPA90 (Judgment ¶16(c)).

Second, this (b)(2) class was an unnecessary and artificial contrivance that inverted the design of Rule 23.  Echoing Rule 23's drafters, the Supreme Court has made clear that subsections (b)(1) and (b)(2) were intended to reflect existing, "standard" practices in collective litigation, and that "adventuresome" innovations were confined to Rule 23(b)(3).  *See, e.g.*, *Amchem*, 521 U.S. at 615; Benjamin

45

Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 394 (1967). This settlement, which splits a unitary claim in order to create a future-looking, "injunctive" component—amenable to a global release for all time by a non-opt-out class—is anything but "standard." It thus belongs in Rule 23(b)(3). Indeed, because the relief provided to (b)(3) classes frequently includes injunctions, there is no need for the "adventuresome" innovation in claim-splitting this case seeks to inaugurate. *See, e.g.*, *Wal-Mart*, 396 F.3d at 112-13 (approving substantial forward-looking relief in class action certified under Rule 23(b)(3)); *Literary Works*, 654 F.3d at 249 (same).

In fact, the approval of this settlement would give Rule 23(b)(2) an entirely new and dangerous function. The only possible purpose of including damages claims against ongoing and future conduct in a (b)(2) settlement is to extinguish them; attempting to dole out individualized damages to a (b)(2) class would be an even more obvious violation of *Dukes*. Prohibiting the inclusion of such claims in mandatory class settlements thus provides the only check against a very dubious practice: allowing the settling plaintiffs to confer on defendants the right to *injure* other class members in the future through conduct those other class members would attack as unlawful if only they had the right to opt out and litigate on their own. And that, in fact, is the central feature of this settlement: It enables Visa and

46

MasterCard to pay a fee—the payment to the members of the (b)(3) class—in exchange for the unfettered right to continue practices that the appellants argue are against the law, without any threat of future suit from any merchant.

### 2. Rule 23(b)(2) does not allow the certification of monetary claims that arise in the future for the purpose of creating "litigation peace."

Ultimately, the district court recognized that extinguishing all possible future claims against defendants' ongoing conduct was the *sine qua non* of the settlement. It nonetheless believed that the ongoing and future damages claims of absent and objecting merchants could be mandatorily sacrificed because it was "essential to providing defendants the litigation peace they legitimately expect[ed] in return for the settlement of claims." SPA44. But global peace is not a prize that can be bought over the objection of class members who prefer to preserve their individualized legal claims for themselves.

Indeed, the Supreme Court has made perfectly clear that—contrary to the district court's suggestion—the mandatory sections of Rule 23 do not exist to vindicate class-action *defendants*' interest in achieving forward-looking global peace. The only interest in global settlement the Supreme Court has even suggested might justify the mandatory release of monetary claims arises in "limited fund" cases under Rule 23(b)(1), where the resolved legal claims would be terminated anyway because the available monies to pay them would be exhausted

47

(as in a bankruptcy).  *See, e.g.*, *Ortiz*, 527 U.S. at 839.[8]  In such cases, terminating

monetary claims is arguably justified because class-wide resolution would give

"the class as a whole the best deal" but would "not give a defendant a better deal

than *seriatim* litigation would have produced."  *Id.*  But these considerations have

no application here.  The only global interest the mandatory release accomplishes

here is to give defendants a better deal than seriatim litigation would produce—

exactly the opposite of the type of necessity that could justify forcing *plaintiffs* like

appellants to give up the claims that belong to them by constitutional right.

## II.    The Mandatory Class Lacked The Required Cohesion Of Interests.

The settlement is also invalid for the independent reason that it improperly

bound together, in a mandatory (b)(2) class, millions of diverse merchants with

conflicting interests in both the one claim on which they were granted relief and

the vastly broader collection of claims that the settlement resolved.

### A.    The greatest degree of cohesion is required for mandatory settlement classes.

"Cohesion" denotes the overarching requirement that any class defined

under any provision of Rule 23 contain a set of plaintiffs with sufficiently similar

interests to permit representative litigation.  *See, e.g.*, *Amchem*, 521 U.S. at 622-23;

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 165 (2d Cir. 2001).

---

[8]      Notwithstanding the judicial crisis of asbestos claims, *Amchem* and *Ortiz* insisted that the procedural and due process protections of Rule 23 not yield to claims of exigency.  *See Ortiz*, 527 U.S. at 864; *Amchem*, 521 U.S. at 605.

48

The requirement arises primarily from the constitutional interests that are directly implicated when class-wide representation displaces the right of individuals to pursue their own interests. *See Amchem*, 521 U.S. at 621 ("Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."); *Shutts*, 472 U.S. at 812 ("[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.").

A court's inquiry into whether the class is cohesive is accordingly at its most rigorous where class members are to be bound under Rule 23(b)(2) with no right to opt out. *See, e.g.*, *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005) ("Because 'unnamed members are bound by the action without the opportunity to opt out' of a Rule 23(b)(2) class, even greater cohesiveness generally is required than in a Rule 23(b)(3) class.").[9] Indeed, Rule 23(b)(2) does not provide for notice or opt-out rights—and the Due Process Clause permits such a regime—only because, in a properly certified (b)(2) class, the interests of all class members are so aligned that there is essentially no reason for them to litigate on their own. *See Dukes*, 131 S. Ct. at 2559.

---

[9]    *See also Robinson*, 267 F.3d at 165 (similar); *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000) (similar); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998) (similar).

As *Dukes* explained, Rule 23(b)(2) "applies only when a single injunction …
would provide relief to each member of the class"; it "does not authorize class
certification when each individual class member would be entitled to a *different*
injunction or declaratory judgment against the defendant."  131 S. Ct. at 2557.
Thus, both before and after *Dukes*, courts have rejected class certification under
Rule 23(b)(2) where the class would not derive an indivisible, common benefit
from the injunctive relief being pursued.  *See, e.g.*, *M.D. ex rel. Stukenberg v.
Perry*, 675 F.3d 832, 846 (5th Cir. 2012) (vacating (b)(2) certification order
because district court erred in finding "it irrelevant that some of the class's
requested relief would not apply to every class member"); *Kartman v. State Farm
Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("Where a class is not
cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs,
class certification is typically not appropriate."); *Casa Orlando Apartments, Ltd. v.
Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185, 200 (5th Cir. 2010) ("[F]orty percent of
the class benefiting from an injunction is not sufficient to certify under (b)(2).").

The fact that defendants' practices affect all class members is accordingly
insufficient to render the class cohesive, even if class members have certain
complaints in common about those practices.  If individual class members would
want to litigate and redress their claims in different ways—particularly because the
case will resolve multiple claims, and the class members' differing interests in

50

those claims might be traded off against each other—then those claims are not suitable for (b)(2) treatment.  Instead, they are, at best, the kind of "common questions" that may be certified only under Rule 23(b)(3).  *See, e.g.*, *Ortiz*, 521 U.S. at 854-58 (noting cohesion problem in mandatory class-action settlement aggregating different kinds of claims).

Among (b)(2) classes, settlement-only classes present the very greatest cohesion concerns.  Divisions in the interests of class members may become apparent during the course of litigation.  By contrast, when the district court is presented with proposed class definitions only as a part of an already completed negotiation that will resolve the entire case—and decisions about which claims to pursue and how some might be sacrificed to secure relief on others have not been subject to the scrutiny of individual class members during the litigation—those divisions are more likely to be obscured.  As *Amchem* emphasized, "heightened" scrutiny is required because "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  521 U.S. at 620.

Settlements also create a special risk of trading off class members' claims against each other.  Consider the classic example of a Rule 23(b)(2) class of plaintiffs in a civil-rights suit.  A hypothetical challenge to a males-only admissions policy at a single military college could be pursued by a non-opt-out

51

class of female applicants. But imagine a broader challenge to all the gender-specific practices in every branch of the military. Even if such a claim could be *litigated* on a class-wide basis, it is highly doubtful such a suit could be settled through a mandatory (b)(2) class action, given that any effort to resolve the case would inevitably require trading off some of the plaintiffs' claims for others. A lack of cohesion would arise from the competing interests of some class members who sought, for example, greater gender integration in the Coast Guard and Air Force, which might be traded for a release of all claims regarding the Army or Marines, or bargained for different outcomes with respect to medical and combat personnel. Binding class members on a mandatory basis to such a settlement violates both Rule 23(b)(2) and the Due Process Clause because it puts the common class representatives in the position of trading away the interests of one subset of the class in return for relief for a different group.[10]

**B.    The merchants bound to the (b)(2) class in this case were too diverse for a single, indivisible injunction, and the settlement does not treat those class members equally.**

In *Amchem*, the Supreme Court described the lack of cohesion of the asbestos-victim class by saying: "No settlement class called to our attention is as

---

[10]    The failure of the proposed class to survive this "heightened attention" does not mean that no class action is possible. The most common solutions to cohesion problems are to form subclasses with separate representation (*e.g.*, *Literary Works*, 654 F.3d at 256), to provide class members with opt-out rights (*e.g.*, *Visa Check*, 280 F.3d at 147), and/or to narrow the claims involved (or the release granted) so as to bring the interests of the class closer together.

sprawling as this one." 521 U.S. at 624. This case proves that statement outdated. The two defining features of this (b)(2) settlement are the breadth of the claims involved and the breadth of the class assembled. Each alone is unprecedented; together, they make for a manifestly non-cohesive class.

    *1.    Class members had varying interests in the broad set of claims that the settlement purported to release.*

    This appears to be the broadest commercial class ever assembled. While "the precise size of the class [is] impossible to determine, Class Counsel estimate that approximately 12 million merchants comprise the class." SPA23. But those are only the merchants that existed as of the date of preliminary approval. It does not count the tens of millions of future merchants that will come into existence later. All those millions of merchants are likewise bound to the settlement, and they include every imaginable type of merchant: anyone in the country who sells any kind of thing in any kind of way or ever might sell anything you can think of in any way you can conceive—so long as they accept credit cards, as almost every merchant will. Indeed, since the release lasts forever, the range of merchants captured by this class is endless.

    Accordingly, even the district court acknowledged that members of the (b)(2) class had different interests in one of the core issues in the case—the setting of default interchange rates. As the court found, the claims asserted on behalf of the mandatory class "seek injunctive relief from the bundle of network rules that

result in—according to the plaintiffs' allegations—supracompetitive interchange fees in violation of the antitrust laws." SPA46. And yet, as the court expressly recognized, any "judicial regulation of default interchange fees … *would affect the class unequally.*" SPA52 (emphasis added). The court explained that members of the class had unequal interests in obtaining such relief because "default interchange operates only in the absence of bilateral agreement, and some of the very large merchants have sufficient transaction volume that they can actually negotiate for their own, lower interchange structures." *Id.* Thus, even under the district court's formulation, different members of the class would have differing interests in a central claim in the case, depending on their size and business models.

Further, this case—at least as settled—concerned not just one of the defendants' practices, nor even several of their rules that relate to interchange fees identified in the Complaint, but all of the express policies in defendants' massive rulebooks, their unwritten policies and practices, and any future rules, policies, or practices that are "substantially similar." As counsel for defendants stated at the fairness hearing, the releases are designed to encompass all of the "rules and policies and conduct of the defendants to the extent they adversely affect merchants that accept MasterCard and Visa." JA[__]{Corrected 9/12/13 Tr. 37-38}; *see also* JA[__]{DE2670-8 (Ex. 66 (p. 43))}(Visa General Counsel stating to

investors that the release covers "all of Visa and MasterCard's rules in existence as of the time of approval.").

This expands exponentially the lack of cohesion in this settlement-only class:  An already maximally diverse group of merchants will have even more conflicting interests in determining which rules and practices harm them the most and should be the subject of any negotiated relief.  For that reason, these class members would certainly not seek an "indivisible" bargain with respect to all those claims "at once."  *Dukes*, 131 S. Ct. at 2558.  The best evidence of that is the bargain they got:  The class representatives primarily secured relief on one claim (surcharging) while forever abandoning every other claim of every class member (such as the core challenges to Honor-All-Cards and default interchange).

Merchants' diverse interests in the indescribably broad collection of other claims released by the settlement (some of which have little or nothing to do with interchange) are likewise illustrative.  For example, the FANF rate varies with the number of merchant locations, so large merchants would be more concerned about that issue than small ones.  JA[__]{DE2670-8 (Ex. 84 (pp. 318-21))}.  Some merchants operate in industries that are so competitive that surcharging is highly unlikely.  Some merchants may be well-suited to rolling out mobile-payment technology, and would be much more concerned with releasing such claims than their competitors.  In a settlement that concerns every written and unwritten

network practice and a class of every conceivable type of merchant, this list goes on and on and on.

In sum, the cohesion analysis must take account not only of the variations among the members with respect to the relief they obtained, but also of every claim they have given up, and the balance struck by the settlement of the case as a whole. From that vantage, it is hard to imagine a class less cohesive than this one.

> 2.    *Class members had varying interests in the one claim on which limited relief was actually provided.*

The variance among the interests of the (b)(2) class members is best illustrated by the sole claim on which they obtained any material relief—surcharging. *See supra*, at 14-15, 22-23. There is no dispute that the class members have conflicting interests in surcharging: The district court itself acknowledged it.

The district court recognized that many merchants that do want to surcharge cannot—this settlement notwithstanding. The court found that laws ban merchants from surcharging in at least ten states. SPA40.[11] The only "injunctive" relief that is even arguably material thus does not apply to the merchants in those states at all—it is as if the settlement had an explicit clause excluding them. The district

---

[11]    The district court cited nine, including some of the nation's largest—California, Florida, and Texas. New York's surcharging ban has been struck down, but that decision is currently on appeal to this Court. JA[__]{appellate docket}. Utah has subsequently enacted a surcharging ban. SPA231.

court accordingly recognized, with significant understatement, that those laws

would "diminish, at least in the near term, the efficacy of the proposed relief" for

some of the class. *Id*.

The clearest possible example of a class lacking common interest in a claim

is where—as here—relief on that claim will not apply to certain members *as a*

*matter of law*. As this Court has held, when "variations in state law might cause

class members' interests to diverge," a "district court should pay particular

attention to … Rule 23's requirements 'designed to protect absentees by blocking

unwarranted or overbroad class definitions.'" *In re Am. Int'l Grp. Sec. Litig.*, 689

F.3d 229, 243 (2d Cir. 2012); *see also Amchem*, 521 U.S. at 624 (noting that

"[d]ifferences in state law" undermine class cohesion).

The class's lack of cohesion is equally demonstrated by the settlement's

most-favored-nation provision. Some merchants accept only Visa and MasterCard

credit cards. But nearly 70% of merchants accept American Express, which

separately prohibits surcharging, and those merchants comprise over 90% of

credit-card transaction volume nationwide. JA__{DE2111-1 at 48-49}; JA__

{DE2670-5, ¶65}. As the district court and its appointed expert recognized, all

those merchants would be prohibited from surcharging Visa and MasterCard under

the terms of the settlement and their contracts with American Express. *See* SPA42

(finding that, "merchant restraints imposed by American Express" would, like

57

"state laws," also "undermine the [surcharging] relief"); SPA41 (because of existing agreements, "most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products."). Those merchants obviously have much less interest in how the surcharging claim is resolved than the subset of members that accept only Visa and MasterCard.

The value of the surcharging relief also varies among merchants with different business models. The court explained that "many merchants, for reasons sufficient to them, may choose not to avail themselves of the right to surcharge." SPA36. By contrast, "the major airlines" seemed to be more sanguine about the value of surcharging than other classes of merchants, including "smaller retailers, such as grocery stores and convenience stores," which were more likely to have objected or opted out. SPA23-24. The district court took this as evidence that the surcharging relief had some value for purposes of assessing the fairness of the settlement and the reaction of the class. *Id.* But it failed to recognize the point that matters under Rule 23(b)(2): The different class members' *divergent* valuations demonstrated the class's lack of cohesion. Even if surcharging did have some value to certain members of the class, forcing airlines and grocery stores to accept the same bargain, negotiated by a single set of representatives, far exceeded what Rule 23(b)(2) allows.

Despite recognizing the barriers to surcharging that many class members faced, the district court held that "the fact that some merchants may elect not to avail themselves of the rule, or are prohibited by factors beyond the scope of this lawsuit from surcharging, does not undermine my conclusion that the class is sufficiently cohesive." SPA 52. This reasoning is manifestly incorrect. Discounting preexisting "factors" affecting the interests of class members as "beyond the scope of this lawsuit" simply erases all content from the cohesion analysis. In applying the "heightened attention" required for settlement-only class certification, a court must of course consider factors such as "[d]ifferences in state law" and class members' different, pre-existing circumstances that might "undermin[e] class cohesion." *Amchem*, 521 U.S. at 620, 624. In fact, the only way to determine cohesion is to ask whether such factors create different interests among the class with respect to the relief that the lawsuit does control. If the cohesion inquiry merely asked whether the class members received the same relief, without regard to preexisting factors affecting its value, then virtually every settlement class would be "cohesive," no matter how disparately that relief might apply. And the district court's analysis simply ignores that class members with different interests in surcharging would not bargain for the same surcharging relief, and so cannot be forced into a single class with respect to this Complaint.

59

Surcharging also illustrates that class counsel were not even *aware* of the divergent interests of their sprawling collection of millions of clients. Once the settlement was disclosed, pharmacies objected that they had no "realistic ability" to surcharge because of restrictive Medicare regulations and prohibitions on surcharging in their contracts with health insurers and pharmacy benefit managers. JA[__]{DE 2619 (NCPA Obj. ¶22)}. Similarly, health insurers objected because the Affordable Care Act requires them to spend a certain portion of premium revenues on medical services and thus leaves them differently situated from other (b)(2) class members with respect to surcharging. While the district court "agree[d] with these objectors that no one thought of their unique concern in formulating the settlement," it viewed that as "no reason not to approve it," because the insurers' objections were speculative. SPA48. But this misses the point: In this representative litigation, "no one thought of their unique concern," and therefore no one protected their interests—and because they had no opt-out rights, they were powerless to protect themselves. A settlement class that is so sprawling that it does not even recognize the interests it affects obviously fails the "heightened" cohesion requirement for certification under Rule 23(b)(2).

For all these reasons, the members of the (b)(2) class were differently situated and would have ascribed very different value to the Complaint's underlying surcharging allegations for purposes of negotiating a global settlement

of claims.  This settlement plainly violated *Dukes*' holding that "Rule 23(b)(2) applies only when a single injunction … would provide relief to each member of the class."  131 S. Ct. at 2257.  The district court's conclusion that the class is nonetheless cohesive for purposes of Rule 23(b)(2) is wrong as a matter of law.[12]

> 3.    *The relief on the Complaint's surcharging claim does not constitute an indivisible injunction.*

The relief on the surcharging claim is furthermore forbidden by Rule 23(b)(2) because it is not an "indivisible injunction benefitting all [class] members at once."  *Dukes*, 131 S. Ct. at 2558.  Indeed, the relief provided on this claim is divisible on its face.  The settlement expressly provides that "[n]othing in this Class Settlement Agreement shall prevent the … Defendants from contracting with merchants not to surcharge."  SPA149, 162-63 (Settlement ¶¶42(f), 55(f)).  In other words, defendants remain free to balkanize the class after the fact, and exploit bargaining leverage (which will surely be greater as to some merchants than

---

[12]    Another minor "rules change" in the settlement further demonstrates the district court's inattention to the class's lack of cohesion.  The settlement authorizes merchants that operate multiple businesses under different "trade names" to accept Visa and MasterCard on a trade-name basis.  SPA13; SPA140-41, 153-54 (Settlement ¶¶41, 54).  This relief is useless to small businesses that operate under one name and so represents another unsurprising divergence in a class that includes everything from YUM! Brands (KFC, Taco Bell, Pizza Hut) to the local pizza shop.  But it also creates tensions even among large-volume merchants:  Gap Inc. operates six brands with very different business models; The Home Depot conducts the vast majority of its business under one banner.  The court did not even address whether this relief will benefit each member of the class, and it obviously will not.

others) to create a system in which the allegedly common practice that underlies

(b)(2) certification becomes uncommon once again.

This provision of the settlement leaves defendants free to bargain

individually with strategic merchants whose national prominence might actually

allow their surcharging practices to pose a threat to defendants' inflated rates.

Those merchants can be offered a private, individualized deal to avoid the class-

wide benefit that the district court repeatedly invoked. *See, e.g.*, SPA38

(speculating that surcharging might reduce interchange rates on a nationwide

basis). For example, if a large merchant who is an industry leader in a segment

(say, McDonald's) decides to pursue surcharging, defendants can offer that

merchant a break on its interchange rates in exchange for its agreement not to

surcharge. For competitive reasons, smaller merchants that vie with McDonald's

for customers would then be discouraged from surcharging. This may bring down

the rate for McDonald's, but certainly not for the whole industry, let alone the

whole class of millions of merchants. Whatever benefits surcharging may produce,

it is the isolated merchants that may be able to surcharge who "will realize the

greatest savings." *See, e.g.*, JA[__]{DE2111-5 (Frankel Decl. ¶68)}. This result is

not an indivisible injunction providing a common benefit to the class *as a whole*.

**C.     The district court's cohesion analysis ignored these flaws.**

The district court's opinion addressed the cohesiveness of the (b)(2) class in only a single page.  The court concluded that the class was cohesive because "[t]he network rules regimes that gave rise to this case applied generally to every merchant accepting Visa and MasterCard credit cards."  SPA51.  But that is true only in a superficial way—in the same irrelevant sense in which, for example, the set of all Wal-Mart employee policies and practices could be said to "apply generally" to "every" Wal-Mart employee.  *See Dukes*, 131 S. Ct. at 2551-57.  The network rules consist of thousands of pages of different policies, and countless more unwritten practices, with greatly varying impacts on the different merchants based on, for example, business models, market conditions, and state and federal laws.  In such a wide-ranging settlement, there are inevitably innumerable issues— including contractual and regulatory obligations—that affect particular class members' abilities to derive value from relief on particular claims, and yet will escape the attention of class counsel and representatives.

The district court also thought that, "by focusing the settlement efforts on the merchant restraints [*i.e.*, surcharging], as opposed to, for example, default interchange, … Class Plaintiffs have enhanced the cohesion of the class" because regulation of default interchange "would affect the class unequally."  SPA52.  The problem with that reasoning is that the settlement efforts were focused on default

63

interchange—the district court approved a class settlement that released all claims forever regarding default interchange, along with everything else in the Visa and MasterCard rulebooks. The requirements of the Due Process Clause and Rule 23 exist to protect those claims from being *resolved* without adequate representation and effective consent, whether or not the class obtains any relief. Indeed, those protections are especially relevant if the class will not receive any relief on the claim being resolved. Accordingly, the settlement efforts were no more "focused" on the merchant restraints than they were on default interchange; the only difference was who got relief and who gave up (or, more accurately, was forced to give up) the respective kinds of claims.

The district court's error in this regard is similar to one the Supreme Court identified in *Ortiz*. There, the plaintiffs attempted to establish cohesion by demonstrating a shared interest in the common fund created by the settlement. But the Supreme Court held that "the determination whether 'proposed classes are sufficiently cohesive to warrant adjudication' must focus on 'questions that preexist any settlement.'" *Ortiz*, 527 U.S. at 858 (quoting *Amchem*, 521 U.S. at 622-23). The same is true here: The cohesiveness of the class must be determined by reference to the entire set of claims that the class could have pursued, not just the particular relief that the settlement provided in the end.

Similarly, the Court in *Ortiz* found that conflicting interests of present and future claimants were not resolved by giving them equal rights to a settlement fund because their different interests required different treatment—some claims were more valuable than others.  As the Court held: "The very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen."  527 U.S. at 857; *see also Literary Works*, 654 F.3d at 253 (similar).  Here, too, the decision to grant all merchants a limited right to surcharge is a "result[] almost certainly different from the results that" merchants that are precluded from surcharging "would have chosen"—especially in light of the different value many different members in this class of millions would ascribe to the claims being given up in exchange.

In short, this case does not involve a class with a claim that calls for a single, class-wide remedy necessarily benefitting each member of the class at once.  Instead, whatever possible benefits injunctive relief might have here would fall (and do fall) unequally on class members, while the settlement simultaneously releases a host of claims with different values to those same members.  For this reason, many different members of the class would have pursued a radically different settlement.  In such a case, while it might be possible to certify a class

under Rule 23(b)(3), there is no permissible way to force the settlement on objecting class members under Rule 23(b)(2).

## III.  The Settlement Violates The Requirement Of Rule 23(a)(4) That The Class Members Receive Adequate Representation.

This Court should also hold that the settlement is unlawful because the structure of the settlement negotiations deprived the class members of adequate representation.  Most obviously, the (b)(2) class that received so little in exchange for its sweeping release was represented by those who stood to reap colossal financial benefits by negotiating a larger recovery for the (b)(3) class.  Class members bound to the (b)(2) settlement were not represented by a separate class representative or lawyer with their interests solely in mind.  In reality, the (b)(2) class was merely the means to an end—obtaining the mandatory release defendants demanded from all the merchants that might ever sue them as the price of a large cash payment for the (b)(3) class.

### A.  Adequate representation requires separate representatives and counsel for subgroups with divergent interests.

Multiple classes in a single case that have different interests in the outcome must have separate class representatives and counsel to avoid structural conflicts. Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class."  This requirement is related to—but distinct from—the cohesion requirement discussed in Part II, because an adequate

representative must in fact protect the interests of every class member. Thus, as with cohesion, an even higher degree of scrutiny is required where individual class members have no opportunity to opt out and protect those interests for themselves. *See supra*, at 49-51.

The principal role of the adequacy requirement is to prevent parties from determining the rights of absent class members through "a global compromise with no *structural assurance* of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627 (emphasis added). Accordingly, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625.

While the Rule's text focuses on the named plaintiffs, the Supreme Court has "recognized that the adequacy of representation enquiry is also concerned with the 'competency and conflicts of class counsel.'" *Ortiz*, 527 U.S. at 856-57 & n.31 (quoting *Amchem*, 521 U.S. at 626 n.20). For that reason, "an attorney who represents another class against the same defendant may not serve as class counsel." *Id.* at 856 (citing Moore's Federal Practice § 23.25[5][e]). Indeed, following *Ortiz* and *Amchem*, the clear rule is that, in any case involving subgroups with diverse or antagonistic interests, "[o]nly the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of

67

that particular subgroup are in fact adequately represented." *Literary Works*, 654

F.3d at 252.

### B.    The (b)(2) and (b)(3) classes had antagonistic interests and could not be adequately represented by common representatives and counsel.

The merchants whose claims are bound to this settlement have substantially

different interests in the nature of the relief they might receive.  Some merchants

have very little interest in prospective rules changes:  They may have already

ceased operating, or be shrinking in volume, so that they place far greater emphasis

on obtaining money for past claims now.  The opposite is true for merchants that

do not yet exist or growing companies, which are much more concerned with

achieving lasting changes to the networks' practices as opposed to getting more

money for past injuries.  *Cf. Amchem*, 521 U.S. at 626 ("[F]or the currently injured,

the critical goal is generous immediate payments.  That goal tugs against the

interest of exposure-only plaintiffs in ensuring ample [relief] for the future.").

The negotiation of this settlement brought those conflicting interests into

stark relief.  Both the district court and the settling parties recognized that the

defendants would provide a large cash payment for retrospective damages only if

they prospectively received overarching "litigation peace"—that, in particular, any

deal would be contingent on a forward-looking release from the mandatory (b)(2)

class that would extinguish all possible future claims.  As Duncan MacDonald,

68

independent consultant and former General Counsel for Citigroup's North American and European card businesses, candidly explained: "The 'release' is a breathtaking success for the bankcard industry. It is about as comprehensive as any I've ever seen. *It should end the industry's antitrust wars for years to come*." JA[__]{DE2670-8 (Ex. 67 (p. 52))}(emphasis added).

In other words, defendants would agree to pay money now in exchange for freedom from future threats of interference with their rules and practices. More money for the (b)(3) class would buy more peace for defendants. As lead counsel for the Class Plaintiffs acknowledged at the preliminary approval hearing: "The negotiations before the mediators were always—one issue was monetary, the other issue was equitable relief. *One was not going to be reached without reaching the other*." JA[__]{DE1732 (11/9/12 Tr. at 9)}(emphasis added).

But, although the settlement in this case created two classes—one with greater retrospective interests and another that could only receive prospective relief—both had the same class representatives and counsel. This was entirely a problem of the settlement proponents' own creation. Rather than addressing tensions among class members in ways required by precedent—providing members the right to opt out; creating independently represented subclasses for merchants with different interests; or narrowing the claims the case would resolve—the representatives created two classes defined by kinds of relief. That

was their strategy to avoid the bar to resolving individualized monetary claims without an opt-out right. But this strategically crafted structure only gave rise to another fatal flaw. It created two classes with opposing interests: one seeking a large monetary award and willing to cede claims arising in the future; and the other seeking injunctive relief only. Having manufactured this structure, the proponents of the settlement at the very least were required to ensure that each class received its own champion and place at the bargaining table.

But there was no named plaintiff with solely the interests of the (b)(2) class in mind. Instead, the class representatives consisted exclusively of established merchants with claims on the (b)(3) class settlement, and they represented both classes in common. Worse still, when a majority of the original named plaintiffs, including the six trade associations (which themselves had *de minimis* damages claims) objected to the balance that settlement negotiations had struck, they were dropped as representatives with respect to both classes. In other words, in their role representing the (b)(2) class, class counsel *fired their clients* and restructured the representation so that all that remained were class representatives committed to a deal that gave the (b)(3) class money in exchange for a broad release from the (b)(2) class. Every single representative that expressed a desire to prioritize the mandatory (b)(2) settlement over the money was removed from the process.

70

The representatives that remained naturally prioritized their interest in monetary relief. In fact, all were ineligible for the surcharging relief that supposedly justifies the (b)(2) settlement because they operate in states that prohibit surcharging or accept American Express. JA[__]{DE2670 at 39-40}. That such merchants approved the settlement, while the trade associations with *de minimis* damages and predominating interests in future relief objected, is powerful evidence of a conflict between past and future claims requiring separate representation.

Indeed, this structure created the all-too-predictable possibility that the representatives would trade away the future-looking interests of the mandatory (b)(2) class in return for more money today—a very nearly zero-sum affair. That is the exact kind of conflict that Rule 23(a)(4) prohibits. As *Ortiz* put it: "[I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter … attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), *with separate representation to eliminate conflicting interests of counsel*." 527 U.S. at 856 (emphasis added).

The dilemma was structural. Representatives with present interests simply cannot fight for the best possible relief for future-looking claims. Even if they did, they would then fail in their obligation to class members interested in greater

71

monetary relief.  There is *no* representative that can adequately represent two client groups with such directly conflicting interests, especially when the members of one cannot protect themselves by opting out.

The potential for conflict was, if anything, worse for class counsel, whose stake in the (b)(3) class's multi-billion dollar recovery had no parallel when it came to fighting for the (b)(2) class.  Indeed, the settlement left in place one of the best-understood conflicts for counsel in class-action law:  letting lawyers with everything to gain from a monetary settlement on behalf of present claimants bargain on behalf of future claimants as well.  In a closely related context, *Ortiz* discussed this problem at length and condemned it as "egregious":

> In this case, … at least some of the same lawyers representing plaintiffs and the class had also negotiated the separate settlement of 45,000 pending claims, the full payment of which was contingent on a successful Global Settlement Agreement….  Class counsel thus had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class.  The resulting incentive to favor the known plaintiffs … was, indeed, an egregious example of the conflict noted in *Amchem* resulting from divergent interests of the presently injured and future claimants.

*Id.* at 852-53 (internal citations and quotations omitted).  This case is indistinguishable:  With a fee request representing the largest share of a multi-billion dollar fund—and with that fund dependent on reaching an agreement that provided a mandatory release from the (b)(2) class—class counsel faced the natural

incentive to be sure that the deal got done. No class counsel could be expected to scuttle a multi-billion dollar settlement based on the conviction that the (b)(2) class was releasing too much in exchange for too little injunctive relief. As *Ortiz* makes clear, the law cannot indulge assumptions so contrary to human nature, at least "in any class action settlement with the potential for gigantic fees." *Id.* at 852.

As precedent demonstrates, the absence of separate and adequate representation for the unique interests of the future-looking (b)(2) class is fatal. In *Amchem* and *Ortiz*, the Supreme Court considered efforts to create global settlements regarding asbestos-related injuries. A key problem identified in both cases was the tension between present claimants who had already developed symptoms from asbestos exposure, and "exposure-only" plaintiffs who were in jeopardy, but as yet had no injury. The former (like the (b)(3) class here) wanted the greatest possible relief for existing claims; the latter (like the (b)(2) class here) wanted the greatest possible protection for future claimants. In both cases, the Supreme Court insisted on sub-classes with separate representation "to eliminate conflicting interests of counsel," and condemned the settlements because "[n]o such procedure was employed [t]here." *Ortiz*, 527 U.S. at 856; *see also Amchem*, 521 F.3d at 620. "No such procedure was employed here" either.

Perhaps the closest case on point is this Court's recent rejection of the settlement in *Literary Works* on grounds of inadequate representation. There,

73

digital database owners wanted a global settlement with copyright holders about the works in the database. The settlement recognized that three different kinds of copyright claims with different values were at issue, and so it provided different relief for the three subgroups. It did not, however, provide them separate representatives in bargaining for that outcome.

Noting that "*[o]nly* the creation of subclasses, *and the advocacy of an attorney representing each subclass*, can ensure that the interests of that particular subgroup are in fact adequately represented," this Court rejected the settlement. *Literary Works*, 654 F.3d at 252 (emphasis added). Even if class representatives themselves belonged to each group, and so had some incentive to look out for each group of claims, "[t]he selling out of one category of claim for another [wa]s not improbable." *Id*. To avoid that risk, each subgroup needed its *own* representative and its *own* separate counsel, so there was always someone who "advanced the strongest arguments in favor of [each category's] recovery." *Id.* at 253. And yet that feature is as absent here as it was in *Literary Works*.

## C.    There is no substitute for independent and adequate representation.

The settlement proponents and the district court offered two responses to the failure to provide independent representation to the (b)(2) class here. Both are unpersuasive and confirm that this settlement fails to satisfy Rule 23(a)(4).

### 1.    *Overlap*

The district court evidently believed that the class representatives could represent both classes because they were members of both classes.  *See* SPA52 ("The Class Plaintiffs adequately represent both the (b)(2) and the (b)(3) settlement classes.").  This Court has already rejected that interpretation of Rule 23(a)(4) in a discussion the Supreme Court adopted wholesale in *Amchem*:

> [W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement *except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.*

521 U.S. at 627 (quoting *In re Joint E. and S. Dist. Asbestos Litig.,* 982 F.2d 721, 743 (2d Cir. 1992)) (emphasis added); *see also Eubank v. Pella Corp.*, 2014 WL 2444388, *3 (7th Cir. June 2, 2014) (calling a single set of representatives agreeing to nationwide settlement on behalf of two subclasses a "red flag[]").  It is thus dispositive that in the negotiation of this settlement, there has never been any class counsel or class representative who has bargained solely for the benefit of the (b)(2) class.

Moreover, the "overlap" between the (b)(2) and (b)(3) classes should not be misunderstood or overstated.  As an initial matter, the membership is *not* the same:

There are tens of thousands of now-defunct merchants belonging only to the (b)(3) class; and there are millions of other merchants that have been newly created, will be created in the future, or opted out, and thus belong only to the (b)(2) class.[13]

The problem is exemplified by future merchants that start their businesses after 2021, when the settlement relief expires.  Such merchants will have no right to complain about any Visa or MasterCard practice that is "substantially similar" to any aspect of today's rulebook or current unwritten practices.  Those unlucky future merchants do not even exist yet, but this settlement has already deprived them of all the claims they might ever have against Visa and MasterCard.  What will they have received in exchange?  Literally nothing.  Meanwhile, existing merchants founded after November 2012 may be able to surcharge—for a few years, if they operate in the right state, and they don't take American Express—but unlike the class representatives who purported to act on their behalf, they have no claim whatsoever on defendants' settlement fund.

Failing to provide separate representation to this enormous class of future merchants is an egregious version, on an even-shorter time frame, of the

---

[13]    It is easy to miss the size of the future merchant class whose interests the settlement completely ignored.  The number of new firms founded in the United States each year is in the hundreds of thousands.  Accordingly, the class of future merchants launching after the settlement date—merchants who would have no interest in a monetary settlement—will likely include *many* millions of members.  That class alone would be among the most sprawling commercial classes ever certified.

representation problem identified in *Stephenson*. There, Agent Orange claimants who did not discover their injuries until after 1994 were left uncovered by a 1984 settlement. *See* 273 F.3d at 260-61. This Court found that, because they lacked effective representation in the 1984 settlement, the Due Process Clause prohibited applying the judgment to them. That a similar class of millions here received no independent consideration or voice in the settlement makes absolutely clear that the representation afforded to the (b)(2) class did not measure up to the necessary standard according to the four-square holdings of precedents like *Stephenson*, *Literary Works*, *Amchem*, and *Ortiz*. Representatives focused exclusively on the (b)(2) class's interests would not have left such future interests out in the cold.

Those who opted out of the (b)(3) class here likewise deserve special attention because they demonstrate the deep structural anomaly of this case. In a typical (b)(3) case, there is little concern regarding class counsel's representation of those plaintiffs who have opted out, at least once they have left the case: Their claims are no longer subject to adjudication by representation, and they can hire their own lawyers to protect their own interests in opt-out litigation. But here, those that opted out of the (b)(3) class remained bound as members of the (b)(2) class to the very attorneys and class representatives who negotiated the settlement the opt-outs were rejecting as members of the (b)(3) class. In fact, those representatives were exclusively parties and lawyers who, *unlike the (b)(3) opt-*

*outs*, remained interested in the money that could be obtained by trading away the rights of the (b)(2) class for a global settlement. Accordingly, as members of the (b)(3) class opted out but remained bound to the (b)(2) class, the misalignment of their interests with those of their representatives only became worse.

### 2. Results

Although both class counsel and the district court touted the magnitude of the monetary settlement, the results of the negotiations in no way suggest that the (b)(2) class received adequate representation. Positive results, even if "fair" to all members, are no substitute for adequate representation. *See, e.g.*, *Literary Works*, 654 F.3d at 253 ("The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?"). In any event, the results here are unfair, which furnishes additional evidence of the (b)(2) class's inadequate representation. *See id.* at 252-54 (noting that *Amchem* permits courts to find Rule 23(a)(4) violations based on settlement results).

Other briefs discuss the fairness of the settlement as such, but it suffices for these purposes to focus on just one comparison. As detailed above, *supra*, at 15-17, 22-23, the (b)(2) class obtained (at best) some relatively inconsequential rule changes in exchange for a dramatic release of claims. The (b)(3) class, meanwhile, got billions of dollars.

78

This comparison reflects poorly on the representation of the (b)(2) class, and eviscerates the district court's rationale for concluding that the settlement was fair with respect to those class members.  For example, the district court repeatedly emphasized its belief that the class claims faced hurdles to success on the merits.  But that reasoning cannot explain the stark contrast between the size of the cash settlement for the (b)(3) class and the narrowness of the relief for the (b)(2) class.  Each class's claims would have similar merit, as they are distinguished only by the date on which the damages accrue.

Ultimately, it is clear that the (b)(2) class was a means to the broader end of global resolution, not an end in itself with rights that received independent and adequate representation.  The settlement fund in this case is large[14] and as the outcome fully attests, there was simply no structural assurance that class representatives and counsel with a claim against that sum had a sufficient incentive to prevent the (b)(2) class's interests from being sacrificed in its pursuit.  If anything, that sum's size simply shows the value to defendants created by the mismatch between the (b)(2) class's broad and mandatory release of future claims and the meager future-looking relief that the (b)(2) class secured.

---

[14]     To the banks, of course, the amount is relatively inconsequential—less than two months' worth of interchange fees.

**IV.  By Releasing All Future Antitrust Claims, Including Claims That Far Exceed The Scope Of The Complaint, The Settlement Violates Controlling Precedent And Exceeds The Power Of A Federal Court.**

The settlement separately fails because the (b)(2) release exceeds the permissible scope of a class-action settlement.  The effect of that release is to immunize Visa and MasterCard from future antitrust challenges, as well as an array of other claims that could not have been resolved by the Complaint.  That release extends broadly in both time and subject matter—sweeping aside essentially all present and future claims that merchants may have, but granting only limited relief—whether or not the extinguished claims are ripe or have anything to do with the core complaints in the case.  Putting to the side that this is bad antitrust policy, it is not the proper business of settling parties and federal courts.

**A.  The settlement unlawfully releases future antitrust claims.**

This Court has long recognized that antitrust claims are uniquely laden with public concerns.  In *American Safety*, for example, this Court explained that "[a] claim under the antitrust laws is not merely a private matter.  The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest."  *Am. Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968).  That is so because "[a]ntitrust violations can affect hundreds of thousands—perhaps millions—of people and

inflict staggering economic damage." *Id.*  The Supreme Court has thus affirmed that private agreements cannot waive future antitrust claims without violating public policy.  *See, e.g.*, *Italian Colors*, 133 S. Ct. at 2310; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (If a private agreement "operated … as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.").

This doctrine is fully applicable to settlement agreements that purport to resolve future antitrust claims under the auspices of a federal court.  In *Lawlor*, 349 U.S. at 328-29, the Supreme Court stated that "extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case … would in effect confer on [defendants] a partial immunity from civil liability for future violations."  The Court then held that, given "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," conferring such "a partial immunity from civil liability for future violations … is consistent with neither the antitrust laws nor the doctrine of res judicata."  *Id*. at 329.  Accordingly, even though the suit in *Lawlor* was brought by the *very same plaintiffs* who had earlier settled a case brought on the same antitrust theory, the Court reversed a decision giving that settlement preclusive effect as to the same conduct undertaken after the settlement date.  *Id.*

81

Federal courts since *Lawlor* have consistently disapproved settlements that purported to absolve parties from liability for future violations of the antitrust laws. *See, e.g., Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994); *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *Minn. Mining & Mfg. Co. v. Graham-Field, Inc*., 1997 WL 166497, *3 (S.D.N.Y. Apr. 9, 1997).

The (b)(2) release in this case violates *Lawlor* and *Soler* by waiving antitrust claims with respect to future conduct.  As discussed, it applies to all of defendants' present rules and unwritten practices, as well as any new rules or conduct that are "substantially similar."  SPA171 (Settlement ¶68(g)-(h)).  The release also expressly bars claims concerning the "future effect" of that conduct, even if competitive conditions change dramatically.  *Id.*; SPA173-74 (Settlement ¶71); *supra*, at 16-17.  From defendants' perspective, this was the whole point.  *Supra*, at 69.

**B.     The settlement unlawfully releases claims beyond the scope of the present litigation.**

Because the settlement is a private agreement conferring antitrust immunity, the Court could simply stop there and invalidate it under *Lawlor* and *Soler*.  But that would severely understate the scope of the problem.  This is not merely a

private agreement by one party not to sue another in the future for a violation affected with the public interest; instead, it is a *mandatory* settlement that prevents merchants—the parties most susceptible to defendants' market power—from challenging anticompetitive conduct *forever*. That converts the settlement from a private agreement that violates the antitrust policy of the United States into one that actively tries to make industrial policy for the whole United States credit-card market. The implications for consumers in the form of higher credit card fees and higher prices for goods are obvious. Settled principles of class-action law prevent such a broad, future-looking release of claims.

This Court has held that any release in a class-action settlement is limited to the claims that could be precluded by a judgment against the class following a trial. *See Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16-18 (2d Cir. 1981) (Friendly, J.) ("If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either."); *Literary Works*, 654 F.3d at 247 (class release may not extend beyond "claims that were or could have been pled"). This limitation is referred to as the "identical factual predicate" doctrine, and it limits class-action releases to only those claims that were pled or could have been pled on the *precise* facts before the court. *See, e.g.*, *TBK*, 675 F.2d at 460.

This doctrine imposes two kinds of limitations.  First are limits in *time*:  A settlement cannot release future claims based on later arising facts not yet before the court.  Second are limits in *scope*:  A settlement cannot release kinds of claims beyond those properly at issue in the case.  The settlement in this case contravenes both limitations.

### *1.     The settlement improperly releases unripe future claims.*

Claims related to future conduct are unripe—the conduct has not happened yet—and so fall outside the jurisdiction of the court and the factual predicates of the class-action case before it.  *See, e.g.*, *Prime Mgmt. Co., Inc. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990) ("While a previous judgment may preclude litigation of claims that arose 'prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'") (quoting *Lawlor*, 349 U.S. at 328).  Indeed, releasing future conduct that occurs in an unknown factual context poses severe dangers to class members—especially where, as here, they have no opportunity to protect themselves by opting out.  *See generally* James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*, 91 N.C. L. Rev. 387 (2013) (explaining dangers associated with allowing class-action settlement agreements to release future conduct).

In *Literary Works*, this Court suggested that an opt-out class-action settlement could release future copyright-infringement claims because a trial in that case would have resolved whether the defendants could legally "continue to sell and license the works" at issue. *See* 654 F.3d at 248. But that doctrine cannot be extended to this case's damages release for three reasons.

First, unlike the injunctive claim regarding future use in *Literary Works*, which by definition was forward-looking, the varied antitrust damages claims released here depend on market conditions and competitive impacts that can only be assessed based on existing or past factual circumstances—circumstances that will likely change in the future and could not possibly have been litigated in this case. Restraints of trade evaluated under the rule of reason do not ripen into antitrust violations until anticompetitive effects are shown. *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006).

Second, the claims that were released in *Literary Works* are always released in a future-looking way. Copyright claims are amenable to *licensing*; indeed, the settlement was conceived of as a "continuing license." *See* 654 F.3d at 247. Unlike antitrust law, the very essence of copyright is the power to release future infringement claims in exchange for present consideration. *See, e.g.*, Grimmelmann, 91 N.C. L. Rev. at 409-10.

Finally, *Literary Works*—like other cases applying the "identical factual predicate" doctrine, even outside the context of future claims—was not a mandatory settlement.[15]  Not only did it allow class members to opt out, but it specifically allowed them to withhold a future-looking license and preserve their statutory right to bar future use of their copyrighted works.  654 F.3d at 247.

Citing *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1977), the district court held that future claims could be released because the legality of defendants' rules was an "unsettled question."  SPA45.  But *Robertson* is inapposite.  It addresses a different doctrine that would condemn even a settlement confined to the matters properly before the court if it allowed the perpetuation of clearly illegal behavior. *See Robertson*, 556 F.2d at 686.  *Robertson*, which predates *Super Spuds*, in no way suggests that a class-action settlement can release claims regarding future conduct not before the court so long as the conduct is arguably kosher.  As Judge Friendly recognized in *Super Spuds*, the issue is not just the legality of the conduct released, but the extent to which that conduct is subject to the power of the court

---

[15]     *See, e.g.*, *Wal-Mart*, 396 F.3d at 112 (agreeing with analysis in prior case that release "was not problematic" because, *inter alia*, it provided class members "the opportunity to opt out"); *Weinberger v. Kendrick*, 698 F.2d 61, 77 (2d Cir. 1982) (distinguishing *Super Spuds* on grounds that released claims were added before class certification, and settlement "afforded an opportunity to opt out"); *Super Spuds*, 660 F.2d at 19 (distinguishing prior case with broad release because class members could opt out).

and the class representatives, which are both limited to resolving the particular case or controversy implicated by the facts and claims at bar.

To be sure, courts will frequently have the instinct—even the correct view—that approving a prospective regime agreed to in a global settlement will achieve more for the parties or public than disapproving it. But especially in a commercial case with no opt-out rights, a settlement that attempts to "implement a forward-looking business arrangement" for an entire industry, "without permission of the [class members]," simply goes "too far." *Google Books*, 770 F. Supp. 2d at 669. Enforcing the established bars on releasing future antitrust claims not properly before the court respects the limited role of federal litigation and ensures that class actions remain a respected tool in the service of proper goals. Conversely, allowing class actions to release claims against future conduct by all prospective plaintiffs—as this one does—is an invitation for private parties to engage in industry-wide regulation that is more likely than not to prioritize parochial goals over the public good.

### 2. *The settlement improperly releases present claims beyond the scope of the case.*

Even the *present* claims that the settlement releases extend well beyond the "identical factual predicate" of the claims that were actually brought. The district court recognized the case's proper scope: it concerned four categories of allegedly anticompetitive network rules—default interchange rules, certain "anti-steering"

rules, certain "exclusionary" rules, and "Honor-All-Cards" rules—which have "allow[ed] Visa and MasterCard and the issuing banks to set supracompetitive default interchange fees."  SPA18-19.  At a minimum, the "identical factual predicate" doctrine would limit a class-action release to such claims alone.

But the releases are in fact much broader.  They unambiguously bar claims based on *any* of defendants' current rules and practices—as well as substantially similar future conduct—not just claims based on the four categories of allegedly anticompetitive rules and the resultant default interchange fees.  *Supra*, at 15-17.  The releases even purport to bar damages claims concerning the FANF, which appears nowhere in the Complaint because it was implemented in April 2012, *three years after merits discovery had closed*.

The over-breadth of the Rule 23(b)(2) release is exacerbated by the settlement's definition of "Rule 23(b)(2) Settlement Class Releasing Parties" as including "subsidiaries" of any class member, without geographic limitation.  SPA166 (Settlement ¶66); SPA88 (Judgment ¶16(a)).  This definition facially encompasses British supermarket chain ASDA—a subsidiary of appellant Wal-Mart Stores, Inc.—which is now litigating claims in European Union courts seeking substantial monetary relief for anticompetitive conduct abroad.  *See* JA[__]{DE2644 (Wal-Mart Obj. ¶¶56-58)}.  Thus, ASDA, which cannot be a member of either class and receives nothing from the settlement, could face the

88

argument that its extra-territorial claims, which are well outside this case's factual predicate, are subject to the (b)(2) release as well.

The problem goes even deeper. The settlement proponents and the district court incorrectly portrayed the scope of the release as limited to the factual predicates of the case because it covers only existing rules and those that are "substantially similar." SPA44-47. This fails to recognize that a "rule" could have very different effects in different factual contexts.

The history of the Honor-All-Cards rules, and defendants' exploitation of them to suppress competition, illustrates the point. Honor-All-Cards rules that were introduced in the 1960s and applied solely to credit cards were utilized by Visa and MasterCard in the 1990s to extend their market power into the emerging market for debit transactions—tying practices that resulted in the *Visa Chec*k settlement, which this Court approved. JA[__]{DE455-4 ¶4; DE455-5 ¶4}(settlement provisions requiring revisions to Honor-All-Cards to untie debit from credit).

Here, counsel for defendants made clear that Visa and MasterCard have every intention to use their Honor-All-Cards rules again as a tying device—this time by linking mobile payments to payments made with traditional payment cards. *See supra*, at 26-27. To the extent they do so, such claims would depend on future facts, including the extent to which the application of the Honor-All-Cards

89

rules to mobile payments suppresses competition in those technologies.  And this is only one of innumerable future factual scenarios in which the application of an "existing" or "substantially similar" *rule* would result in future *conduct* with radically different, anticompetitive effects.

The effect of a mandatory release of claims of such breadth for eternity is to replace the statutory rights and remedies that Congress has provided with a privately negotiated, quasi-regulatory regime for the credit-card industry going forward.  As Judge Chin recently recognized, this is not properly the business of settling parties and federal courts.  In *Google Books*, the court recognized that a large part of the settlement was directed to "future and ongoing arrangements … [that] would release Google (and others) from liability for certain *future* acts."  770 F. Supp. 2d at 676-77.  The court rightly concluded that "this second part of the [settlement] contemplates an arrangement that exceeds what the Court may permit under Rule 23," because it is "an attempt to use the class action mechanism to implement forward-looking business arrangements that go far beyond the dispute before the Court in this litigation."  *Id.* at 677.  Such matters, the court noted, are for Congress, and not the federal courts.  The same is true here.  Indeed, the result here looks even more like legislation, because objectors to the *Google Books* regime for the future of that industry at least had the right to opt out.

90

## **CONCLUSION**

The judgment should be reversed.

Dated:  New York, New York
          June 16, 2014

                                        Respectfully submitted,

                                        /s/ Thomas C. Goldstein

Stephen R. Neuwirth[*]                  Thomas C. Goldstein[*†‡]
Sanford I. Weisburst                    Eric F. Citron
Steig D. Olson                          GOLDSTEIN & RUSSELL, P.C.
Cleland B. Welton II                    5225 Wisconsin Avenue, N.W.
QUINN EMANUEL URQUHART &                Suite 404
   SULLIVAN, LLP                        Washington, DC 20015
51 Madison Avenue
22nd Floor                              Michael J. Canter[‡]
New York, NY 10010                      Robert N. Webner
                                        Kenneth J. Rubin
Jeffrey I. Shinder[†]                   VORYS, SATER, SEYMOUR
Gary J. Malone                             AND PEASE LLP
A. Owen Glist                           52 East Gay Street
CONSTANTINE CANNON LLP                  Columbus, OH 43215
335 Madison Avenue
9th Floor                               Gregory A. Clarick[‡]
New York, NY 10017                      CLARICK GUERON REISBAUM LLP
                                        40 West 25th Street
                                        12th Floor
                                        New York, NY 10010

                  *(Parties listed on following pages.)*

*Attorneys for Objector-Appellant Home Depot U.S.A., Inc.

†Attorneys for Plaintiffs-Appellants
 Coborn's Incorporated; D'Agostino Supermarkets, Inc.; Jetro Holdings, LLC;
 Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience
 Stores; National Community Pharmacists Association; National Cooperative
 Grocers Association (NCGA); National Grocers Association; National
 Restaurant Association; and NATSO Inc.;
And for Objectors-Appellants
 7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports Outdoors; Aldo US Inc.
 d/b/a Aldo and Call It Spring; Alon USA, LP (Alon Brands); Amazon.com, Inc.;
 American Eagle Outfitters, Inc.; Barnes & Noble, Inc.; Barnes & Noble College
 Booksellers, LLC; Best Buy Stores, L.P.; BJ's Wholesale Club, Inc.; The William
 Carter Company (Carter's); Costco Wholesale Corporation; Crate & Barrel
 Holdings, Inc.; Darden Restaurants, Inc.; David's Bridal, Inc., DBD Inc. and
 David's Bridal Canada Inc.; Dick's Sporting Goods, Inc.; Dillard's, Inc.; Family
 Dollar Stores, Inc.; Drury Hotels Company, LLC; Foot Locker, Inc.; Gap Inc.;
 GNC Holdings, Inc. (General Nutrition Corporation); Genesco Inc.; The
 Gymboree Corporation; HMSHost Corporation; IKEA North America Services,
 LLC; J. Crew Group, Inc.; Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon
 Petroleum LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; National
 Railroad Passenger Corporation d/b/a Amtrak; Nike, Inc.; Panda Restaurant
 Group, Inc.; Panera Bread Company; P.C. Richard & Son, Inc.; PETCO Animal
 Supplies, Inc.; PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational
 Equipment, Inc. (REI); Roundy's Supermarkets, Inc. d/b/a Pick 'N Save,
 Rainbow, Copps, Metro Market and Mariano's; Sears Holdings Corporation;
 Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Thermo Fisher
 Scientific Inc.; The Wendy's Company; The Wet Seal, Inc.; Whole Foods Market,
 Inc.; Zappos.com, Inc.; Fleet Wholesale Supply Co., Inc.; Mills Motor, Inc.;
 Mills Auto Enterprises, Inc.; Willmar Motors, LLC; Mills Auto Center, Inc.;
 Fleet and Farm of Alexandria, Inc.; Fleet Wholesale Supply of Fergus Falls,
 Inc.; Fleet and Farm of Green Bay, Inc.; Fleet and Farm of Menomonie, Inc.;
 Mills Fleet Farm, Inc.; Fleet and Farm of Manitowoc, Inc.; Fleet and Farm of
 Plymouth, Inc.; Fleet and Farm Supply Company of West Bend, Inc.; Fleet and
 Farm of Waupaca, Inc.; Mills E-Commerce Enterprises, Inc.; Brainerd Lively
 Auto, LLC; Ashley Furniture Industries Inc.; Beall's, Inc.; Boscov's, Inc.; The
 Buckle, Inc.; Buc-ee's Ltd.; The Children's Place Retail Stores, Inc.; Cracker
 Barrel Old Country Store, Inc.; Cumberland Farms, Inc.; Express, LLC; Family
 Express Corporation; New York & Company, Inc.; Republic Services, Inc.;
 Swarovski U.S. Holding Limited; and The Talbots, Inc.

‡*Attorneys for Objectors-Appellants*

*Target Corporation; Macy's, Inc.; Kohl's Corporation; The TJX Companies, Inc.; Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.; Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.; Ascena Retail Group, Inc.; Abercrombie & Fitch Co.; OfficeMax Incorporated; Saks Incorporated; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.; Luxottica U.S. Holdings Corp. and American Signature, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with this Court's order dated May 27, 2014 (ECF No. 936), granting leave to file an oversized brief, because it contains 20,992 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

<u>/s/ Thomas C. Goldstein</u>

94